Hcj6ameo

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    AMERICAN CIVIL LIBERTIES
     UNION,
4
                   Plaintiff,
5
              v.                           17 CV 3391(PAE)
6
     DEPARTMENT OF DEFENSE, et al.,
7
                   Defendants.
8
     ------------------------------x
9                                          New York, N.Y.
                                           December 19, 2017
10                                         3:00 p.m.

11   Before:

12                    HON. PAUL A. ENGELMAYER,

13                                         District Judge

14                           APPEARANCES

15   ACLU
          Attorneys for Plaintiff
16   BY:  BRETT M. KAUFMAN
          ANNA N. DIAKUN
17
     DEPARTMENT OF DEFENSE
18        Attorneys for Defendants
     BY:  REBECCA S. TINIO
19        SARAH NORMAND

20

21

22

23

24

25

Hcj6ameo

1          (Case called; in open court)

2          THE COURT:  We're here for oral argument now on the

3     cross-motions that have been made.  I have thought about it and

4     it seems to me it probably makes as much sense as anything for

5     the ACLU to go first on these motions.  It could have been done

6     either way, but I think that makes at least the most sense.

7          I will hear from the ACLU first.

8          MR. KAUFMAN:  Thank you, your Honor.

9          Here is what we know:  The government acknowledges

10    that in January 2017 it successfully conducted an intelligence

11    gathering raid against AQAP, a terrorist group in Yemen.  In an

12    effort to defend the raid after public criticism surrounding

13    the resulting deaths of a Navy SEAL and multiple Yemeni

14    civilians, the President's press secretary emphasized that the

15    raid was approved after an extensive planning process.  To

16    illustrate that process, the press secretary pointed to a White

17    House meeting between the President and a small group of top

18    national security officials, specifically including the

19    director of the CIA, at which the raid was approved, and then

20    the President boasted about the raids intelligence bounty in

21    his very first speech to Congress.

22          The CIA bears the burden of demonstrating that its

23    Glomar response to plaintiff's FOIA request is both logical and

24    plausible; but given these facts, the agency simply cannot do

25    so because the only thing that responding to the request would

Hcj6ameo

1    reveal, the agency's intelligence interest in the raid is

2    already known.  Moreover, under these circumstances that is

3    exactly what the drafters of the FOIA would have expected.  One

4    of the main purposes of the FOIA was to end the government's

5    practice of selective disclosure especially concerning national

6    security matters.  The CIA's Glomar response in this case is

7    simply an effort to engage in that practice and respectively

8    this Court should reject it.

9          Your Honor, I would like to just try to address some

10   of the things that came up in the government's reply brief from

11   last week.  I will go through it and note where I think a

12   comment is required.  So first I want to clarify the Glomar

13   standard that is at issue here because there is some back and

14   forth about the Court needs to decide.  I think the parties

15   agree that the question here is whether responding to the

16   request would cause harm under Exemption 103, and demonstrating

17   that is the agency's burden here.  In order to carry that

18   burden, the CIA's justification of those harms must be logical

19   or plausible.

20         THE COURT:  Logical or plausible is what comes from

21   the D.C. Circuit decision that deals with Glomar, but there is

22   a suggestion from the back side from the defense brief that the

23   Wilson standard is different.

24         Can you harmonize the Wilson standard, which talks

25   about the disclosure being appropriate only if it is -- I think

Hcj6ameo

1    you know the sound bite from page 187 of Wilson.  I will not

2    read the whole thing aloud.

3              MR. KAUFMAN:  Yes, your Honor.  This is a point that

4    is worth clarification.  So the standard on any FOIA response

5    is logical or plausible.  I think the D.C. Circuit in *Drones*

6    *FOIA* the court explains that a case like this, which we think

7    is very close to the *Drones FOIA* case, involves an intersection

8    of these two kinds of cases.  So in regular FOIA cases,

9    including Glomar cases, the ultimate question is whether the

10   government's response is logical or plausible.

11             The Wilson standard, which comes from the D.C.

12   Circuit, and so the D.C. Circuit has addressed that same

13   standard through what in the D.C. Circuit is the Wolf standard,

14   asks how we determine whether a piece of information has been

15   officially acknowledged by the government.  A case like this

16   involves both of those tests, both of those strands.  So when

17   we talk about the government's ultimate burden in this case, I

18   think the government would agree that its burden is to

19   demonstrate that its response is logical and plausible.

20             THE COURT:  Look, Wilson says -- and we're dealing

21   here with whether there has always been an official

22   disclosure -- that classified information is deemed to be

23   officially disclosed only if it is "as specific as the

24   information previously released" matches the information

25   previously disclosed.  It is another dimension of that, but

5

Hcj6ameo

1    we'll skip that.

2         The issue that is presented then is how specific the

3    information that would result if you are to prevail at this

4    step would then be?  Because, yes, there has been some form of

5    disclosure through the press secretary, but it has been of

6    necessity at an extremely abstracted high level.  So maybe the

7    answer is you clear the step but then ultimately wind up

8    getting a very abstracted level response at the next step.

9         I welcome your explaining to me how you square your

10   bid here, which seems to be calling for a disclosure point by

11   point as to the five different dimensions of your FOIA request

12   with Wilson which says official disclosure works only at a

13   specific level.

14        MR. KAUFMAN:  That is a good question, your Honor.  So

15   the stage that we're at now we're talking about just

16   responding, period.  We're not talking about the details of

17   that response.  We're not talking about whether any document

18   will actually ever be disclosed to the plaintiffs.  We're not

19   even talking about a Vaughn Index at this point.  What we're

20   talking about is whether the government's claim that something

21   that has not been acknowledged will be revealed if it merely

22   says, Yes, we have a record.  That is the stage that we're at.

23        Just to back up a little bit, in the end as we

24   explained in our opening brief, there are several ways to

25   combat a Glomar response.  The first is simply if the agency

Hcj6ameo

1   doesn't do its job to explain why the answer is logical or

2   plausible.  We cite a bunch of cases where that has happened --

3   *Phillippi* is one -- where the Court just simply rejections the

4   explanation on its face without the introduction of any kind of

5   contrary evidence or official acknowledgment.  The other side

6   is when information has been disclosed by the government in an

7   official capacity and that information is the same as the

8   information upon which the agency is basing its Glomar

9   response, and we think that is the situation we're in right

10  now.

11          THE COURT:  Explain that.  I am not sure I follow what

12  you just said.

13          MR. KAUFMAN:  Sure.  In the end so justify a Glomar

14  response, the government has to point to some protected fact

15  that would be revealed if it says it has records because that

16  is the minimal step that we're asking for with this motion.

17          THE COURT:  You want to clear this and fight another

18  day as to how generic or specific the Vaughn Index need be?

19          MR. KAUFMAN:  Absolutely, your Honor.

20          THE COURT:  But you understand that if you take

21  literally the Wilson standard, it has significant implications

22  for any Vaughn Index; right?  The point is if you get past the

23  Glomar response because the CIA's response in the Vaughn Index

24  need not be specific, you wind up in the situation where the

25  Vaughn Index could be essentially utilizing the latitude that

Hcj6ameo

1    Judge Garland cites in the D.C. District case at a very generic

2    extracted level at which it might be unrevealing to you.

3              MR. KAUFMAN:  This is true.  There is no way to

4    contest that, your Honor.  In the *Drones FOIA* itself after

5    winning the D.C. Circuit argument and that opinion, we actually

6    didn't receive any documents.

7              THE COURT:  How generic versus specific was the Vaughn

8    Index that you got?

9              MR. KAUFMAN:  Well, we didn't get a Vaughn Index in

10   that case.

11             THE COURT:  What happened in that case in the

12   subsequent history?

13             MR. KAUFMAN:  On remand the government described

14   categories of records that it had and described why it should

15   be withheld.  We challenged those and ultimately lost in a

16   non-published opinion.

17             THE COURT:  How generic, if you will, were the

18   categories that the government put in its Vaughn Index

19   substitute in effect?

20             MR. KAUFMAN:  What I recall from that the case is that

21   the government said, We have a set of legal memos, and said

22   very little more than that.  It explained why it believed that

23   those documents would merit withholding under the FOIA.

24             THE COURT:  Even that would arguably be more specific

25   than has previously been disclosed here.  In other words, sure,

Hcj6ameo

 1    at a very high level I understand your argument why there has

 2    been an intelligence interest expressed in the sense that at

 3    the front end Director Pompeo was in the room.  To quote

 4    Hamilton, He is there at the time of the decision that is taken

 5    and in the back there is intelligence material that is

 6    received.  Although, it is not specifically said that it goes

 7    to the CIA.  Perhaps in contrast to another agency.

 8              There is nothing here that is disclosed that says

 9    that, for example, the CIA rendered any legal judgment as to

10    the raid or that its legal operative had anything to do with

11    this or for that matter the CIA possesses the fruits of another

12    agency's legal analysis.  So even at the abstract level at the

13    highly generalized level at which the agency responded in this

14    D.C. Circuit case, even that may be more specific than had been

15    specifically disclosed here.  In other words, when you

16    chronicle what Judge Garland looks at in that decision, he

17    keeps writing, And there is more and there is more and there is

18    more.  That discussion in our case is only a few sentences.

