UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
:
AMERICAN CIVIL LIBERTIES UNION and                    :
AMERICAN CIVIL LIBERTIES UNION                        :            17 Civ. 3391 (PAE)
FOUNDATION,                                           :
                                                      :            OPINION & ORDER
                              Plaintiffs,             :
                                                      :
                -v-                                   :
                                                      :
DEPARTMENT OF DEFENSE, CENTRAL                        :
INTELLIGENCE AGENCY, DEPARTMENT OF                    :
JUSTICE, and DEPARTMENT OF STATE,                     :
                                                      :
                              Defendants.             :
                                                      :
------------------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:**_____
**DATE FILED:** 6/27/2018

PAUL A. ENGELMAYER, District Judge:

This lawsuit under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), concerns a

request by the American Civil Liberties Union ("ACLU") for records held by federal agencies

related to an intelligence-gathering raid ("the Raid") in al Ghayil, Yemen that was disclosed and

discussed at a series of press briefings by then-White House Press Secretary Sean Spicer.

The ACLU has sought such records from four federal agencies: the Department of

Defense ("DoD"), the Central Intelligence Agency ("CIA"), the Department of Justice

("Justice"), and the Department of State ("State").  Of these, all but the CIA have proceeded in

this litigation by identifying responsive records and determining whether particular records are

properly withheld pursuant to one or more FOIA exemptions.  To the extent these three agencies

have declined to produce records, summary judgment briefing is underway as to whether the

claims of withholding are justified.

The CIA, however, pursuant to its customary practice, has issued a "*Glomar* response,"

in which it refused to confirm or deny the existence of responsive records on the ground that to

1

do so would itself reveal information (the existence of a CIA intelligence interest in the Raid and/or CIA operational involvement in it) which FOIA protects from disclosure.  The ACLU and CIA have now cross-moved for summary judgment on the propriety of the CIA's *Glomar* response.  The ACLU argues that the White House's statements, per Spicer, about the Raid (and earlier statements by CIA officials regarding its interest in Yemen generally) constitute an official acknowledgment of its interest in the Yemen Raid that precludes the CIA from relying on the instant *Glomar* response.  The ACLU also argues that a substantive response to its FOIA requests would not reveal the CIA's operational involvement in the Raid.  The CIA argues that the *Glomar* response was proper.  For the reasons that follow, the Court agrees with the ACLU that the White House's statements sufficiently acknowledged a CIA interest in the Raid as to preclude the CIA's *Glomar* response as formulated.

I.      **Background**[1]

   A.      **The Air Raid in Yemen**

   On January 29, 2017, the US conducted an "intelligence-gathering raid" in al Ghayil, Yemen.  One service member and an unspecified number of civilians died.  According to news reports cited by the ACLU, in anticipation of the Raid, President Trump declared the area around al Ghayil, Yemen, a temporary "area of hostilities."  This designation exempted the Raid from existing policy guidance that limited, in the interest of minimizing civilian casualties, the circumstances under which such a raid can lawfully be conducted.

---

[1] These facts are drawn from the factual summaries submitted by the parties in their briefing and the documents submitted in support of the parties' motions.  These facts are undisputed, insofar as the decisive facts consist of public statements by officials within the federal government.  To the extent that other facts recounted here are drawn from the ACLU's briefs, which in turn draw upon press accounts, the facts are recounted merely for the purpose of background.

In the days that followed, White House Press Secretary Spicer three times fielded questions at press briefings about the Raid. Because their content is central to this dispute, and particularly to whether there was an official acknowledgement of the CIA's interest in the Raid, and if so what the scope was of that acknowledgement, the Court quotes them in full.

On January 31, 2017, the following exchange occurred during Spicer's daily press briefing:

**Q (Reporter):** Thanks, Sean. Just following up again about the strike over the weekend in Yemen. Can you confirm that the eight-year-old—the reports that the eight-year-old daughter of Anwar al-Awlaki was killed in that strike? And if you can address sort of the killing of the American citizen in this anti-terrorism operation.

**MR. SPICER:** I'm not going to go any further than what the Department of Defense has released. Obviously, we recovered a tremendous amount of information, and we killed an estimated 14 members of al Qaeda in—AQAP individuals. And then we suffered the loss of life of a service member, and four people were injured. That's as far as I'm willing to go at this time.

Dkt. 37 ("Daikun Decl."), Ex. 6 at 12.

On February 2, 2017, during a daily press briefing, the following exchange occurred:

**Q (Reporter):** On Yemen, it was initially described, the raid over the weekend, as a successful raid by the administration. There are now some questions and comments raised about the possibility of additional civilian casualties. So I've got a couple of questions for you on this one. Would you still stand by your characterization of the raid as "successful"? Was the President given multiple options about this raid, or just one? And were there consultations with the prior administration's national security officials, military officials about the raid moving forward?

**MR. SPICER:** Thank you. Actually, I'd like to just walk through that. I appreciate you bringing this up. There is—let's go through the tick-tock on that raid. On November 7th, CENTCOM submitted the plan to DOD. Clearly, that was under the last administration. Legal teams were involved immediately when it was submitted to DOD. On December 19th, the plan was approved by the Department of Defense and recommended that it be moved ahead. It was sent then to the National Security Council staff here in the White House. Again, this all happened under the previous administration.