19              MR. KAUFMAN:  It is true that in this case what we

20    have put forward so far we're not claiming has acknowledged

21    anything beyond the intelligence interests that we think

22    defeats the agency's Glomar response.

23              The questions that you are discussing, your Honor, are

24    things for a later motion.  It will be up to the government to

25    decide how it wants to categorize responsive records after it

Hcj6ameo

1   conducts a search, which it has not done yet.

2           THE COURT:  The question is what you are trying to

3   accomplish so.  If in effect you are making a doctrinal point

4   that this battle ought to be fought out not at the Glomar stage

5   but at the Vaughn Index or its functional equivilent stage, I

6   get the point.  If what you are trying to do is get actual

7   useable information from a FOIA request, the challenge

8   presented I think by the Wilson standard is you may get

9   information at such an abstracted level that it is negligible

10  utility.

11          MR. KAUFMAN:  Sure.  A couple responses, your Honor.

12  First, we think there is a clear public interest in the CIA

13  following the law.  And if it cannot justify as logical and

14  plausible a Glomar response in this case, it should be

15  rejected.  On a practical level, though -- this is evident in

16  the *Drones FOIA* case as well -- the agency issuing Glomar

17  responses that it cannot substantiate after a motion, really

18  just delays the entire process by months or possibly even

19  years.

20          THE COURT:  I take it you, as a repeat FOIA player,

21  have an institutional interest even if this FOIA request bears

22  no useful fruit at the end of the day in maintaining sense of

23  legal discipline about the parameters of Glomar?

24          MR. KAUFMAN:  Absolutely, your Honor.  We as the ACLU

25  but also the public as well because the standards that come out

Hcj6ameo

1    of cases like this govern how the agencies will treat future

2    FOIA requests.

3              THE COURT:  Let me ask you there is something unusual

4    in the CIA's response in that they did undertake some degree of

5    document review.  They represent that they took certain steps

6    to confirm the existence of records that would speak to the

7    presence of the CIA director at the January 25th working dinner

8    at which the raid was said to have been approved, and the

9    government says that that document review yielded nothing.

10             MR. KAUFMAN:  Yes.

11             THE COURT:  How do you process that?  Where does that

12   fit into the analysis?

13             MR. KAUFMAN:  It is hard to figure out what the CIA

14   was trying to do there.

15             THE COURT:  What is your take on its relevance?

16             MR. KAUFMAN:  I think that it has very little impact

17   on this case.  We argued in the brief that it sort of

18   undermines what the CIA is trying to accomplish.  Now, the CIA

19   claims what it searched for wouldn't be responsive to the

20   request.  That is a head-scratcher for us given that part of

21   our request addresses the approval process for the raid.  So

22   when the government said that it searched one office in the

23   CIA -- nothing more than that -- for documents over an

24   arbitrarily short time period -- this was not the last six

25   months up in until the time of the request.  I think it was

Hcj6ameo

over than less than a month that they chose and didn't explain

why.  They searched limited documents -- calendar entries of

the director and other sorts of what they call briefing

materials over a very short period of time.

THE COURT:  Your view is that there are other parts of

the CIA that would have had to be searched to determine

comprehensively whether the CIA had any records referencing the

January 25th dinner?

MR. KAUFMAN:  Absolutely.  I think under the case law

there is no question that when we asked the CIA for records, a

reasonable search would not be limited to one office.

THE COURT:  So help me with this.  Supposing we're

past Glomar and the CIA whatever the Vaughn Index would say is

obliged to search for records relating to the January 25th

dinner, where would they go in your view beyond where there

declarations say they went?

MR. KAUFMAN:  Well, I am not exactly sure of the

different compartments of the CIA where that would be true.  It

says the agency must take reasonable steps to search for

records where they would reasonably be expected to be located.

So the general counsel's office.  I don't know if there are

suboffices that deal with certain countries or certain kinds of

operations, but certainly not just the office of the director

himself.  They would need to search for those materials not

just from January 15 to February 15th or about what they did in

Hcj6ameo

1    this case, but they would need to search for them all the way

2    up until the time they began searching.  So the last nine or 10

3    months of eight or so months of material.

4            So to turn your question about the specificity

5    involved down the line, we have had some back and forth about

6    what Wilson requires and I think the Courts have tried to

7    implement what the Second Circuit did.  I don't think it is

8    relevant to this case here.  I think that very clearly we can

9    say that the acknowledgments we put forward are as specific as

10   the intelligence interests that we're claiming has been

11   revealed here.

12           THE COURT:  Because it is put at a general level, you

13   could wind up getting a response that simply says we are

14   unable, see Glomar in effect, to describe by character even the

15   nature of responsive materials.  It suffices to say all of them

16   fit within Exemption One or Exemption Three, and to describe

17   them with anymore texture would then be intention with Wilson.

18           MR. KAUFMAN:  That is possible, your Honor, but I

19   think it is a little premature to decide that.  The agency we

20   think should have to justify its responses to our requests,

21   perhaps prong by prong.

22           THE COURT:  What do you mean prong by prong?

23           MR. KAUFMAN:  Our request has five discrete

24   categories.

25           THE COURT:  That's exactly the problem.  That is

Hcj6ameo

1    exactly what I am trying to pin you down on.  In other words,

2    let's look at your five categories.

3              MR. KAUFMAN:  Sure.

4              THE COURT:  The first, and one we can go through the

5    exercise as to each of these, the legal and policy bases in

6    domestic foreign and international law upon which the

7    government evaluated or justified the raid, including but not

8    limited to records related to the designation of parts of Yemen

9    as "areas of active hostility" and the legal and factual basis

10   that the government uses in designating such areas.  That is

11   the first of your five prongs.

12             MR. KAUFMAN:  Sure.

13             THE COURT:  You are not arguing, are you, that Sean

14   Spicer when he spoke about the raid said anything about number

15   one, are you?

16             MR. KAUFMAN:  No, we're not.

17             THE COURT:  Here is the problem:  If you are later

18   going to direct or ask me to direct that the government in its

19   Vaughn Index or some functional equivalent thereof break out

20   its response by number one, versus two, versus three, versus

21   four, versus five, if the government gives a yes answer, yes,

22   we have records even if we claim that there are all exempt,

23   under number one they are admitting something that has not been

24   admitted by the official disclosure that you are basing your

25   opposite to Glomar on.

Hcj6ameo

My point being is if you are insisting that what follows at the next stage be broken out by one through five, you are walking into a Wilson problem.

MR. KAUFMAN:  Well, I am not sure that is right, your Honor.  I think this is a critical incident in *Drones FOIA*.  In *Drones FOIA* the D.C. Circuit said that an ordinary FOIA response by the CIA would not reveal whether the agency itself, as opposed to some other U.S. entity, such as the DoD, operates drones.  What it was doing there was understanding that the request did not seek information about the CIA.  It did not seek information that necessarily concerned the CIA.  But it did seek information in the CIA's possession.  What the D.C. Circuit said is even if the CIA does not operate drones and fly them around and use the lethal weapons attached to them, it is implausible that the CIA can stand here before us and say that it does not have an intelligence interest in drones.

THE COURT:  I am assuming for the time being that we get past your generic point that the CIA has an intelligence interest on the basis on the material you have rendered.  The issue is what comes next, and I thought earlier you were acknowledging that there is enough flexibility here that the CIA's response would not be required to hue to the five separate subparts that you have identified for precisely the policy reason implicit in Wilson.  Now you seem to be taking a firmer line and saying, in fact, you would expect that the

Hcj6ameo

1    CIA's Vaughn Index or other response would track your five

2    categories in your request.

3              MR. KAUFMAN:  I think what I am saying is I am not

4    sure what the agency will do.  In past cases where the

5    government lost the Glomar case either in the district court or

6    in the circuit and then on remand, the agency just abandoned

7    its response.  Florida is the most recent in this example.

8              THE COURT:  What do you mean abandoned its response?

9              MR. KAUFMAN:  For example, there are several Glomar

10   cases where a court will say, We don't buy this yet.  We're not

11   going to grant summary judgment to the agency.  Remand and the

12   court can determine how to move forward.  Rather than then try

13   to put forward a better justification or defend those responses

14   in a different way, the agency will just abandon them.

15             THE COURT:  Abandon them?  I am not sure what you are

16   saying.  What you are saying is that the agency acceded to a

17   court's ruling that there was not a valid Glomar court ruling

18   they have to abide by it or appeal.  The issue is at the next

19   step when they respond, will you be taking the position that

20   their response needs to be sorted by the five document calls or

21   requests that you made, or as you seem to indicate earlier and

22   as the drones strikes case seems to indicate and as the

23   subsequent history seems to embody, can the CIA answer in a

24   more generic way that doesn't provide a clear yes or no

25   category by category as to whether they have documents.