On January 6th, there was an interagency deputies meeting. The deputies recommended at that time that they go ahead. It was so easily approved it was sent straight up. The conclusion to hold was, at that time, to hold for what they called a "moonless night," which, by calendar, wouldn't occur until then-President-elect Trump was President Trump.

On January 24th, shortly after taking office, Secretary of Defense-then Mattis [sic] read the memo, resent it back up to the White House conveying his support. On the 25th of January, the President was briefed by General Flynn on Secretary Mattis's recommendation and the status of the operation, or potential operation.

The President asked to see Secretary Mattis and Joint Chiefs [sic] of Staff Dunford. He then, on that evening, had a dinner meeting, which included the President, the Vice President, Secretary Mattis, Chairman Dunford, Chief of Staff Priebus, Jared Kushner, Chief Strategist Bannon, General Kellogg, General Flynn, and CIA Director Pompeo where the operation was laid out in great extent. The indication at that time was to go ahead on Friday the 26th.

In the morning, the deputies committee met again. It was not a necessary step because they had previously recommended and also reaffirmed their support for that. On January 26th, the President signed the memo authorizing the action. So it was a very—not only was it a very, very though-out [sic] process by this administration, it had started back on November 7th in terms of—clearly well before that, but it was a move forward by CENTCOM on November 7th. This was a very, very well thought-out and executed effort.

**Q:** Where was the President the night of the raid? How did he learn about Chief Owens's death? And do you still stand by your characterization that it was successful?

**MR. SPICER:** The President was here in the residence. He was kept in touch with his national security staff. Secretary Mattis and others had kept him updated on both the raid and the death of Chief Owens, as well as the four other individuals that were injured. So he was kept apprised of the situation throughout the evening.

And again, I think—I would go back to what I said yesterday: It's hard to ever call something a complete success when you have the loss of life, or people injured. But I think when you look at the totality of what was gained to prevent the future loss of life here in America and against our people and our institutions, and probably throughout the world in terms of what some of these individuals could have done, I think it is a successful operation by all standards.

And again, I want to reiterate, it is tough to ever use the word "success" when you know that somebody has lost their life. But when you go back and look at an individual that dedicated their life to serving this country, and went over and over and over and over again knowing that this not only the risk that he took but wanted to do it because he knew the threat that these kind of individuals pose to our country and to our people, that's—while not a success that you lost to [sic] him, you know that he died in sacrifice for someone else here in this nation.

Daikun Decl., Ex. 5 at 10–11.

Finally, on February 7, 2017, during a daily press briefing, the following exchange occurred:

**Q (Reporter):** I have a question for you, Sean, though, on Yemen.

**MR. SPICER:**  Yes.

**Q:**  I did say two.

**Q:**  One of the world's most wanted terrorists is now taunting President Trump, calling him a "fool" after that raid.

**MR. SPICER:**  Right.

**Q:**  Any response from the White House?  And do you still stand by your characterization that it was a successful raid?

**MR. SPICER:**  Absolutely.  That—he was not—that was—the raid that was conducted in Yemen was an intelligence-gathering raid.  That's what it was.  It was highly successful.  It achieved the purpose it was going to get—save the loss of life that we suffered and the injuries that occurred.  The goal—

**Q:**  So you're pushing back on reporting that he was a target?

**MR. SPICER:**  Absolutely.  He was not—the goal of the raid was intelligence-gathering.  And that's what we received, and that's what we got.  That's why we can deem it a success.

Daikun Decl., Ex. 4 at 10–11.

### B.    Other Public Statements Regarding Yemen

In the years 2011 through 2015—*i.e.*, prior to the Raid—CIA officials had made three public statements that the ACLU argues demonstrate the CIA's ongoing intelligence interest in Yemen.

On September 13, 2011, in a statement before Congress "on the Terrorist Threat Ten Years After 9/11," then-CIA Director David H. Petraeus addressed "[p]olitical unrest in Yemen [that] has helped AQAP co-opt local tribes and extend its influence."  He explained that "counterterrorism cooperation with Yemen has, in fact, improved," and that "we clearly have to intensify our collaboration and deny AQAP the safe haven that it seeks to establish."  Dkt. 48 ("Second Diakun Decl."), Ex. 4 at 3–4.

On February 26, 2014, speaking at the President's Associates Dinner at the University of Oklahoma, then-CIA Director John O. Brennan identified the activities of Al-Qaeda in the

Arabian Peninsula ("AQAP") in Yemen as a one of the "challenges that cause us the greatest concern."  Second Diakun Decl., Ex. 3 at 3.  The ACLU alleges that AQAP was the target of the Raid at issue here.

On March 13, 2015, speaking before the Council on Foreign Relations, Brennan explained that CIA analysts "monitor[] developments" in a number of "hotspots," including Yemen.  Second Diakun Decl., Ex. 2 at 4.

### C.      Procedural History

On March 15, 2017, following Spicer's statements, the ACLU submitted a FOIA request about the Raid in Yemen to the CIA and other federal agencies.  In its request, the ACLU sought the release of any and all records that pertain to:

> (1) The legal and policy bases in domestic, foreign, and international law upon which the government evaluated or justified the al Ghayil Raid, including but not limited to records related to the designation of parts of Yemen as "areas of active hostilities," and the legal and factual basis that the government uses in designating such areas;
>
> (2) The process by which the government approved the al Ghayil Raid, including which individuals possessed decision-making authority and the evidentiary standard by which the factual evidence was evaluated to support the determination;
>
> (3) The process by which the decision was made to designate three parts of Yemen as "areas of active hostilities;"
>
> (4) Before-the-fact assessments of civilian or bystander casualties of the raid and the "after-action" investigation into the raid; and
>
> (5) The number and identities of individuals killed or injured in the al Ghayil Raid, including but not limited to the legal status of those killed or injured, with these separated out by individuals intentionally targeted and collateral casualties or injuries.