Hcj6ameo

1          MR. KAUFMAN:  Just to be clear, I am not dictating how

2    the CIA should respond.  I am merely arguing that it will be

3    the government's burden to defend whatever that response is.

4          THE COURT:  You are not arguing that if you prevail at

5    this stage, the CIA will necessarily be bound to construct its

6    response in a way that discloses requests by request yes or no

7    whether there are responsive materials.

8          MR. KAUFMAN:  I think that is one option and I think

9    it has happened in a variety of other cases where the agency

10   sort of break down which part of the response they are actually

11   going to give a Glomar to.

12         THE COURT:  Forgive me.  I understand that in some

13   cases, it works that way.  The issue is not whether that is one

14   possibility.  The issue is whether you're taking the position

15   that here the agency will be obliged to do that.

16         MR. KAUFMAN:  I would expect it that it could do that,

17   but as we say in our briefs we think it is premature to

18   determine what the agency's response will be.

19         THE COURT:  You would acknowledge that in other cases

20   intelligence agencies, national security agencies have been

21   permitted as in drones strikes to respond in a much more

22   abstracted level.

23         MR. KAUFMAN:  Absolutely.  Just to make this more

24   concrete, your Honor, as an example, and I don't think we need

25   to argue about these examples now, but we do think there are

Hcj6ameo

1    records that would be responsive that would have nothing to do

2    with this the CIA or at least what the government tries to

3    argue in this case that its operational interests -- sorry

4    operational role would be revealed.

5          For example, I think it is quite sensible to expect

6    that in the wake of this raid whether or not the CIA had boots

7    on the ground or provided live intelligence support or anything

8    of that nature, that the CIA might have a memorandum

9    summarizing the results of the raid.  The CIA might have

10   memoranda discussing individuals killed during DoD's raid and

11   that would say nothing about whether the CIA was actually

12   involved.

13         THE COURT:  What would be fact if the CIA held

14   documents that had been prepared by a sister agency?  Say the

15   beforehand legal analysis or the afterwards casualty analysis

16   or anything in between, what would that say about the CIA that

17   they possessed those records?

18         MR. KAUFMAN:  This is addressed in the briefs, your

19   Honor.  I think the CIA sort of misled the Court a little bit

20   in terms of how its regulation works in those circumstances.

21   We point this out in our reply brief.  The CIA has two options

22   when it happens records that have other agency information.  If

23   the records themselves are the agency's, let's say DoJ gave a

24   legal analysis to the CIA legal counsel, the CIA doesn't have

25   to produce those records as its own under FOIA.  It can refer

1  those records to DoJ and say, We have these in our possession

2  but DoJ is going to take care of those.

3  THE COURT:  There is a way in which the fact that the

4  CIA happened to be the possessor goes undisclosed as long as a

5  sister agency whose records they are then responds?

6  MR. KAUFMAN:  Correct.

7  THE COURT:  To the extent that the CIA, which is the

8  only one of the government defendants that has made a Glomar

9  response, hypothetically could possess records of another

10  agency.  If the CIA laterals those records to the DoD or DoJ,

11  what does the CIA's response then look like as it relates to

12  the records of another agency that it is tasking the other

13  agency with responding about?

14  MR. KAUFMAN:  For those kinds of records, it would

15  refer the records per its regulation to the other agencies, and

16  it may or may not disclose that fact in its declaration

17  responding to the request.  The other category of records

18  covered by the CIA's regulation are records that have other

19  agency information.  I think this is the category in which my

20  example falls into.  CIA discussion of the DoD's raid and

21  evaluation of the intelligence fruits or what have you, this

22  would be a CIA record and the CIA would -- it would be

23  responsive to our request.  The CIA could refer that record to

24  another agency so that agency can protect its own equities, but

25  then the CIA would be forced to defend the withholding of that

Hcj6ameo

1    information going forward.

2              THE COURT:  Other than derivative of the other

3    agency's point of view?

4              MR. KAUFMAN:  Yes.  Because what the structure of that

5    kind of example is that it is a CIA record but there is FBI or

6    DoJ or DoD information in it so those agencies might have an

7    equity in it, but the CIA would have to respond.  So when we

8    talk about going through the prongs --

9              THE COURT:  Why is it the case that that wouldn't then

10   reveal something that is unrevealed as yet by the Spicer

11   disclosure.  Spicer says one thing about the CIA plus CIA which

12   is that Pompeo was at the table at the time the decision was

13   made.  There is nothing said about whether he said anything.

14   There is nothing said about whether he was primarily there for

15   other agenda items.  We know he was present.  There is nothing

16   said about whether the intelligence fruits of the raid that are

17   later admitted by the President but also by spicer in a

18   subsequent press conference went to the CIA at all.

19              So the CIA's admission as you would have it in its

20   later stage FOIA response would be giving up the fact that the

21   CIA came to possess these intelligence fruits.  That is a new

22   fact the; right?

23              MR. KAUFMAN:  It may be, your Honor.  I think a lot of

24   this is why we think a lot of this is premature.  Now, from

25   what he put forward on this motion, we have been targeting the

Hcj6ameo

1   CIA's intelligence interest, which we think has been clearly

2   acknowledged.  Now, when the CIA comes back and says--

3           THE COURT:  Couldn't the intelligence interest be of

4   that of a different intelligence agency?  The CIA's interest is

5   as reflected in Pompeo's presence.  The government's

6   intelligence interest is perhaps admitted by the later press

7   conference but nothing then is said about the CIA specifically.

8           MR. KAUFMAN:  That is true, but in *Drones FOIA* and

9   also in the *Smith* case, you have acknowledgments that have

10  nothing to do with the CIA.  In *Drones* you have statements from

11  the President about the U.S. Drone program.  You had a

12  statement from John Brennan, who at that point was only working

13  in the White House and was not a CIA representative, also

14  speaking about the U.S. drone program, and what Judge Garland

15  said is that these acknowledgments, those first two, are

16  sufficient to acknowledge the CIA's intelligence interests.

17          THE COURT:  Is the *Drones FOIA* case the one that

18  breaks things out agency by agency, or is it addressed to the

19  agency as a collectivity for the purpose of that decision?

20          MR. KAUFMAN:  That opinion is about the CIA, your

21  Honor.

22          THE COURT:  In contrast to the others.  In other

23  words, was the CIA the only agency in that case that filed a

24  Glomar response?

25          MR. KAUFMAN:  Yes.

Hcj6ameo

1          THE COURT:  The others as here did not?

2          MR. KAUFMAN:  Correct.

3          THE COURT:  I will give you an opportunity to respond,

4    but I want to make sure that I have enough time with the back

5    table.  I think it is more fruitful at this point for me to

6    turn to them.

7          Government, before I begin hear what you have come to

8    stay so I understand the state of play with respect to the

9    other three defendants per the order issued November 17, I

10   understand that I will be receiving the DoD FOIA's response in

11   final form by January 31st and the others beforehand.

12         MS. TINIO:  Yes, your Honor.  DoD's response is the

13   only one still pending.  Everyone else has completed their

14   responses.

15         THE COURT:  Where do we stand then as to a Vaughn

16   Index as to the other three?

17         MS. TINIO:  Those are not yet due, your Honor.  Those

18   usually are prepared later on in the process.  So those would

19   actually be submitted as typical with summary judgment

20   briefing.  There is a whole process laid out in the Court's

21   November 17th order which, for example, directs the defendants

22   generally to provide general descriptions, not Vaughn, and

23   withheld records so that we may confer with the plaintiffs,

24   which is the next deadline to identify disputed issues.  That

25   hopefully would narrow the scope of the issues to be limited

Hcj6ameo

1    and at that point then the agencies would undertake to provide

2    Vaughns.

3              THE COURT:  So before we begin with the CIA

4    specifically, can you explain why it is that three of the

5    agencies are at least proceeding that far whereas the CIA and

6    the CIA alone is going the Glomar route?

7              MS. TINIO:  Absolutely, your Honor.  I recall that

8    that was a question that your Honor raised the last time we

9    were together and we endeavored to address that in numerous

10   ways in our papers and submissions.  So first the fact that a

11   military operation occurred in a specific place Al-Ghayil,

12   Yemen, on a particular date on, I think January 29, 2017, that

13   is a publically acknowledged fact.  We know that because

14   CENTCOM which is part of the DoD, your Honor, has issued press

15   releases acknowledging that a military operation occurred.  So

16   the DoD is not saying that to acknowledge the existence or

17   nonexistence of records would itself be a classified fact.

18   That is the effort of the Glomar, and DoD is not saying that

19   here.

20             THE COURT:  What about DoJ?

21             MS. TINIO:  DoJ likewise is not saying -- DoJ really

22   refers to the OLC and I think one other --

23             THE COURT:  Right.

24             MS. TINIO:  They likewise, as well as the Department

25   of State, are not saying that to acknowledge the existence or

Hcj6ameo

1    nonexistence of responsive records here with respect to the

2    raid that would not be classified as to DoJ and the Department

3    of State.  We've explained that as well.