Diakun Decl., Ex. 1 at 2, 5.

On May 8, 2017, after no agency had released any responsive records, the ACLU filed this lawsuit to obtain compliance with its FOIA requests.  *See* Dkt. 1 ("Complaint").

6

On July 31, 2017, the CIA sent the ACLU its *Glomar* response, in the form of a letter.

*See* Diakun Decl., Ex. 2.  The letter stated:

> This [letter] is to notify you that, with respect to the FOIA request at issue in the above referenced case, the CIA cannot confirm or deny the existence or nonexistence of the requested records because to do so would reveal information that is protected by FOIA Exemptions 1 and 3, 5 U.S.C. § 552(b)(1), (b)(3).

*Id.* at 2.

On October 11, 2017, the ACLU moved for summary judgment with respect to the CIA's *Glomar* response.  It sought a declaration that its response had been unlawful, such that the CIA was obliged to respond to the FOIA request on the merits, *i.e.*, as to responsive records, either producing responsive materials or invoking an applicable FOIA exemption.  Dkts. 35 ("ACLU Motion"), 36 ("ACLU Br.").  On November 9, 2017, the CIA opposed the ACLU's motion and cross-moved for summary judgment.  Dkts. 42 ("CIA Motion"), 43 ("CIA Br.").  In support, the CIA filed a declaration by Antoinette Shiner, an Information Review Officer at the CIA's Litigation Information Review Office.  Dkt. 44 ("Shiner Decl.").  There, Shiner explained why the CIA viewed a *Glomar* response as justified consistent with FOIA Exemptions One and Three.  On November 28, 2017, the ACLU filed a brief in opposition to the CIA's motion and in further support of its own.  Dkt. 47 ("ACLU Reply").  On December 13, 2017, the CIA filed a reply.  Dkt. 52 ("CIA Reply").

On December 19, 2017, the Court held argument on the pending motions.[2]

---

[2] On January 11, 2018, the CIA brought to the Court's attention a recent decision in the United States District Court for the District of Columbia ("D.D.C."), which, it argued, supported its position.  Dkt. 53.  The ACLU submitted a letter in reply.  Dkt. 54.

## II.      Applicable Legal Standards

### A.      Summary Judgment Motions Under FOIA

FOIA governs public access to information held by the federal government.  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted).  However, "Congress realized that legitimate governmental and private interests could be harmed by release of certain types of information, and therefore provided the specific exemptions under which disclosure could be refused."  *Id.* (citation omitted).  "Recognizing past abuses, Congress sought to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy."  *Id.* (citation omitted).

"FOIA thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions."  *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011).  "These exemptions are explicitly made exclusive, and must be narrowly construed."  *Id.* (citations omitted).  "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure."  *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009).  Courts review the adequacy of the agency's justifications *de novo*.  *Id.*

Summary judgment is the usual means by which a court resolves a challenge to a government agency's FOIA response, *see, e.g.*, *Johnson v. CIA*, No. 17 CIV. 1928 (CM), 2018 WL 833940, at *2 (S.D.N.Y. Jan. 30, 2018), including one that takes the form of a *Glomar* response, *see, e.g.*, *Am. Civil Liberties Union v. CIA*, 710 F.3d 422, 425 (D.C. Cir. 2013) (Garland, C.J.) ("*ACLU*"); *Wilner*, 592 F.3d at 69; *Wolf v. CIA*, 473 F.3d 370, 372 (D.C. Cir.

8

2007).  "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.  Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible."  *Wilner*, 592 F.3d at 73 (citation omitted).  However, "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden."  *Larson v. DOS*, 565 F.3d 857, 864 (D.C. Cir. 2009).

### B.    *Glomar* Responses to FOIA Requests

An agency issues what is known as a *Glomar* response in response to a FOIA request when it refuses to confirm or deny the existence of responsive records on the ground that even to acknowledge records' existence itself would cause the harm underlying a FOIA exception.  *See Gardels v. CIA*, 689 F.2d 1100, 1102–03 (D.C. Cir. 1982); *Wolf*, 473 F.3d at 374.  The *Glomar* doctrine has its origins in a 1976 case before the United States Court of Appeals for the District of Columbia, *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), in which the CIA refused to respond to a FOIA request pertaining to the oceanic research ship the Hughes Glomar Explorer. The CIA based its refusal on the ground "that, in the interest of national security, involvement by the U.S. government in the activities which are the subject matter of [plaintiff's] request [could] neither be confirmed nor denied."  *Id.* at 1012.  "The *Glomar* doctrine is in large measure a judicial construct, an interpretation of FOIA exemptions that flows from their purpose rather than their express language."  *ACLU*, 710 F.3d at 431.  In 2009, the Second Circuit confirmed that it, like the D.C. Circuit, recognizes the viability of a *Glomar* response where factually justified.  *See Wilner*, 592 F.3d at 68–69.