4         THE COURT:  The reason, though, why DoJ is district

5    from the CIA is what?

6         MS. TINIO:  The CIA, as we set forth in our papers,

7    your Honor, has a very particular unique mission that the DoJ,

8    Office of Legal Counsel, for example, and the Department of

9    State, Office of Legal Advisor, they do not have.  That mission

10   is to conduct clandestine covert foreign operations and

11   counterintelligence activities and things of that nature.  It

12   can encompass a variety of different things, but the people of

13   the Office of Legal Counsel at DoJ are not engaging in

14   clandestine covert foreign operations, counterintelligence

15   activities and things like that.

16        So that is why the CIA has unique equities and because

17   of its unique mission that is why, not just in this case but in

18   other cases as well, the CIA often does find itself in a

19   position of having to assert a *Glomar* where other agencies do

20   not.  In our papers we identify a number of cases.  Some we

21   specifically identified in our papers, but there are numerous

22   ones where courts examine the CIA's Glomar on its own merits or

23   on their own merits and do not tie them to --

24        THE COURT:  Well, I am not saying you are estopped in

25   some sense or all the four different defendants need to track

Hcj6ameo

1   together; but I am trying to understand in as much of all them

2   were described as essentially being at the table on that day,

3   why it is that the CIA and the CIA alone is pursuing a Glomar

4   argument, i.e., they are saying that our intelligence interests

5   has been yet unrevealed.

6           MS. TINIO:  At table on that date may clarify --

7           THE COURT:  That they are identified by the White

8   House press secretary as having been participated or been

9   present for the President's review of the decision of whether

10  to undertake the raid.

11          MS. TINIO:  Absolutely.

12          THE COURT:  And all of the defendant agencies are in

13  effect listed as at the table or present for that discussion.

14  Only one of them is disclaiming intelligence interests.

15          MS. TINIO:  Your Honor, I would make a couple of

16  responses.  Preliminary I would note, for example, that the

17  statement that then press secretary Spicer made about that

18  dinner meeting that happened, he noted a number of people who

19  were there -- Mr. Brennan, Mr. Kushner, the Price President,

20  the President, Chairman of the Joint Chiefs of Staff General

21  Dunford, General Mattis, General Flynn, Director Pompeo.  It

22  actually was not the case that all four defendants were there.

23          THE COURT:  How does that help you?  That suggests

24  that the admission is more specific as to the CIA as being

25  present at the creation than, say, the OLC?

Hcj6ameo

1          MS. TINIO:  I am simply saying there is no reason to

2     tie them altogether and to link up how they rise and fall in

3     this particular case.

4          THE COURT:  Is the basis for the CIA's position that

5     this is just what the CIA does, that because the CIA wants to

6     not concede an inch because of its clandestine intelligence

7     mission, even where there has been public acknowledgment that

8     its leader was with the President when a mission was

9     authorized, that it still is going to say *Glomar*?

10         MS. TINIO:  Well, that is established by our

11    declaration and the more important point about that meeting,

12    your Honor, is that --

13         THE COURT:  I am sorry.  I am not sure you meant to

14    give that answer.

15         My question is:  Is the reason the CIA is making a

16    Glomar response here because it is just what the CIA does?  It

17    has a muscle memory of always saying Glomar even when the White

18    House press secretary to the world has said, CIA Director

19    Pompeo was there when this was decided?

20         Help me with that.

21         MS. TINIO:  Yes, your Honor.

22         THE COURT:  It feels like what you are saying is that

23    the CIA culturally and unusually more protective of its

24    interest as covered by Glomar than some of the other defendants

25    here.

Hcj6ameo

1          MS. TINIO:  Your Honor, thank you for inviting me to

2     clarify.  I misheard a different part of your question.

3          The CIA does not have some sort of automatically or

4     knee-jerk fashion protected culture to say that we have a

5     unique mission, not a more protected culture than a unique

6     mission in the unique equities.  I think going to one of your

7     Honor's questions before where you had said the CIA was at the

8     table, we would actually disagree with that characterization.

9     The CIA was not at table as described.

10          THE COURT:  Sorry.  In a sense of Langley wasn't at

11     the table, right, but the director of the CIA was at the table.

12          MS. TINIO:  Sure.  The director's presence as

13     established by the CIA's submissions and declarations, Director

14     Pompeo has different hats and has different roles.

15          THE COURT:  Does he have some job title other than

16     head of the CIA?

17          MS. TINIO:  No, but is he, for example, part of a

18     National Security Council.  He is part of other things simply

19     than representing the CIA's operation involvement.

20          THE COURT:  Forgive me.  In the various ex officio

21     roles he has, they are ex officio because the officio refers to

22     him as the CIA.  It is not as if he is also working for OLC or

23     something.  The only reason he is at any of the relevant

24     meetings is because of the job title he has at the CIA.

25          MS. TINIO:  Yes.

Hcj6ameo

1        THE COURT:  What does it mean to say the CIA wasn't at

2    the table?  Who else from the CIA could more embody the CIA

3    than Director Pompeo?

4        MS. TINIO:  Your Honor, as we have established in our

5    submissions, Director Pompeo as an advisor to the President,

6    among many other advisors, could be present at a meeting, which

7    is all then Press Secretary Spicer said.  He was at a meeting

8    where this was discussed.

9        THE COURT:  I am sorry.  You are asking me to assume

10   that Pompeo was there not because he is head of the CIA but

11   because he is a generally wise person in this area or something

12   like that.  I am not buying that.

13       MS. TINIO:  Not exactly, your Honor.

14       THE COURT:  He is there.  It's not as if so some

15   coherent alternative theory of what he is doing there has been

16   articulated.  He has the knowledge he has and the expertise he

17   has and the relevance he has as director of the CIA.

18       MS. TINIO:  Well, not exactly, your Honor.  Not in

19   terms of what you are saying; but, yes, he was there because he

20   as the title of CIA director.

21       But going to the requests as your Honor started to run

22   down, what our submissions establish is that Director Pompeo's

23   presence at a meeting where this raid was discussed, as Press

24   Secretary Spicer says, does not go further than that and

25   revealed much more particular and protected facts that the CIA

Hcj6ameo

                    1    itself has or does not have records or responsive to these

                    2    requests.  These requests are about the Al-Ghayil raid in

                    3    Yemen.

                    4           THE COURT:  Now we are getting to a separate issue.

                    5    We are now to an issue, which we will get to in a few minutes,

                    6    which is if you lose at this stage, how specific or general

                    7    does your next level response have to be.  To put it bluntly if

                    8    Pompeo is CIA director as opposed to private citizen at the

                    9    meeting at which the raid is discussed thoroughly at length as

                   10    I think both the President and Spicer say and if the raid later

                   11    yields what Spicer anyway says it was always intended to yield,

                   12    which is a trove of intelligence information, how can it

                   13    credibly be said that the CIA at least at a generic level

                   14    doesn't have an intelligence interest in this?

                   15           MS. TINIO:  Well, I think we're talking about a couple

                   16    of different standards.  At this point it might be helpful to

                   17    be clear about what the standards are to go through them kind

                   18    of one my one if your Honor --

                   19           THE COURT:  I am sorry.  Before we move to standards,

                   20    articulate for me how it isn't logical and plausible that the

                   21    CIA has an intelligence interest in a mission that the CIA

                   22    director whose initiation of the CIA director was present for

                   23    along with the President of the United States?

                   24           MS. TINIO:  Within your question, your Honor, you

                   25    embodied two different issues that have two different

Hcj6ameo

standards.  The Spicer statement about the meeting where he

said the Pompeo was present, that goes to whether or not CIA

has waived its ability to assert a Glomar.  That goes to the

Wilson test, which your Honor has previously asked my adversary

about.  The standard there is not:  Oh, Pompeo was at that

meeting.  Is it credible that the CIA doesn't have any

documents?

       That is not the standard for the Wilson test.  The

Wilson test, as your Honor laid out, has three parts -- the

disclosure, the acknowledgment has to be as specific as the

facts seeking to be protected.  It has to match and it has to

have been officially and publically disclosed.  Now, when your

Honor goes to the logical or plausible or as you said credible

standard, that goes to the first part of what we're trying to

establish here.

       THE COURT:  Wait.  This is what Judge Garland writes

as to this very standard, "There does not need to be a specific

public acknowledgment that there are actually documentary

records on the subject.  The Court can logically infer from a

disclosed intelligence interests that there are records

discussing".

       So, please, this is the last chance to explain to me

why there is not a disclosed intelligence interest.  I know you

want to go to standards.  I am trying to pin you down on what

to my mind is an important issue.

Hcj6ameo

1          Yes or no is there a disclosed interest by the CIA in

2     the raid?