"To properly employ the *Glomar* response . . . an agency must 'tether' its refusal to respond to one of the nine FOIA exemptions—in other words, 'a government agency may . . . refuse to confirm or deny the existence of certain records . . . if the FOIA exemption would itself preclude the *acknowledgment* of such documents." *Id.* (citations omitted) (emphasis in original).  As with a conventional FOIA response, an agency "resisting disclosure of the requested records has the burden of proving the applicability of an exemption.  The agency may meet its burden by submitting a detailed affidavit showing that the information logically falls within the claimed exemptions." *Id.* (internal quotation marks and citation omitted).  However, a *Glomar* response will be justified only in "unusual circumstances and only by a particularly persuasive affidavit." *Florez v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016) (citation omitted).

### C.     The FOIA Exemptions at Issue Here

The CIA's *Glomar* response here invokes FOIA Exemptions One and Three.

Exemption One "exempts from disclosure records that are 'specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy,' and 'are in fact properly classified pursuant to such Executive order.'" *Ctr. for Constitutional Rights v. CIA*, 765 F.3d 161, 164 (2d Cir. 2014) (quoting 5 U.S.C. § 552(b)(1)). The CIA here claims that the existence or nonexistence of responsive records is classified under Executive Order 13,526 ("EO 13,526").  Specifically, it points to § 1.1(4) of EO 13,526, "which permits classification of information that, if disclosed, 'reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.'" *Florez*, 829 F.3d at 182 (2d Cir. 2016) (quoting Classified National Security Information, 75 Fed. Reg. 707, 707 (Dec. 29, 2009)).  Such information must also pertain to one or more categories of activity, including "intelligence activities (including covert action), intelligence sources or methods, or

cryptology" and "foreign relations or foreign activities of the United States, including confidential sources." 75 Fed. Reg. at 707. Courts are to give deference "to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Am. Civil Liberties Union v. Dep't of Justice*, 681 F.3d 61, 70 (2d Cir. 2012) ("*Dep't of Justice*") (citation omitted).

Exemption Three "permits the Government to withhold information from public disclosure provided that: (1) the information is 'specifically exempted from disclosure by statute'; and (2) the exemption statute 'requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue' or 'establishes particular criteria for withholding or refers to particular types of matters to be withheld.'" *Id.* at 72 (quoting 5 U.S.C. § 552(b)(3)). Here, the CIA invokes § 102A(i)(l) of the National Security Act of 1947 ("NSA"), as amended 50 U.S.C. § 3024(i)(1),[3] a recognized withholding statute that protects "intelligence sources and methods from unauthorized disclosure." *CIA v. Sims*, 471 U.S. 159, 167 (1985); *see also Florez*, 829 F.3d at 183. "The Supreme Court gives even greater deference to CIA assertions of harm to intelligence sources and methods under the National Security Act . . . [b]ecause the purpose of national security exemptions to the FOIA is to protect intelligence sources before they are compromised and harmed, not after." *Wolf*, 473 F.3d at 377 (citations omitted).

**D.     The Official Acknowledgement Exception to the *Glomar* Doctrine**

An agency "loses its ability to provide a *Glomar* response when the existence or nonexistence of the particular records covered by the *Glomar* response has been officially and publicly disclosed." *Wilner*, 592 F.3d at 70. A public official or agency may officially

---

[3] Formerly 50 U.S.C. § 403–1(i)(1) and § 403–3(c)(7).

acknowledge the existence of responsive records (or lack thereof) in two ways. Most directly, that official or agency can make a statement admitting the existence of responsive records, for example, by reading excerpts of the records aloud at a congressional hearing. *See Wolf*, 473 F.3d at 379. An official acknowledgement can also occur indirectly, when the "substance of an official statement and the context in which it is made permits the inescapable inference that the requested records in fact exist." *James Madison Project v. Dep't of Justice*, No. 17-CV-00144 (APM), 2018 WL 294530, at *6 (D.D.C. Jan. 4, 2018). The Court can infer from an agency's repeated public statements about a government program that the agency possesses at least some documents related to that program. *See ACLU*, 710 F.3d at 431.

### III.   Discussion

The limited issue before the Court is whether the official-acknowledgment exception to the *Glomar* doctrine applies so as to bar the CIA from relying on the *Glomar* response that it issued to the ACLU's FOIA request for records regarding the Yemen Raid. The ACLU contends that the White House's statements by Spicer at the press briefings reviewed above represent an "official acknowledgment" of the CIA's intelligence interest in the Raid. Therefore, the ACLU argues, the CIA may not proceed by means of a *Glomar* response to the FOIA request, but must instead (like DoD, Justice, and State) review its responsive records to determine, and report on the merits, whether disclosure of these is protected by one or more FOIA exemptions. The CIA—while not disputing that the White House's statements are attributable to the CIA—disputes that these statements constitute an official acknowledgment of such a nature as to preclude a *Glomar* response.

The Court's analysis begins by reviewing the two most apposite decisions, each applying the official acknowledgement doctrine in the context of drone strikes: the D.C. Circuit's decision in *ALCU*, 710 F.3d 422; and the Second Circuit's decision in *New York Times Co. v.*

*U.S. Dep't of Justice*, 756 F.3d 100 (2d Cir. 2014) ("*New York Times*"), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014) (on other grounds), *supplemented*, 762 F.3d 233 (2d Cir. 2014) (also on other grounds).