3          MS. TINIO:  Certainly not, your Honor.

4          THE COURT:  Certainly not.  Why not?

5          MS. TINIO:  Director Pompeo presence at a meeting is

6     not an official acknowledgment that the CIA had an intelligence

7     interest in this particular military operation that occurred in

8     a particular place on a particular day.

9          THE COURT:  Suppose the same statement had been made

10    by the public information officer at the CIA, would your answer

11    be different?

12         MS. TINIO:  I don't think so, your Honor, no.

13         THE COURT:  Why?

14         MS. TINIO:  Because the content would be the same and

15    the content does not disclose that the CIA itself had

16    intelligence interest in this raid.

17         THE COURT:  So what else is he doing at the meeting?

18         MS. TINIO:  That is not --

19         THE COURT:  Is he not discussing Obama Care.  He is

20    not discussing taxes.  He is discussing an intelligence

21    gathering operation along as it that happens with other

22    national security and other agencies and the other people.

23         MS. TINIO:  What we have to do, your Honor, is we have

24    look at Press Secretary Spicer's statement and what it tells us

25    and what it does not.  All it says about Director Pompeo is

Hcj6ameo

| | |
|---|---|
| 1 | that he was there.  Now, if you look at Press Secretary |
| 2 | Spicer's statement again, it is much longer than that.  It |
| 3 | says, Back in November CENTCOM proposed a plan for this raid to |
| 4 | DoD.  DoD approved it and then they went and talked to the |
| 5 | President and then in January 25th there was a -- sorry, your |
| 6 | Honor.  I am referring to Exhibit 5 in the first declaration |
| 7 | which gives the Spicer statement.  It's page 11 of 13 of |
| 8 | Exhibit 5. |
| 9 | THE COURT:  I understand.  At Tab 6, though, we have |
| 10 | the President meeting with the Vice President, Secretary Mattis |
| 11 | and others, including the then National Security Advisor and |
| 12 | "CIA Director Pompeo" -- he is identified by his name -- where |
| 13 | the operation was laid out in great extent. |
| 14 | No, it is certainly true the words used by any |
| 15 | participant, including the President, aren't quoted but I would |
| 16 | like to think that the CIA director has other things to do with |
| 17 | his time on a Saturday night than to talk about at great length |
| 18 | intelligence gathering operation that his agency is not |
| 19 | interested in. |
| 20 | I am trying to figure out from a common sense |
| 21 | prospective exactly the prospective that Judge Garland asks us |
| 22 | to take.  Why is it not a matter of common sense that this is |
| 23 | not something the agency has an interest in? |
| 24 | MS. TINIO:  Because there so much discussion between |
| 25 | the parties about that *Drones FOIA* opinion by Judge Garland and |

Hcj6ameo

1    why don't we take a look at that.  So Judge Garland does write

2    that opinion, but I think we have to look at the context in

3    which he was writing it.  Not only --

4            THE COURT:  Can we stop talking about, though -- just

5    explain to me in human terms.  You you keep going to the

6    standard and I keep trying to give you a final chance to

7    explain rather than state why it is that there is no disclosed

8    intelligence interest by the CIA.

9            I will ask a series of pointed questions you tell me

10   if this is what you are saying.  Is what you are saying that he

11   may have been at the meeting for other reasons and this subject

12   was simply something he was sitting through?  Is it what you

13   are saying that even if he was there opining, he may have been

14   opining in some capacity other than CIA head?  Is it that even

15   if he opined and even if he weighed in as CIA head that doesn't

16   mean the CIA was interested or cared about this?  Explain to me

17   not just the conclusion, which is quite unpersuasive, but the

18   reasoning.

19           MS. TINIO:  Sure.  Frankly, it could be any of those

20   things, your Honor.  All we can really do is look at what is

21   disclosed by Press Secretary Spicer's statement, which is that

22   he was there.  So he could have been there to discuss other

23   agenda items.  So spicer's statement says that DoD CENTCOM

24   presented this.  It doesn't say CIA Pompeo presented this plan.

25   It doesn't say that CIA Director Pompeo voted on the plan.  It

Hcj6ameo

1    just said he was there.

2          So he could have just been there because it was an

3    agenda of other items.  He could have been there because he was

4    providing general advice.  What this does not acknowledge is

5    anything relating to the CIA as the CIA's possession of records

6    responsive to this request, which is what Wilson requires.

7          THE COURT:  You don't doubt, do you, that an agent of

8    the President of the United States, his press secretary, would

9    be capable of binding the CIA as to his interests?  That is to

10   say, let's suppose that Spicer said something that satisfied

11   even your heightened rigorous standard of what would count,

12   let's suppose the statement was, The CIA director was there

13   because he had a disclosed intelligence interest, and let's

14   just say he said literally those words, you are not arguing to

15   me that Sean Spicer as the spokesperson for the President of

16   the United States is incapable of binding the CIA to that

17   point, are you?

18          MS. TINIO:  Is what?

19          THE COURT:  Incapable of binding the CIA to that?

20          MS. TINIO:  We would not make the argument that Press

21   Secretary Spicer's statements are disqualified, no.

22          THE COURT:  Well, you are not saying that he cannot

23   bind the CIA, are you?

24          MS. TINIO:  I wouldn't put it that way.  No, we're not

25   saying that.

Hcj6ameo

1          THE COURT:  I am aware of a different case for which,

2     for example, a statement made by the FBI was disclaimed as

3     binding the CIA because they are essentially sister agencies

4     but the FBI isn't the boss of the CIA.  In point of contrast,

5     the President of the United States does from a long chart sit

6     atop the CIA and it is for that reason whether you are arguing

7     or not that the President's spokesperson can't effectively

8     speak for the CIA.

9          MS. TINIO:  We're not saying that.

10          THE COURT:  You are simply saying the words that were

11     used are insufficient to disclose an intelligence interest?

12          MS. TINIO:  Yes.  An intelligence interest and also

13     whether or not the CIA had a role.  Both things are important.

14     Whether or not the CIA had a role, an actual role or an

15     intelligence interest in this particular military operation,

16     both of those facts are properly classified and protected by

17     statute and are not at all acknowledged by Press Secretary

18     Spicer's statement.

19          THE COURT:  Press Secretary Spicer's statement a few

20     sentences earlier talks about a deputy's meeting, which I

21     understand to be the deputies of the various national security

22     or foreign affair agencies.  He doesn't unpack who those

23     deputies were and whether therefore the deputy for the CIA, for

24     example, was there.

25          Anything you can share on that?

Hcj6ameo

1          MS. TINIO:  I am sorry?

2          THE COURT:  Anything you can share on what was meant

3    by the "deputies' meeting."  There is a term of art quality

4    about that.

5          MS. TINIO:  Your Honor, for the purposes of this

6    argument, we only can go by what the Press Secretary said.  I

7    don't have anything to add to that.

8          THE COURT:  And the ACLU has not argued that the

9    expressed deputies' meeting either necessarily means the deputy

10   head of the CIA?

11         MS. TINIO:  No, your Honor.

12         THE COURT:  Now if you want to compare and contrast

13   with the ACLU versus CIA, the Judge Garland decision, you can.

14         MS. TINIO:  Sure.  I think Mr. Kaufman said something

15   about *Drones FOIA* where he said in *Drones FOIA* there weren't

16   any CIA acknowledgments or statements at all.  That is just

17   simply dead wrong.  First of all, in *Drones CIA* before Judge

18   Garland even wrote his opinion, the CIA admitted, conceded,

19   your Honor, that it had intelligence interests in the targeted

20   killings using drones.  In fact, it said, and you should really

21   remand this, because we admit that we have an intelligence

22   interest.  There was a parallel litigation happening in the

23   Second Circuit where the CIA admitted that it had responsive

24   documents to FOIA requests about targeted killings.

25         So Judge Garland was writing in an environment in

Hcj6ameo

1   which the CIA actually admitted it wanted the case to be

2   remanded and said, We have an intelligence interest in these

3   drones.  Apart from that there were numerous statements not

4   only by non-CIA individuals but there were numerous specific

5   statements by CIA directors saying, Yeah, and there is an

6   emphatic head nod for example when he was asked, Do the

7   drones--

8          THE COURT:  Look, if what you are saying is factually

9   the record is denser in that case of the intelligence

10  interests, I think we can all agree with that.  Judge Garland

11  begins about four or five paragraphs in a row saying in

12  substance, And there is more.

13         MS. TINIO:  Exactly.

14         THE COURT:  I understand that the text here is

15  thinner, but the Judge Gardephe isn't saying that is not a

16  close case.  It is not clear to me that the correct observation

17  that the factual record here is thinner means that it falls

18  sort of the required line.

19         MS. TINIO:  Well, with respect to Judge Garland, we

20  would review some of his language as not dispositive of the

21  standards laid out.  We would point the Court in addition to

22  the D.C. Circuit's next opinion examining the same requests on

23  the fact examining the zone strike requests issued in 2016.