At issue in *ACLU* was a FOIA request by the ACLU for records held by the CIA "pertaining to the use of unmanned aerial vehicles ('drones') to carry out targeted killings." *ACLU*, 710 F.3d at 425.  The President of the United States, his counterterrorism advisor, and the CIA Director had made statements that acknowledged that the United States operates drones, that the United States relies on the full range of its intelligence capabilities in deciding whether to carry out drone strikes, and that such strikes are "very precise" and "very limited in terms of collateral damage."  *See id.* at 430–31.  The ACLU argued that those statements constituted an "official acknowledgement," and thus requested disclosure of records about the use of drones.  In response, the CIA issued a *Glomar* response, asserting that a substantive response to the FOIA request "would reveal that the CIA was either [1] involved in[] or [2] interested in[] drone strikes (while denying that it did would reveal the opposite)."  *Id.* at 427.

The D.C. Circuit, per Chief Judge Garland, held that the CIA's *Glomar* response was unavailing under the "official acknowledgement" doctrine.  It reasoned that, given the "acknowledgments that the United States ha[d] participated in drone strikes, it [was] neither logical nor plausible for the CIA to maintain that it would reveal anything not already in the public domain to say that the Agency at least ha[d] an intelligence interest in such strikes.  The defendant [was], after all, the Central *Intelligence* Agency."  *Id.* at 430 (citation omitted) (emphasis in original).

The D.C. Circuit further rejected the CIA's claim that a more substantive response would reveal whether the CIA was "involved with" or "operated" drones.  It noted that: (1) the FOIA

requests at issue were not "limited to drones operated by the CIA," and (2) the CIA had offered

"no reason to believe that disclosing whether it has any documents at all about drone strikes

[would] reveal whether the Agency itself—as opposed to some other U.S. entity such as the

Defense Department—operates drones." *Id.* at 428. Finally, the D.C. Circuit reasoned, "it [was]

implausible that the CIA d[id] not possess a single document on the subject of drone strikes":

> Unless [the Court was] to believe that the Director was able to 'assure' his audience
> that drone strikes [were] 'very precise and . . . very limited in terms of collateral
> damage' without having examined a single document in his agency's possession,
> those statements [were] tantamount to an acknowledgment that the CIA ha[d]
> documents on the subject. In short, although the President, [his counterintelligence
> advisor, and the CIA Director] did not say that the CIA possesse[d] responsive
> documents, what they did say ma[de] it neither 'logical' nor 'plausible' to maintain
> that the Agency d[id] not have any documents relating to drones.

*Id.* at 431. Thus, the CIA's *Glomar* response was untenable. *Id.* at 432.

At issue in *New York Times* were FOIA requests by the New York Times and the ACLU

for records primarily related to drone strikes in Yemen that had killed American citizens "Anwar

al-Awlaki and Samir Khan in September 2011 and al-Awlaki's teenage son, Abdulrahman al-

Awlaki, in October 2011." *New York Times*, 756 F.3d at 104. The CIA made *Glomar* responses

to a subset of the ACLU's FOIA requests, even though CIA Director (and later Secretary of

Defense) Leon Panetta had made a series of public statements about the CIA's use of drones. *Id.*

at 107–08, 121–22.[4] As summarized by the Second Circuit: "The Government's core argument

---

[4] *See, e.g.*, *id.* at 117 ("On September 30, 2011, DOD released a transcript reporting then-
Secretary of Defense Panetta stating, '[W]e've been working with the Yemenis over a long
period of time to be able to target Awlaki, and I want to congratulate them on their efforts, their
intelligence assistance, their operational assistance to get the job done.'); *id.* at 118 ("A March
18, 2010, Wall Street Journal article quotes Panetta, then CIA Director: 'Anytime we get a high
value target that is in the top leadership of al Qaeda, it seriously disrupts their operations,' Mr.
Panetta said. 'It sent two important signals,' Mr. Panetta said."); *id.* ("In a June 27, 2010,
interview with Jake Tapper of ABC News, Panetta said: '[W]e are engaged in the most
aggressive operations in the history of the CIA in that part of the world, and the result is that we
are disrupting their leadership. We've taken down more than half of their Taliban leadership, of

14

to justify the *Glomar* . . .  is that identification of any document that provides legal advice to one or more agencies on the legality of targeted killings 'would tend to disclose the identity of the agency or agencies that use targeted lethal force against certain terrorists who are U.S. citizens.'" *Id.* at 122.

The Second Circuit, drawing on similar reasoning to that used by the D.C. Circuit in *ACLU*, ruled that the CIA's *Glomar* response was unjustified.  It reasoned that "the statements of Panetta when he was Director of CIA and later Secretary of Defense, set forth above, ha[d] already publicly identified CIA as an agency that had an operational role in targeted drone killings."  *Id.*  Because the CIA had been so identified, the Circuit held, its "main argument for the use of *Glomar* . . . responses evaporate[d]," and it was not entitled to summary judgment in its favor.  *Id.*

Here, the CIA defends its *Glomar* response by articulating the same interest as in those two cases and using, in fact, almost exactly the same formulation as it did in *ACLU*—that "[i]f the CIA either confirmed or denied the existence of responsive records, that would tend to confirm that the CIA either did or did not have an intelligence interest and/or operational role with respect to the Raid."  CIA Br. at 8; *see also* Shiner Decl. at 8 ("Hypothetically, if the CIA were to respond . . . by admitting that it possessed responsive records, it would indicate that the CIA had some involvement in the raid or, at a minimum, an intelligence nexus to the operation,

---

their Al Qaida leadership.  We just took down number three in their leadership a few weeks ago. . . Awlaki is a terrorist and yes, he's a United States citizen, but he is first and foremost a terrorist and we're going to treat him like a terrorist.  We don't have an assassination list, but I can tell you this.  We have a terrorist list and he's on it."); *id.* ("On October 7, 2011, Panetta, then Secretary of Defense, was quoted as saying in a speech to sailors and Marines at the United States Navy's 6th Fleet headquarters in Naples, 'Having moved from the CIA to the Pentagon, obviously I have a hell of a lot more weapons available to me in this job than I had at the CIA, although the Predators aren't bad.'").

such as providing intelligence to support it.  Such a response would reveal specific clandestine

intelligence sources, methods and activities of the CIA by showing the Agency's involvement in

this operation, and in Yemen more generally . . . .").