24         In that D.C. Circuit opinion in the same case with

25  respect to the same requests, at that point the CIA was no

Hcj6ameo

longer asserting Glomar because of its admissions and in that
case and in the parallel Second Circuit case.  In that case the
D.C. Circuit properly went through the standards, first looking
at the CIA's indication of exemptions and whether or not that
was logical and plausible because that is the context in which
the logical or plausible standard applies.  Is it logical or
plausible to say you are looking at Exemption One?  Yes.  And
then after that when the D.C. Circuit found that the CIA had
met its burden to show that it is logical or plausible then the
D.C. Circuit said, Well, now the ACLU has is saying there has
been an official acknowledgment, and it applied three-part
Wilson test and that is the proper kind of procedure the way
you march through the different parts of the analysis and that
is really accurately reflected by the D.C. Circuit's subsequent
opinion in 2016 in the very same case.

THE COURT:  The Second Circuit has told us that it is
not rigidly required that the matching part of the Wilson test
be applied.  So while I appreciate the tenor of Wilson is
suggests a degree of rigor, the *New York Times* case suggests
that the circuit does not oblige a reviewing judge to
rigorously apply the matching component, i.e., that one has to
look at each document called and ask the question whether that
has been disclosed.

You are not arguing with that, are you?

MS. TINIO:  Well, we think that Wilson is still the

Hcj6ameo

1   law and we certainly appreciate the court's and *New York Times*

2   I think thoughts about the second prong of that; but the *New*

3   *York Times* court in that case still applied all three prongs

4   and numerous courts in the Second Circuit have applied all

5   three prongs of the Wilson test after that opinion, including

6   twice in the *Targeted Killings* case where Second Circuit

7   affirmed.

8           THE COURT:  But the circuit also says that the

9   matching aspect of the Wilson test does not require absolute

10  identity and then it goes on to say, "Indeed such a requirement

11  would make little sense.  The FOIA requester would have little

12  need for undisclosed information if hadn't had precisely

13  information previously disclosed."

14          Given that isn't the real issue here not the existence

15  of the intelligence interests as closed but the latitude you

16  would have at the next step to tailor your responses to make

17  sure that you are not disclosing more than that which has been

18  disclosed in the course of your, say, Vaughn Index?

19          MS. TINIO:  I think that is getting a little bit ahead

20  of things.  The three elements even with the Court's thoughts

21  about prong two still apply to anything the ACLU has identified

22  as an official acknowledgment.  What they are focusing on most

23  is Press Secretary Spicer's statement about Director Pompeo's

24  presence at the meeting.  So we still need to go through all

25  three elements.

Hcj6ameo

1            I can point to preponderance of evidence and decisions

2       after *New York times* to show you how that operates in reality

3       and how courts march through those three.  There was that *New*

4       *York Times* opinion that mused upon the rigidity or not of the

5       matching element.

6            THE COURT:  Muse is one way to put it.  The other way

7       to say it is the Second Circuit stated.

8            MS. TINIO:  Sure.  It questioned the level of rigidity

9       of it.

10           THE COURT:  In language that I would submit a District

11      Court is obliged to heed.  This is the Second Circuit speaking.

12           MS. TINIO:  Absolutely.  For example, your Honor, when

13      *New York Times* was remanded to the District Court, Judge

14      McMahon was the District Court who had those cases, the

15      *Targeted Killings* cases, and she issued a number of following

16      opinions and in basically every opinion she applied Wilson.

17      She said, We have to still have the specific disclosure.  We

18      have to have matching.  Although, she acknowledges the Second

19      Circuit's comments and rulings on that.  She said you still

20      have to look at --

21           THE COURT:  Sorry.  Wilson ultimately derives not the

22      case itself but the test from the D.C. Circuit.

23           MS. TINIO:  Uh-huh.

24           THE COURT:  Judge Garland's decision is more recent

25      from the D.C. Circuit.  Putting aside that the Second Circuit

Hcj6ameo

1      might take the Wilson test in a different direction, do you

2      believe that the Garland decision effectively either abrogates

3      or adds informative meaning to the Wilson test?

4              MS. TINIO:  No, your Honor.  The way we know that is

5      in the following D.C. Circuit opinion in the very same case,

6      the *Drones* case, the 2016 D.C. Circuit that followed Judge

7      Garland's opinion, they went through the three parts of the

8      test exactly the same.

9              THE COURT:  Sorry.  But that is not the Glomar stage.

10     That is the next stage; right?

11             MS. TINIO:  That is a stage at which the ACLU has the

12     burden of pointing for a specific matching official public

13     disclosure that waives the CIA's ability to--

14             THE COURT:  I am sorry.  I thought the Glomar stage

15     was resolved by the decision of Judge Garland and then what

16     happens afterwards is effectively the agency prevails because

17     in the end there is sound reason not to with any specificity

18     even have to give a Vaughn Index that might by its nature tend

19     to reveal.  Where I am going is that it sounds to me tracking

20     the history in the D.C. Circuit that the concepts that you are

21     articulating may yet well carry the day in this litigation for

22     the agency.  It is just not at the Glomar stage.

23             MS. TINIO:  Your Honor, this is all part of the Glomar

24     stage.  So there are two parts to the Glomar stage.  The first

25     is where the agency establishes that to disclose the existence

Hcj6ameo

1    or nonexistence of records that itself is a protected fact and

2    that has to be tethered to particular FOIA exceptions.  That

3    tethering has to be logical and plausible.  So our submissions

4    have done that, said it is logical and plausible that to

5    disclose whether or not the CIA has records or not would, A,

6    tend to reveal a classified fact, which would be the

7    involvement the CIA in this particular military operation or an

8    intelligence interest of the CIA.

9          The second part the Glomar, it is actually still part

10   of Glomar.  Their burden now is to trying to overcome a Glomar

11   response by saying, Oh, no, you have waived it because there is

12   a specific matching public disclosure.

13          THE COURT:  Let us suppose that I, in contrast to the

14   argument you are making, find a disclosed interest by the

15   agency as reflected in the Spicer statement.  What from your

16   perspective is the next step in this litigation?

17          MS. TINIO:  Well, I think we would -- I think it would

18   depend a bit on which part of it the Court had a problem with.

19   For example, if the Court had looked at the agency's

20   declaration and said, Well, you know, I kind of think that even

21   though your declaration says that Director Pompeo was present

22   in the meeting, that has nothing with the CIA's role or

23   intelligence interests, I am not sure you established that but

24   I think we would ask to provide a supplemental declaration

25   further establishing it if your Honor --

Hcj6ameo

1        THE COURT:  What more do you need?  We litigated this.

2   You each have made substantial submissions.  This was your

3   chance.  If what you are saying is you would like a Mulligan, I

4   am not following.  In other words, you've made your

5   submissions.  The Spicer statement and the materials that the

6   ACLU has mustered are what they are.  Let us suppose that I

7   find having reviewed the rather voluminous submissions that

8   have been made, I am not buying what you are selling and that

9   the agency has disclosed at a highly general level to be sure

10  its intelligence interests in this raid, what happens next?  I

11  am not saying you get a do-over.  I am not asking you to agree

12  with me; but if you assume I find against you that the Spicer

13  statement and the companying data reflected disclosed agency

14  interest, where do we go next?

15       MS. TINIO:  The agency would then have to undertake a

16  search, your Honor.

17       THE COURT:  Right.  If the agency undertook a

18  search -- I am not asking you whether you have and I am

19  assuming you have not because I don't want this dialogue

20  inadvertently to give up something that you are obliged to

21  protect, so we're talking entirely at a hypothetical level.  If

22  you were to undertake a search and you were to find material

23  responsive to some or all of the five document calls but you

24  were to conclude that they were all covered by Exemptions One

25  or Three or since they seem to logically track together both,

Hcj6ameo

what form would your ensuing response take that would not in

turn disclose, for example, which of the five distinct requests

by the ACLU the materials were responsive to?

          I understand you to be saying in effect we are not

obliged to give a Vaughn Index that reveals that we have legal

submissions or casualty submissions or things of that ilk that

may be more specific than we have ever admitted.  In effect, I

think you're saying that our response needs to be proportionate

to the amount of the earlier disclosure, which was by anyone's

measured a very general level and therefore following on what

Judge Garland writes, There is flexibility in the Vaughn Index

if you would utilize that.  I think I am hearing you say that

and my question is concretely what would that look like?

          Suppose you found material responsive to all five --

this is purely a hypothetical -- your judgment was it would

reveal information about our role that hasn't been revealed to

specify which document request materials were responsive.  How

would you formulate your Vaughn Index so to invoke the

exemptions but not reveal more than has been publically

revealed?

          MS. TINIO:  I think, your Honor, there are a couple of

parts to my response.  One is without having done the search

and knowing what may or may not exist, we cannot say in good

faith -- represent in good faith what our response would be.

It has to be appropriately tailored.