Were it not for the White House's public statements about the Raid, the interest that the

CIA articulates with respect to the Raid—that it is entitled not to disclose the existence or not of

an intelligence interest as to a particular subject—would likely justify its *Glomar* response.

Courts have upheld *Glomar* responses in the closely analogous context of FOIA requests

directed to the CIA involving particular individuals.  *See, e.g.*, *Wolf*, 473 F.3d at 376–77 ("[i]t is

plausible that either confirming or denying an Agency interest in a foreign national reasonably

could damage sources and methods by revealing CIA priorities"; *Glomar* response held

appropriate under Exemptions One and Three); *see also Ctr. for Constitutional Rights v. Dep't of

Defense*, 968 F. Supp. 2d 623, 638 (S.D.N.Y. 2013) (same under Exemption One); *Am. Civil

Liberties Union v. Dep't of Defense*, 752 F. Supp. 2d 361, 367–68 (S.D.N.Y. 2010) (same under

Exemption One).  And "'it is bad law and bad policy to second-guess the predictive judgments

made by the government's intelligence agencies' regarding whether disclosure of the [withheld

information] would pose a threat to national security." *Dep't of Justice*, 681 F.3d at 70–71

(quoting *Wilner*, 592 F.3d at 76).

The White House's statements about the Raid, however, change the analysis, because the

assembled statements by Spicer clearly disclosed the CIA's intelligence interest in the Raid.  For

this reason, the analyses of the D.C. Circuit in *ACLU* and the Second Circuit in *New York Times*,

holding that an official acknowledgment precluded the CIA's respective *Glomar* responses,

apply with force here.  In particular, Spicer explicitly acknowledged that the U.S. participated in

the Yemen Raid; that the Raid was an "intelligence-gathering raid"; and that the Director of the

Central *Intelligence* Agency (explicitly referred to by his official title) was in the room when the Raid was "laid out in great extent" and at a time when "the indication . . . was to go ahead." Under any reasonable reading, these statements revealed the CIA's intelligence interest in the Raid, a point further underscored by the CIA's prior acknowledgement of its intelligence interest in Yemen.[5]  *See ACLU*, 710 F.3d at 431 ("'There comes a point where . . . Court[s] should not be ignorant as judges of what [they] know as men' and women." (quoting *Watts v. Indiana*, 338 U.S. 49, 52 (1949) (opinion of Frankfurter, J.)).

The Court has considered the CIA's various arguments in response, but does not find any persuasive.

To the extent the CIA contends that a substantive, *i.e.*, a non-*Glomar*, response to the ACLU's FOIA request here would inevitably reveal the CIA's operational role (if any) in the Raid, that is mistaken, for two independent reasons.  First, as in *ACLU*, none of the ACLU's five requests here have asked the CIA to turn over records related to the CIA's operational role in the Raid.  Indeed, none ask the CIA to yield documents related to *any* agency's operational role. The requests instead are for documents regarding the legal and policy basis for the Raid, the processes involved in the Raid's approval, and after-action assessments of the Raid's outcome. Second, even assuming *arguendo* that a response by the CIA revealing the existence of records responsive to such requests otherwise might have tended to reveal that the CIA had a hand in the operation of the Raid, on the facts here, no such inference would arise.  That is because Spicer's statement acknowledged that other agencies—most relevant, the Department of Defense, a unit

---

[5] The CIA argues that *ACLU* and *New York Times* are distinguishable because in those cases the agency at issue had made a greater number of official statements on the topic at hand than did Spicer.  But whether Spicer acknowledged one time or 10 the CIA's intelligence interest in the Raid is not determinative.  What matters is that Spicer's statements inescapably revealed the CIA's intelligence interest in the Raid.

of government with obvious military and intelligence operational capabilities—were involved in the Raid.  It therefore is not plausible or logical to claim that disclosing the possession by the CIA of responsive documents regarding the Raid would be reasonably expected to reveal that the CIA in particular carried out, or had the operational capability to carry out, this mission.