Hcj6ameo

1          THE COURT:  Of course.  Look, I am asking you to

2    indulge the hypothetical, that you were to find all that and it

3    is easier to have this conversation with you now when everyone

4    is in front of the veil and nobody has looked behind and we

5    don't know what, if any, documents are there.  I am asking

6    assuming you found all five, what are some of the options

7    available to you that would permit you to invoke both

8    exemptions as to all documents without disclosing on a

9    document-call-by-document-call basis what those documents

10   relate to?

11          MS. TINIO:  Well, I think I would like to come back to

12   something at the end, but I think there are some types of

13   responses that an agency can make that we actually discuss in

14   our opening brief.  Again, we cannot say that any of them would

15   necessarily be appropriate here.

16          THE COURT:  I know.

17          MS. DIAKUN:  If the CIA found no documents, there

18   would be no document response.  It is possible in some

19   circumstances that a no-number-no-list response may be

20   appropriate; but we do not know such that such a response would

21   be appropriate here.  Most Vaughns don't necessarily actually

22   break out documents by requests.  So it wouldn't necessarily

23   have to do that even if we provided a typical Vaughn; but a

24   typical Vaughn in itself reveals quite a lot of information,

25   which is the type of document, who is it from, what is it going

Hcj6ameo

1      to go to, the date, and things like that.

2                  THE COURT:  In your experience what are the most

3      abstracted types of Vaughn Indexes when they are put at the

4      most generic general level; what do they look like?

5                  MS. TINIO:  Sometimes it can be categorical Vaughns

6      with exceptions.  Although, I don't know that that would be

7      appropriate here.  There is a variety, your Honor.  A

8      no-number-no-list response, for example, is literally not a

9      list.  It says, We acknowledge there are responsive documents,

10     but we're not going to tell you how many and we're not going to

11     list them out as what we do in a typical Vaughn.  We don't know

12     if that would be appropriate.

13                 THE COURT:  What are some of the other options

14     available to the agency that allow it to mark the record that

15     the following two, say, exemptions apply but does not

16     needlessly reveal detail that has gone undisclosed given the

17     very generic statement of the Spicer statement?

18                 MS. TINIO:  I think I have pretty much gone through

19     the main options, but I would like to return to something your

20     Honor was saying.

21                 THE COURT:  Yes.

22                 MS. TINIO:  I think in your Honor in your questions to

23     Mr. Kaufman correctly pointed out that then Press Secretary

24     Spicer's statements are general.  I believe you characterized

25     them as abstract and high-level and do not disclose the

Hcj6ameo

1      existence or nonexistence of records responsive to each

2      particular request.  You actually started the exercise of

3      talking Mr. Kaufman through the request.  For the official

4      acknowledgment test, your Honor, the gulf between the abstract,

5      high-level nature of Press Secretary Spicer's statement and the

6      specificity of the requested records, there is no waiver

7      ability to assert Glomar.  That is essentially an on-off

8      switch.

9              Now, there are cases where courts have said, Okay,

10     well, we found a little bit of a correspondence and so we're

11     going to say that you waived your ability to assert Glomar as

12     to some categories but not others.  That is not a case where

13     the statement or the acknowledgment is just very broad and each

14     statement is very -- each request is very specific.  That is

15     more of a case where the court says, Hey, in this statement you

16     specifically knowledge that there is legal analysis.

17             THE COURT:  Let me ask you this:  Suppose that is

18     right, but isn't one of the options available to this Court to

19     say, We'll look at the ACLU's five items and Items One, Three

20     Four and Five are undisclosed by the Spicer statement; but Item

21     Two, which begins with the opening clause, The process by which

22     the government approved the Al-Ghayil raid, that at least is

23     disclosed by the Spicer statement so in theory could not the

24     Court say, I sustain the government's Glomar response as to

25     Documents One, Three, Four and Five because none of those are

Hcj6ameo

1    spoken to by Sean Spicer but because, number two, the process

2    of approval is literally the subject of the relevant portion of

3    the Spicer statement and as to that I don't sustain your Glomar

4    and so we now move forward with respect to Item Two; is that an

5    available option to the Court?

6         MS. TINIO:  In theory it is possible to do things like

7    that, but in this particular case that would not be consummate

8    with the facts in the record.

9         THE COURT:  No, no.  I sorry.  I know you don't agree

10   with what I have posited about what the Spicer statement

11   connotes; but if I believe that the Spicer statement is

12   describing who is at the table in the approval process, would

13   that not be at least be a doctrinally available option for the

14   Court, which is to prune the request by saying, Your Glomar is

15   fair game as to One, Three Four and five but there has been

16   enough of a disclosure to keep Two alive?

17        MS. TINIO:  Well, for example, in other cases such as

18   *targeted killings* or *Electronic Surveillance Programs*, courts

19   say, You have acknowledged that this program exists, or in the

20   *Targeted Killings* case, You have acknowledged that the CIA had

21   some operational role and that has been acknowledged.  However,

22   the CIA has still been able to maintain its Glomar over more

23   specific topics, for example, whether or not the CIA --

24        THE COURT:  I think you are saying "yes"?

25        MS. TINIO:  Yes.  But in this case, I would also point

Hcj6ameo

out the fact in good faith, because I think your Honor sees

some relevance between Director Pompeo having had been at the

meeting as Press Secretary Spicer said and perhaps an approval

process.  So in this case the CIA in good faith undertook the

search that your Honor asked Mr. Kaufman about because as is

set forth in the CIA's declaration, Director Pompeo's simple

presence at a meeting is itself not necessarily --

THE COURT:  I am sorry.  I was puzzled by that.  It

seems unusual to me in the context of Glomar for you to

volunteer about a document search that you undertook as to some

parts of this CIA as to one issue.  Supposing your search had

revealed documents, I take it you would have disclosed that,

too?

MS. TINIO:  Well, I think if the CIA had discovered

documents reflecting nothing more than Director Pompeo was in a

meeting, I think we would have provided a response as to that

aspect, but the CIA did that search in good faith.  That also

demonstrates that Director Pompeo's simple presence at a

meeting as a general advisor to the President, does not itself

reveal a classified fact.  However, if CIA itself had documents

responsive to the five particular requests, which are very

technical and very detailed, that in itself would tend to

reveal a classified act as established in our declaration.

THE COURT:  Is Mr. Kaufman right that were this

proceeding to plenary document review, the plenary search in

Hcj6ameo

1    response to a FOIA request, your search as to evidence relating

2    to that meeting, as to documents relating to the meeting would

3    have necessarily looked at a broader part of the CIA like the

4    General Counsel's Office?

5              MS. TINIO:  No.

6              THE COURT:  Was there a search done of the General

7    Counsel's Office?

8              MS. TINIO:  Well, as the Shiner declaration

9    establishes and which is consistent with the law, your Honor,

10   the CIA looked at all locations in which it is reasonable

11   likely --

12             THE COURT:  That is conclusory.  Was the General

13   Counsel's Office searched?

14             MS. TINIO:  I am not completely sure aside from what

15   is --

16             THE COURT:  Can you represent what parts of the CIA

17   were searched?

18             MS. TINIO:  Well, the declaration says a search in the

19   office of the director because it is the office of the director

20   set forth in a declaration, which would have records about the

21   director's attendance at different meetings and any related

22   background material relevant to a particular meeting.

23             THE COURT:  May I ask you this:  Who did the search?

24             MS. TINIO:  The CIA.

25             THE COURT:  No, I know that.  Was it outside counsel

Hcj6ameo

1    for the CIA?  Was it the General Counsel's Office?  Was it a

2    lawyer at the CIA who did the search?

3           MS. TINIO:  I am not completely sure that the CIA as

4    most agencies do have particular people who are responsible for

5    FOIA requests.

6           THE COURT:  Do we know that whoever did the search at

7    the CIA was sufficient neutral that their representations are

8    merit weight?

9           MS. TINIO:  Well, this is set forth in a sworn

10   declaration by the CIA's declarant, which is unrebutted --

11          THE COURT:  Of course it is unrebutted.  If he want me

12   to initiate discovery so they can rebut it, we can do that.  Of

13   course, it is unrebutted.  Unless the ACLU has a mole, it is

14   going to be unrebutted.

15          MS. TINIO:  The CIA's declaration is afforded a

16   presumption of good faith.  The declarant is the information

17   review officer for the litigation information review office.

18   So as part of her role, she does clarification reviews.  For

19   example, she does clarification of CIA documented information

20   that may be the subject of FOIA.  This is certainly this

21   person's job.

22          THE COURT:  Let me try it differently.  Let's suppose

23   that the outcome of this proceeding were a split decision in

24   which only Document Call Two survive the Glomar request and the

25   Glomar submission, if that is the right word, and Two was in

Hcj6ameo

1    turn narrowed to the meeting at the White House as opposed to

2    later stages or earlier stages in the approval process on the

3    theory that those were not in haec verba disclosed or

4    circumstantially suggested, if so has the CIA already done then

5    the entirety of the search that it would undertake if we got to

6    the stage at which a document search in response to Document

7    Call Two as I have narrowed it would be done?

8              MS. TINIO:  Yes, your Honor.  As the declaration

9    establishes, to look at the broader meaning of Document Request

10   Two, would -- it would have to respond to that otherwise --

11   tend to reveal a classified and protected fact.