To the extent that the CIA argues that Spicer's statements do not themselves reveal the agency's possession of one or more records relating to the Raid, that argument does not carry the day, because the attendant circumstances compel the inference that the agency possesses some such records.  As in *ACLU*, where the D.C. Circuit held it "implausible that the CIA d[id] not possess a single document on the subject of drone strikes," 710 F.3d at 431, Spicer's statements admitting the CIA's intelligence interest in the Raid—and the CIA's multiple earlier acknowledgments of its broader intelligence interest in Yemen—make the inference unavoidable that the CIA has, at a minimum, some records related to the Raid.  It is not logical or plausible to claim otherwise.  According to Spicer, the Raid was "highly successful" in achieving its "intelligence-gathering" mission and resulted in the loss of an American life.  The Court is unprepared to accept that the CIA Director attended the meeting with the President in which that Raid was discussed and appears to have been approved, but that neither he nor his staff ever generated or received any documentation whatsoever (even in the form of a calendar entry or preparatory paperwork) related to that meeting or the Raid before, during, or after these occurred.  Taking the White House press secretary's statements regarding the Raid at face value, the only rational inference is that the CIA must possess at least some records related to the Raid as to which the CIA Director was personally briefed.[6]

---

[6] The CIA proffers that, as yet, it has not uncovered any records related to Director Pompeo's attendance at the meeting at which the Raid was discussed. *See* Shiner Decl. at 5.  In the event that a sufficiently thorough search ultimately yields a lack of records responsive to one or more

The CIA next argues that an agency can lose its ability to provide a *Glomar* response only "when the existence or nonexistence of the particular *records* covered by the *Glomar* response has been officially and publicly disclosed."  CIA Reply at 8 (emphasis in original) (quoting *Wilner*, 592 F.3d at 70); *see also* CIA Br. at 21–22.  There is indeed language in Second Circuit decisions in accord with this view.  *See, e.g.*, *Wilner*, 592 F.3d at 70.  But the case law also holds that where an agency's official acknowledgments make untenable the basis of its *Glomar* response—*i.e.*, where agency statements have exposed as fallacious the basis for claiming that revealing the existence of records would cause the harm underlying a FOIA exemption—the agency's *Glomar* response may be rejected in toto.  *See, e.g.*, *ACLU*, 710 F.3d at 429–30; *New York Times*, 756 F.3d at 122; *cf. Florez*, 829 F.3d at 187 (noting, though not in context of official-acknowledgements doctrine, that the FBI disclosures might "bear[] upon the sufficiency of the justifications set forth by the CIA in support of its *Glomar* response").  Thus, for example, in *New York Times*, the Second Circuit held—without a more particularized inquiry into whether the existence of records responsive to specific FOIA requests had been revealed— that, in light of the CIA's public statements, its justifications for its *Glomar* response "evaporate[d]."  *New York Times*, 756 F.3d at 122.  That principle applies here:  The heart of the CIA's *Glomar* response is that a response on the merits would reveal the CIA's intelligence interest in the Raid.  The White House's statements, however, have effectively acknowledged such an interest, vitiating the *Glomar* response.

---

of the FOIA requests, the CIA, like any FOIA respondent, would be at liberty then to respond to that request by reporting the absence of any responsive records.  But, because the CIA responded to the ACLU's FOIA request here by means of a *Glomar* response, the litigation as to the CIA's compliance with the FOIA request has not yet reached that stage.

Finally, the CIA argues that the ACLU's FOIA request should be denied because the classified information sought by the ACLU is more specific in nature than the information Spicer disclosed.  It asks the Court to uphold its *Glomar* response on the basis of the test articulated in *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009), with respect to the tailoring required between a FOIA request for classified information and the prior official disclosures of that information.[7] The *Wilson* test asks whether the information requested by the plaintiff "matches" the information previously disclosed, and is generally used to determine whether an agency has waived its ability to invoke a particular FOIA exemption.  The Second Circuit has recently called into question how strictly the *Wilson* test is to be applied in practice, *see New York Times*, 756 F.3d at 436 n.19, and the ACLU argues that the test has been supplanted entirely by the "logical and plausible" standard discussed in *ACLU*.

The Court, however, need not address that question here.  In the context of "official acknowledgments," as in the context of determining the applicability of a FOIA exemption more generally, "the government retains the burden of persuasion that [the] information [sought] is not subject to disclosure under FOIA."  *Inner City Press/Cmty. on the Move v. Bd. of Governors of Fed. Reserve Sys.*, 463 F.3d 239, 245 (2d Cir. 2006).[8]  Because the CIA has failed to meet this

---

[7] The *Wilson* test (which, in the D.C. Circuit, is termed the *Fitzgibbon* test) is as follows: "Classified information that a party seeks to obtain or publish is deemed to have been officially disclosed only if it (1) [is] as specific as the information previously released," (2) match[es] the information previously disclosed," and (3) was "made public through an official and documented disclosure."  *Wilson*, 586 F.3d at 186.  "In the Glomar context . . . if the prior disclosure establishes the existence (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue—the existence of records—and the specific request for that information.  In other words, in the Glomar context, the first and second prongs of *Fitzgibbon* [or *Wilson*] merge into one and the third prong continues to operate independently."  *James Madison Project*, 2018 WL 294530, at *5.

[8] The ACLU has the burden of production as to the CIA's official acknowledgments.  *See Inner City Press*, 463 F.3d at 245.  Neither party disputes that it has met that burden.

threshold burden, the Court need not confront the logically subsequent question of the requisite degree of tailoring between the information the ACLU has requested and Spicer's official acknowledgment.  Neither *ACLU* nor *New York Times*, in similarly rejecting as implausible the justifications for *Glomar* responses by the CIA, separately considered *Wilson*.[9]  And the CIA does not cite any case applying *Wilson* to preclude a merits response to a FOIA request where the agency's justifications for the *Glomar* response at issue have been held implausible.  As discussed below, the Court will give CIA the opportunity to submit a new and more tailored *Glomar* response to the ACLU's FOIA request.  In the event of such a response, the Court may then have occasion to consider *Wilson*'s application.  The Court therefore rejects the CIA's motion for summary judgment.