12             THE COURT:  I guess the question would be:  Pompeo's

13   presence at one meeting does not itself speak, I guess the

14   argument would be, to whether the CIA had a hand earlier or

15   later than that and therefore one way to think about this might

16   be to say, Just because the ACLU submitted a FOIA request to

17   find in a particular way, doesn't mean that the Court's ruling

18   on the Glomar response needs to be all or nothing but it can

19   potentially be tailored to the scope of the disclosure embodied

20   in the Spicer statements and therefore render a split decision;

21   that is available?

22             MS. TINIO:  I think it is technically possible, yes.

23             THE COURT:  Mr. Kaufman, brief rebuttal.

24             MR. KAUFMAN:  I will start there, your Honor.

25             THE COURT:  Let me try with you there on that.  Just

Hcj6ameo

1    because you have had five different document calls, and I

2    understand that these are all areas of interest, there is a

3    range of things that the government can say to open doors or to

4    disclose.  Let's look at Number Five.  Number Five says, The

5    number and identity of individuals killed or injured in the

6    Al-Ghayil raid.  Pause there.  How is it that the CIA or Spicer

7    on its behalf has disclosed an interest in that?  There is a

8    generic statement by Spicer that intelligence has been

9    received, but it is untethered to the CIA that Spicer ever

10   made.

11            MR. KAUFMAN:  Addressing this entire line of

12   questioning your Honor has been pursuing with the government,

13   it is the government's burden to defend its response and in its

14   declaration, it has not addressed whether for example

15   responding to Prong Number Five --

16            THE COURT:  I am sorry.  Wait.  From a Glomar

17   perspective your first hurdle is the disclosure.  You need to

18   establish some government disclosure.  Just because the

19   government has made a disclosure that is in some part of this

20   broad space doesn't mean that disclosure runs to the four

21   corners or to the entire ambit of the space that is the Yemen

22   raid.

23            MR. KAUFMAN:  That is correct, your Honor.  I want to

24   be clear that the government has not defended its response on

25   the basis of a prong-by-prong defense.  It needs to do that

Hcj6ameo

1   under the law.  Now, you are right that to rebut a logical and

2   plausible --

3              THE COURT:  Are you saying that disables me from

4   examining in between your two positions what has been fairly

5   disclosed and what has not been?

6              MR. KAUFMAN:  I am --

7              THE COURT:  Because both of you have taken polar

8   positions, does that mean I have to choose one or the other?

9              MR. KAUFMAN:  I think that the Court would certainly

10  benefit from additional briefing on whether, for example,

11  revealing that the CIA had a record responsive to Number Five

12  would merit a Glomar response.  Your Honor, our duty here is to

13  respond to the government.  The government bears the burden and

14  if the government had offered specific arguments about why, for

15  example, merely having a before-the-fact or after-the-fact

16  assessment of civilian casualties would reveal something more

17  than its intelligence interests --

18             THE COURT:  Let me ask you this:  Suppose the Spicer

19  statement -- just to give you a hypothetical -- had said, CIA

20  Director Pompeo attended an approval meeting on January 25th

21  but thereafter the CIA in no way, shape or form had anything to

22  do with the raid or its fruits, if that were the statement and

23  each of you took exactly the positions you are taking, could I

24  not then say, Just because counsel choose to take wing

25  positions, the Court is entitled to take a look at the scope of

Hcj6ameo

1    the disclosure and apply it to the broad requests here?  Why

2    wouldn't I under those circumstances just because counsel have

3    taken those positions can't I split the baby?

4              MR. KAUFMAN:  I think you might have, but again I

5    don't think we would have been here if that were the

6    acknowledgment.  This goes to a point I wanted to make in

7    response if some of the government's arguments.  The value to

8    the efficiency of the litigation here in not allowing the

9    government to impose unreasonable and illogical Glomar

10   responses is huge.  These cases can lead to years of

11   frustration in litigation and this is not about the ACLU's

12   ultimate request for records or whether in fact a record will

13   be made public.  This is about the law that allows a requester

14   like the ACLU to ask the CIA for documents and when the CIA

15   comes back be says, Here is why we cannot give you what you are

16   asking for, we will make a reasonable judgment about whether we

17   should pursue that case.  I think if the acknowledge had been

18   the one that you gave, we would not have spent the last four

19   months litigating this issue.

20             THE COURT:  If the CIA had said, We assert a Glomar

21   response to everything but the opening clause, say, of

22   paragraph two, what would your response have been?

23             MR. KAUFMAN:  Sorry.  They acknowledge --

24             THE COURT:  Supposing the CIA had invoked Glomar as to

25   everything other than the opening clause of your second

Hcj6ameo

document call and as to that stood down and said, Yep, Sean

Spicer gave it up, Director Pompeo was in the room, and

therefore we can't responsively assert Glomar as to the one

particular sought by the ACL, what would your position have

been?

MR. KAUFMAN:  Again, it is hard to know without

responding to what the government's justification would have

been, which is its duty.  Let's just stick to the first

category, your Honor, legal and policy analysis about the legal

basis for the raid.  Now, I don't know if we would have come to

court to make this argument in order to defeat the government's

Glomar on prong one; but we could have said, for example, that

given that the CIA has an intelligence interest in this raid

that has been acknowledged, the very fact that they possessed a

record responsive to Number One does not tell you anything more

than that.  Maybe the government would have additional reasons

for why that information was protected or what it would reveal,

but it is not our job to say why that information shouldn't be

protected.  It is the government's job to say why it would be

protected.

I really do want to emphasize that this practice is

not new.  The agency regularly uses Glomar responses that shift

the timeline for litigation from what could be zero to many,

many years in defense of an indefensible response.

Now, the next point I would like to make is that the

Hcj6ameo

 1    CIA does have to search, and we gave an example of a

 2    potentially responsive record to one or two of the prongs.

 3    There may be more.  It is the government's duty again to

 4    demonstrate that a source or method or something else protected

 5    would glow from merely acknowledging that piece of information.

 6         THE COURT:  Is there any concrete evidence that you

 7    have been able to cite other than Spicer that situates the CIA

 8    specifically as having interest in the raid?

 9         MR. KAUFMAN:  Beyond the panoply of facts that we

10    offer that I think under *Flores* very clearly can enter in and

11    must enter into the Court's judgment about whether the

12    government's explanation is logical and plausible, no, we have

13    not.  Again, if we're given the opportunity to respond in the

14    next stage of the litigation to the CIA's specific arguments

15    about whether it takes it prong by prong or document type by

16    document type or exemption by exemption, we would be entitled

17    to put forward new facts that we think undermine the

18    credibility of those justifications.

19         THE COURT:  Let me ask the government a question.

20         Government, suppose the Court was considering

21    splitting the baby here and permitting Glomar as to some, but

22    not all, you're affidavit speaks globally as Mr. Kaufman points

23    out.  What is the relevance of fact in your view that your

24    affidavit paints with a singular brush as to all five of the

25    document calls?

Hcj6ameo

| | |
|---|---|
| 1 | MS. TINIO:  Your Honor, I think that our declaration |
| 2 | makes very clear that the declarant looked at each of the five |
| 3 | requests.  The declarant specifically and implicitly says that. |
| 4 | For example, in paragraph 18 the declarant says, As each of the |
| 5 | five category of records requested by plaintiffs relate to the |
| 6 | Al-Ghayil raid -- dot, dot, dot -- the agency that did not have |
| 7 | some role in the operation or outcome would not possess the |
| 8 | documents that fit the five categories outlined by the |
| 9 | plaintiff.  So the declarant makes clear that she looked at |
| 10 | every single category, which is all the law requires.  We're |
| 11 | not required to have paragraph A and paragraph B and paragraph |
| 12 | C.  She makes clear she looked at all five of them and that if |
| 13 | agencies did not have a role, they would not have the requested |
| 14 | documents. |
| 15 | THE COURT:  No, but you are saying that the way the |
| 16 | declaration is written is sufficient to speak to each of the |
| 17 | five parts? |
| 18 | MS. TINIO:  Yes, your Honor, and it does specifically |
| 19 | do that. |
| 20 | THE COURT:  Thank you.  We stand adjourned.  I will |
| 21 | take the decision under advisement. |
| 22 | I should have said this at the beginning, but I will |
| 23 | say it now and I say this for the benefit of counsel but for |
| 24 | everyone else who is here:  This is a hard case and it involves |
| 25 | complicated facts and complicated questions of law.  I have |

Hcj6ameo

1    been the beneficiary of superb briefing on both sides and an

2    excellent argument today under heavy fire for both of you.  I

3    don't want it to get lost that I am the beneficiary of terrific

4    lawyering, which both makes my job harder but also more

5    enjoyable.

6              I want to thank all of you here and wish everyone a

7    healthy and happily holiday.

8

9                              o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25