The ACLU's competing motion presents a more complex question.  The ACLU asks for entry of summary judgment in its favor, so as to now require the CIA—like DoD, Justice, and State—to either produce responsive records or produce a *Vaughn* index identifying those records that are properly withheld pursuant to a FOIA exemption.  This familiar procedure was followed by the panels in both *ACLU*, 710 F.3d at 433, and *New York Times*, 756 F.3d at 122.

The Court's judgment, however, is that the wiser course in this case is to give the CIA an opportunity first to assess whether a more targeted *Glomar* submission may viably be made.  The Court has rejected the CIA's capacious *Glomar* theory, that a substantive response could reveal the CIA's intelligence interest in the Raid, because that interest has been acknowledged.  But as the CIA notes in the course of making its argument based on *Wilson*, a number of the ACLU's document requests seek much more specific (and comprehensive) data and records than revealed

---

[9] *New York Times* did consider *Wilson*, not in its discussion of *Glomar*, but in its discussion of another agency's invocation of FOIA exemptions as to a particular legal memorandum.  *See New York Times* 56 F.3d at 120.

by Press Secretary Spicer's broad pronouncements.  A substantive FOIA response to some of these requests possibly might tend to reveal information covered by FOIA Exemptions One and Three.  For example, the ACLU's third request seeks records that pertain to "[t]he process by which the decision was made to designate three parts of Yemen as 'areas of active hostilities.'" However, on the record at hand, the CIA has not officially acknowledged that it or any other agency ever designated any part of Yemen as an "area of active hostilities"; a merits response to that request might reveal more than what Spicer's statements acknowledged.  FOIA requests one, four and five similarly appear amenable, potentially, to valid *Glomar* tailored to those specific requests.[10]  The Court will therefore give the CIA a second chance to supply a *Glomar* response with respect to requests one, three, four, and five.  The Court therefore denies the ACLU's motion for summary judgment as to those FOIA requests.

FOIA request two, however, is different.  It asks for records that pertain to: "[t]he process by which the government approved the al Ghayil Raid, including which individuals possessed decision-making authority and the evidentiary standard by which the factual evidence was evaluated to support the determination."  As to that request, Spicer's statements put CIA Director Pompeo in the proverbial "room where it happened."  Spicer revealed that Pompeo participated in the "process by which the government approved the al Ghayil Raid"—Pompeo, Spicer stated, was present when the Raid was "laid out in great extent" and at the time when "the indication . . . was to go ahead."  The CIA is at liberty of course to claim, on the merits, that records responsive to this request are sheltered by one or more FOIA exemptions.  But the revelation that the CIA

---

[10] The Court, absent a supplemental affidavit by the CIA and briefing by the parties, does not prejudge the ultimate propriety of a *Glomar* response as to requests one, three, four, and five.

contains records responsive to this request has already effectively been made.[11]  Given Spicer's statements, it "beggars belief," *ACLU*, 710 F.3d at 431, that the CIA is devoid of records responsive to request two.  The Court will therefore grant summary judgment in favor of the ACLU as to the application of the *Glomar* doctrine to FOIA request two.[12]

## CONCLUSION

For the foregoing reasons, the CIA's motion for summary judgment is denied in full and the ACLU's motion for summary judgment is denied except as to FOIA request two, as to which it is granted.

The CIA is directed to submit any new *Glomar* response with respect to requests one, three, four and five within two weeks of this order.  Upon submission of such a response, the Court will entertain a joint proposal from counsel as to a prompt schedule for briefing the validity of such a response.  If no such response is submitted, the CIA is directed promptly to produce responsive records and/or a *Vaughn* index to plaintiffs, as have the other three

---

[11] The Court finds that, as request two, the ACLU has met the *Wilson* test (no matter how strictly it is construed).  In the *Glomar* context, the operative question is not whether the records requested ultimately match the official acknowledgment.  Instead, the question is whether the official acknowledgment "matches" the facts (*i.e.*, the existence or not of records) that would be revealed were the agency to respond to the FOIA request with anything other than a *Glomar* response (such as with a no number, no list response).  Here, because Press Secretary Spicer has effectively revealed that at least some records responsive to request two do exist, that standard has been met here.

[12] The Court expects the CIA to move with dispatch to collect records responsive to request two in anticipation of producing either them or a *Vaughn* index chronicling the records withheld and the basis for their withholding.  However, the Court will defer the CIA's duty to furnish such materials to plaintiffs until litigation is complete as to any ensuing *Glomar* response with respect to requests one, three, four and five.  Limiting the CIA to a single *Vaughn* index, as opposed to (potentially) to serial such indexes covering overlapping documents, is more economical.  The Court takes no position, at this stage, on the degree of specificity required in the CIA's forthcoming *Vaughn* index, including whether a "no number, no list response" (a "kind of" "radically minimalist" *Vaughn* index, *ACLU*, 710 F.3d at 433) is appropriate.

defendants.  As to request two, the CIA is directed forthwith to collect records responsive to this request and to be prepared, after the status of the other four requests has been resolved, promptly to produce to the ACLU responsive materials and/or a *Vaughn* Index chronicling withheld materials.

The Clerk of Court is respectfully directed to close the motions pending at Dkts. 35 and 42.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 27, 2018
New York, New York

24