# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

AMERICAN CIVIL LIBERTIES UNION and
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,

　　　　　　　　　　*Plaintiffs*,

　　　v.

DEPARTMENT OF DEFENSE, CENTRAL
INTELLIGENCE AGENCY, DEPARTMENT
OF JUSTICE, and DEPARTMENT OF
STATE,

　　　　　　　　　　*Defendants*.

**Oral Argument Requested**

17 Civ. 3391 (PAE

**ECF CASE**

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CROSS-MOTION
FOR SUMMARY JUDGMENT AGAINST DEFENDANTS
DEPARTMENT OF STATE AND DEPARTMENT OF DEFENSE,
AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Anna Diakun
Brett Max Kaufman
Hina Shamsi
American Civil Liberties Union
　 Foundation
125 Broad Street—18th Floor
New York, New York 10004
Phone: 212.549.2500
Fax: 212.549.2654
adiakun@aclu.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 1

   I.   The Government's Account of the Raid .......................................................................... 2

   II.  The Government's Legal and Policy Standards Applicable to the Raid ......................... 5

   III.  The FOIA Request and Plaintiffs' Challenges .............................................................. 8

ARGUMENT ....................................................................................................................... 11

   I.   Legal Framework .......................................................................................................... 11

   II.  The government has improperly withheld information from the public........................ 12

       A.  The government's Exemption 1 withholdings are overbroad. .................................. 12

          1.  Official acknowledgments cast serious doubt on the government's Exemption
             1 withholdings................................................................................................... 13

          2.  Pure legal analysis cannot be withheld under Exemption 1. ............................ 15

       B.  The government has not established that Exemption 5 applies. ............................... 16

          1.  Deliberative Process Privilege ......................................................................... 17

          2.  Presidential Communications Privilege............................................................. 17

          3.  Waiver .............................................................................................................. 19

          4.  Working Law ..................................................................................................... 20

       C.  Defendants improperly withheld in full or in part each challenged document.......... 20

          1.  The State Department failed to justify withholding information from four
             challenged documents. ..................................................................................... 20

          2.  DOD failed to justify withholding information from nineteen challenged
             documents. ........................................................................................................ 25

   III. The government has failed to segregate and release all non-exempt information........... 33

   IV. This Court should review the withheld documents *in camera*. ..................................... 35

CONCLUSION..................................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*ACLU v. DOD*,
  322 F. Supp. 3d 464 (S.D.N.Y. 2018) .............................................................................. passim

*ACLU v. DOD*,
  No. 15 Civ. 9317 (AKH), (S.D.N.Y. July 31, 2017) ................................................................. 32

*ACLU v. DOJ*,
  90 F. Supp. 3d 201 (S.D.N.Y. 2015) ......................................................................... 20, 30, 31

*ACLU v. DOJ*,
  No. 12-cv-7412 (WHP), 2014 WL 956303 (S.D.N.Y. Mar. 11, 2014) .................................... 35

*ACLU v. DOJ*,
  No. 15 Civ. 1954 (CM), 2016 WL 889739 (S.D.N.Y. Mar. 4, 2016) ............................... passim

*Arthur Andersen & Co. v. IRS*,
  679 F.2d 254 (D.C. Cir. 1982) .......................................................................................... 24

*Bloomberg, L.P. v. Bd. of Governors of Fed. Reserve Sys.*,
  601 F.3d 143 (2d Cir. 2010) ............................................................................................. 11

*Brennan Ctr. for Justice v. DOJ*,
  697 F.3d 184 (2d Cir. 2012) ................................................................................... 17, 20, 21

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ..................................................................................... passim

*CREW v. DHS*,
  06-0173, 2008 WL 2872183 (D.D.C. July 22, 2008) ............................................................ 18

*Ctr. for Constitutional Rights v. CIA*,
  765 F.3d 161 (2d Cir. 2014) ............................................................................................. 12

*Ctr. for Effective Gov't v. DOS*,
  7 F. Supp. 3d 16 (D.D.C. 2013) ..................................................................................... 18, 19

*Dep't of Air Force v. Rose*,
  425 U.S. 352 (1976) ....................................................................................................... 11

*Dow Jones & Co. v. DOJ*,
  880 F. Supp. 145 (S.D.N.Y. 1995) ..................................................................................... 19

*FBI v. Abramson*,
    456 U.S. 615 (1982) ................................................................................. 12

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ............................................ 18, 19, 22, 23

*Judicial Watch, Inc. v. DOJ*,
    365 F.3d 1108 (D.C. Cir. 2004) ................................................ 18, 22, 24

*Larson v. DOS*,
    565 F.3d 857 (D.C. Cir. 2009) ................................................................. 12

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) ................................................................ 12

*Milner v. Dep't of Navy*,
    562 U.S. 562 (2011) ................................................................................ 11

*N.Y. Times Co. v. DOJ* (*N.Y. Times Co. I*),
    756 F.3d 100 (2d Cir. 2014) ........................................................... passim

*Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*,
    811 F. Supp. 2d 713 (S.D.N.Y. 2011) ..................................................... 17

*NLRB v. Sears*,
    421 U.S. 132 (1975) ................................................................... 20, 24, 30

*PHE, Inc. v. DOJ*,
    983 F.2d 248 (D.C. Cir. 1993) ................................................................ 35

*Senate of P.R. v. DOJ*,
    823 F.2d 574 (D.C. Cir. 1987) ........................................................ 17, 28

*Tax Analysts v. IRS*,
    117 F.3d 607 (D.C. Cir. 1997) ................................................................ 20

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973) ................................................................ 35

*Wilner v. Nat'l Sec. Agency*,
    592 F.3d 60 (2d Cir. 2009) ............................................................... 12, 34

*Wilson v. CIA*,
    586 F.3d 171 (2d Cir. 2009) ................................................................... 13

*Wolfe v. Dep't of Health & Human Servs.*,
   839 F.2d 768 (D.C. Cir. 1998) ................................................................ 19

## Statutes

5 U.S.C. § 552 ............................................................................................. passim

## Other Authorities

Alex Emmons, *Pentagon Says 35 Killed in Trump's First Yemen Raid—More than Twice As
   Many As Previously Reported*, Intercept, Dec. 20, 2018 ............................... 4

Chairman of the Joint Chiefs of Staff, No-Strike and the Collateral Damage Estimation
   Methodology (Feb. 13, 2009) ...................................................................... 8

Charlie Savage, *Will Congress Ever Limit the Forever-Expanding 9/11 War?*,
   N.Y. Times, Oct. 28, 2017 .......................................................................... 7

Cheryl Pellerin, *Pentagon Provides Updates on Support for Operations in Yemen, Somalia*,
   U.S. Dep't of Def., Aug. 4, 2017 ................................................................. 5

Dan Lamothe, *The White House Says a Deadly Raid in Yemen Was Long Planned in
   Washington. Not True, Say Officials Who Served Obama*, Wash. Post, Feb. 2, 2017 ............... 2

Eric Schmitt & David E. Sanger, *Raid in Yemen: Risky from the Start and Costly in the End*,
   N.Y. Times, Feb. 1, 2017 ............................................................................ 2

Exec. Order 13,526 ...................................................................................... 16

*Hearing to Receive Testimony on United States Central Command and United States Africa
   Command: Hearing Before the S. Comm. on Armed Servs.*,
   115th Cong. 89 (Mar. 9, 2017) ................................................................ 3, 4

Interview with Andrew Exum and Colin Kahl, *On Yemen Raid Planning, Where Did the Obama
   Administration Leave Off for Trump to Pick Up?*, PBS News Hour, Mar. 1, 2017 ................. 22

Iona Craig, *Death in al Ghayil*, Intercept, Mar. 9, 2017 ................................. 2

Joseph Trevithick, *A USAF C-17 Flew a Secretive Mission Into Yemen to Rescue Wounded
   Emirati Troops in 2017*, Warzone, Dec. 13, 2018 .......................................... 5

Larry LeGree & Chick Rideout, *BATAAN Amphibious Ready Group 24th Marine Expeditionary
   Unit Post-Deployment Brief*, Oct. 18, 2017 ................................................. 5

Press Briefing, White House Off. of Press Sec'y,
   Press Briefing by Press Secretary Sean Spicer (Feb. 2, 2017) ........................... passim

Press Release, U.S. Central Command,
  Statement on Yemen Raid (Feb. 1, 2017) ......................................................... 2, 3, 4

Procedures for Approving Direct Action Against Terrorist Targets Located Outside of the United
  States and Areas of Active Hostilities (May 22, 2013) ......................................... 7, 31

Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force
  and Related National Security Operations, White House (2016).............................. 6, 7, 14, 23

Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force
  and Related National Security Operations, White House (2018).............................. 6, 7

Republican Policy Comm. Statement on Freedom of Information Legislation,
  S.1160, 112 Cong. Rec. 13020 (1966) ....................................................................... 14

Tara Copp, *US Puts Boots on the Ground in Yemen to Attack AQAP*,
  Military Times, Aug. 4, 2017 ..................................................................................... 5

Terri Moon Cronk, *Pentagon Spokesman Describes U.S. Raid in Yemen*,
  U.S. Cent. Command, May 23, 2017 ......................................................................... 28

Terri Moon Cronk, *U.S. Raid in Yemen Garners Intelligence*,
  U.S. Cent. Command (Jan. 30, 2017)......................................................................... 3, 4

*United States Special Operations Command: Hearing Before the S. Comm. on Armed Servs.*,
  115th Cong. 33 (May 4, 2017) .................................................................................... 7

## PRELIMINARY STATEMENT

Within days of taking office, President Trump approved a raid in al Ghayil, Yemen (the "Raid"). The operation went awry, and the Raid turned deadly: according to reports, one U.S. Navy SEAL died, other service members were wounded, and as many as ten Yemeni children were killed. Nevertheless, the government touted the Raid as a success in its public narrative.

The ACLU filed a Freedom of Information Act ("FOIA") request to provide the public with information about the Raid and its consequences, and subsequently filed suit to enforce the request. After multiple rounds of briefing, negotiation, and re-processing of documents, the ACLU has narrowed its challenges to Defendants' withholdings in twenty-three documents based on Defendants' failure to establish that they can properly withhold that information.

Defendants withhold information on the basis of Exemptions 1 and 5, claiming that releasing this information would endanger national security and compromise its decision-making processes. Plaintiffs explain why these claims do not withstand scrutiny, first describing the wealth of information the government has officially acknowledged about the Raid, and then describing the requirements of the privileges Defendants invoke. After describing the applicable facts and law, Plaintiffs detail their arguments with respect to each of the challenged documents.

For the reasons sets forth below, the ACLU respectfully requests that the Court deny Defendants' motion for summary judgment and order them to produce the withheld information.

## STATEMENT OF FACTS

On January 29, 2017, the U.S. government carried out a ground raid in Yemen, the first such operation approved by the Trump administration.[1] After press reports revealed that the Raid

---

[1] Press Release, U.S. Central Command, Statement on Yemen Raid (Feb. 1, 2017), http://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/1068267/us-

had resulted in several deaths, the government faced criticism.[2] This prompted the White House and the military to defend the Raid by describing in detail the government's planning process, how it unfolded, and its aftermath. The government later revealed that the Raid was part of a larger plan to support a United Arab Emirates' ("UAE") military offensive against al Qaeda in the Arabian Peninsula ("AQAP") in Yemen, called the "Shabwah Offensive."[3] Former government officials and reporting by human rights organizations and journalists have called parts of this narrative into question.[4]

Below, Plaintiffs recount the government's public statements about the Raid, the Shabwah Offensive, and the legal and policy frameworks concerning the use of lethal force abroad to which the government claims to adhere. Each is relevant to the agencies' withholdings, especially as they relate to the "official acknowledgment" doctrine. *See infra* Argument § II.A.

## I.    The Government's Account of the Raid

According to the government, planning for the Raid began in 2016, during the Obama administration.[5] The government designed the "intelligence-gathering raid" as a "site exploitation operation" to target an alleged AQAP compound in al-Bayda, Yemen.[6] One goal of

---

central-command-statement-on-yemen-raid ("Feb. 1 Press Release") (attached as Diakun Decl., Ex. 1).

[2] *See, e.g.*, Eric Schmitt & David E. Sanger, *Raid in Yemen: Risky from the Start and Costly in the End*, N.Y. Times, Feb. 1, 2017, https://nyti.ms/2jXAIBs.

[3] JS/038-039 (attached as Diakun Decl., Ex. 2); JS/240-242 (attached as Diakun Decl., Ex. 3).

[4] *See, e.g.*, Dan Lamothe, *The White House Says a Deadly Raid in Yemen Was Long Planned in Washington. Not True, Say Officials Who Served Obama*, Wash. Post, Feb. 2, 2017, https://wapo.st/2kxsQcQ; Iona Craig, *Death in al Ghayil*, Intercept, Mar. 9, 2017, https://interc.pt/2mK3RF2.

[5] Press Briefing, White House Off. of Press Sec'y, Press Briefing by Press Secretary Sean Spicer (Feb. 2, 2017), https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sean-spicer-020217 ("Spicer Feb. 2 Press Briefing") (attached as Diakun Decl., Ex. 4).

[6] *ACLU v. DOD*, 322 F. Supp. 3d 464, 469 (S.D.N.Y. 2018); Terri Moon Cronk, *U.S. Raid in Yemen Garners Intelligence*, U.S. Cent. Command (Jan. 30, 2017), http://www.centcom.mil/

the Raid was to "capture AQAP leaders."[7]

In the days following the Raid, then–Press Secretary Sean Spicer gave an account of its planning and approval process. According to Spicer, on January 6, 2017, the Deputies Committee of the National Security Council convened to review the proposal and "recommended at that time that they go ahead."[8] The plan was "easily approved," and the Committee decided "to hold for what they called a 'moonless night,'" which would not occur until President Trump took office.[9] On January 25, President Trump convened a dinner meeting with a number of top advisors, including CIA Director Mike Pompeo.[10] At that meeting, "the operation was laid out in great extent," and the president approved a plan to support the UAE Shabwah Offensive and the specific Raid as part of the larger plan.[11] The Deputies Committee met again the next morning, but according to Spicer, this "was not a necessary step because they had previously recommended and also reaffirmed their support."[12]

On January 29, U.S. personnel executed the Raid.[13] According to the military, this caused between four and twelve civilian deaths.[14] These victims were "potentially caught up in aerial

MEDIA/NEWS-ARTICLES/News-Article-View/Article/1065112/us-raid-in-yemen-garners-intelligence ("Jan. 30 CENTCOM Article") (attached as Diakun Decl., Ex. 5).

[7] *See* CENTCOM/330 (attached as Diakun Decl., Ex. 6). The CENTCOM Commander "specifically direct[ed] that the detainees shall remain in UAE custody (unless they are [high-value targets])." *See* JS/222 (attached as Diakun Decl., Ex. 7).

[8] Spicer Feb. 2 Press Briefing, Ex. 4.

[9] *Id.*

[10] *Id.*

[11] *Id.*; *see* JS/038-039, Ex. 2; JS/240-242, Ex. 3.

[12] Spicer Feb. 2 Press Briefing, Ex. 4.

[13] Feb. 1 Press Release, Ex. 1.

[14] *See Hearing to Receive Testimony on United States Central Command and United States Africa Command: Hearing Before the S. Comm. on Armed Servs.*, 115th Cong. 89 (Mar. 9, 2017), https://www.armed-services.senate.gov/imo/media/doc/17-18_03-09-17.pdf (statement of Gen. Joseph Votel, Commander, U.S. Cent. Command) ("Mar. 9 Senate Hearing") (attached as Diakun Decl., Ex. 8).

gunfire that was called in to assist U.S. forces" who were "receiving fire from all sides to include houses and other buildings."[15] "This complex situation included small arms fire, hand grenades and close air support fire."[16]

The government initially stated that fourteen alleged AQAP members were killed, including multiple "female fighters."[17] However, according to a Department of Defense ("DOD") document released to a journalist through a FOIA request in late 2018, the Raid's "battle damage assessment (BDA) included approximately 35 enemy killed in action."[18] Chief Petty Officer William "Ryan" Owens also died in the Raid, and at least three other service members were wounded "when an Osprey MV-22 tilt-rotor aircraft made a hard landing during the operation."[19] A U.S. airstrike intentionally destroyed the damaged aircraft.[20]

DOD conducted three separate investigations into the Raid: one concerning the civilian casualties, one concerning the death of Chief Petty Officer Owens, and one concerning the destruction of the Osprey.[21]

The Raid appears to be the first U.S. action taken in support of the UAE's Shabwah Offensive.[22] According to a CENTCOM public affairs officer, since then, U.S. forces have "provided the Emiratis with intelligence support; airborne [intelligence, surveillance, and reconnaissance]; advice and assistance with operational planning; maritime interdiction and

---

[15] Feb. 1 Press Release, Ex. 1.

[16] *Id.*

[17] Jan. 30 CENTCOM Article, Ex. 5.

[18] Alex Emmons, *Pentagon Says 35 Killed in Trump's First Yemen Raid—More Than Twice As Many As Previously Reported*, Intercept, Dec. 20, 2018, https://theintercept.com/2018/12/20/yemen-raid-investigation (attached as Diakun Decl., Ex. 9).

[19] *Id.*; Feb. 1 Press Release, Ex. 1; *ACLU v. DOD*, 322 F. Supp. 3d at 469.

[20] Jan. 30 CENTCOM Article, Ex. 5.

[21] Mar. 9 Senate Hearing at 89, Ex. 8.

[22] *See* JS/039, Ex. 2.

security operations; medical support; and aerial refueling."[23] This support also involved "close air support," "a small number of [U.S.] forces on the ground," and the support of the U.S. Navy's Bataan Amphibious Ready Group.[24] And according to DOD documents released through this litigation, DOD also prepared for potential cyber operations in support of the Offensive.[25] A Pentagon spokesman acknowledged that by August 2017, the military had "conducted more than 80 strikes against [AQAP] militants, infrastructure, fighting positions and equipment," all of which were "based upon the authorities granted in the operation that began" with the Raid.[26]

## II.    The Government's Legal and Policy Standards Applicable to the Raid

The government has publicly explained its asserted domestic and international legal justifications for operations against AQAP in Yemen, as well as some of the specific policy standards it applies during operations like the Raid.

In 2018, the White House released a report on the legal framework for the use of force abroad, describing military actions carried out in Yemen and elsewhere and the justifications for them. The report stated that in 2017, the government continued to "conduct[] direct action

---

[23] Joseph Trevithick, *A USAF C-17 Flew a Secretive Mission Into Yemen to Rescue Wounded Emirati Troops in 2017*, Warzone, Dec. 13, 2018, https://www.thedrive.com/the-war-zone/25484/a-usaf-c-17-flew-a-secretive-mission-into-yemen-to-rescue-wounded-emirati-troops-in-2017 (attached as Diakun Decl., Ex. 10).

[24] Tara Copp, *US Puts Boots on the Ground in Yemen to Attack AQAP*, Military Times, Aug. 4, 2017, https://www.militarytimes.com/flashpoints/2017/08/04/us-ground-forces-airstrikes-attack-aqap-in-yemen (attached as Diakun Decl., Ex. 11); Larry LeGree & Chick Rideout, *BATAAN Amphibious Ready Group 24th Marine Expeditionary Unit Post-Deployment Brief* at 5, Oct. 18, 2017, https://ndiastorage.blob.core.usgovcloudapi.net/ndia/2017/expwar/LeGree_Rideout.pdf (attached as Diakun Decl., Ex. 12).

[25] *See* JS/359 (attached as Diakun Decl., Ex. 13).

[26] Cheryl Pellerin, *Pentagon Provides Updates on Support for Operations in Yemen, Somalia*, U.S. Dep't of Def., Aug. 4, 2017, https://dod.defense.gov/News/Article/Article/1269091/pentagon-provides-updates-on-support-for-operations-in-yemen-somalia (attached as Diakun Decl., Ex. 14).

against AQAP in Yemen as described in" a December 2016 report on the use of force.[27] In the

December 2016 report, the White House stated:

> The United States has been working closely with the Government of Yemen to dismantle operationally and ultimately eliminate the terrorist threat posed by AQAP. As part of this effort, the United States has taken direct action, including airstrikes, against a limited number of AQAP operatives and senior leaders in Yemen who posed a threat to the United States. The United States has also deployed small numbers of U.S. military personnel to Yemen to support operations against AQAP, including support for operations to capture AQAP leaders and key personnel.[28]

The report further asserted that, "[a]s a matter of international law, the United States has

conducted counterterrorism operations against AQAP in Yemen with the consent of the

Government of Yemen in the context of the armed conflict against AQAP and in furtherance of

U.S. national self-defense."[29] According to the report, as a matter of domestic law, "the 2001

AUMF confers authority to use force against AQAP" because AQAP is an "associated force" of

al Qaeda, in that it is both "an organized, armed group that has entered the fight alongside al-

Qa'ida or the Taliban" and "a co-belligerent with al-Qa'ida or the Taliban in hostilities against

the United States or its coalition partners."[30]

    As to the Raid specifically, the government revealed that the relevant area of Yemen was

designated as an "area of active hostilities" for the purposes of the operation.[31] As the White

House has previously explained,

---

[27] Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations, White House 6 (2018) ("2018 White House Report") (attached as Diakun Decl., Ex. 15).

[28] Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations, White House 18 (2016) ("2016 White House Report") (attached as Diakun Decl., Ex. 16).

[29] *Id.*

[30] *Id.* at 4, 18.

[31] *See, e.g.*, JS/058 (attached as Diakun Decl., Ex. 42).

> The determination as to whether a region constitutes an "area of active hostilities" does not turn exclusively on whether there is an armed conflict under international law taking place in the country at issue, but also takes into account, among other things, the size and scope of the terrorist threat, the scope and intensity of U.S. counterterrorism operations, and the necessity of protecting any U.S. forces in the relevant location.[32]

According to the government, the "area of active hostilities" designation exempts an operation from certain policy constraints that safeguard against civilian harm."[33] DOD officials later testified to Congress that one of those constraints—the "requirement of near certainty that no civilian casualties will result"—nonetheless applied to the Raid.[34]

DOD officials also testified that the military had adhered to the law of armed conflict during the operation.[35] In its 2016 Report, the White House asserted that, "under the law of armed conflict, States may target specific, identified individual members of an enemy force as well as individuals directly participating in hostilities."[36] It also stated that the United States must comply with the "fundamental principles of necessity, humanity, distinction, and proportionality,"[37] which safeguard against civilian harm. Finally, a public Chairman of the Joint Chiefs of Staff Instruction document states that there is "an inherent responsibility" to

---

[32] 2016 White House Report at 25, Ex. 16.

[33] Those safeguards are found in a document called the "PPG," which applies to the use of force *outside* "areas of active hostilities." *See generally* Procedures for Approving Direct Action Against Terrorist Targets Located Outside of the United States and Areas of Active Hostilities (May 22, 2013), https://www.justice.gov/oip/foia-library/procedures_for_approving_direct_action_against_terrorist_targets/download ("PPG") (attached as Diakun Decl., Ex. 17). Although the Trump administration has reportedly replaced the PPG, it did not do so until months after the Raid. *See* Charlie Savage, *Will Congress Ever Limit the Forever-Expanding 9/11 War?*, N.Y. Times, Oct. 28, 2017, https://nyti.ms/2yTGUmc.

[34] *United States Special Operations Command: Hearing Before the S. Comm. on Armed Servs.*, 115th Cong. 33 (May 4, 2017), https://www.armed-services.senate.gov/imo/media/doc/17-41_05-04-17.pdf (attached as Diakun Decl., Ex. 18).

[35] *Id.*

[36] 2016 White House Report at 19, Ex. 16.

[37] 2018 White House Report at 7, Ex. 15; *see also* 2016 White House Report at 20–21, Ex. 16.

"[e]stablish positive identification (PID) and to accurately locate targets consistent with current military objectives and mission specific ROE [rules of engagement]."[38] This means there must be a "reasonable certainty that a functionally and geospatially defined object of attack is a legitimate military target in accordance with the Law of War and applicable ROE."[39]

## III.    The FOIA Request and Plaintiffs' Challenges

To provide the public with information about the Raid's legal and factual basis, the ACLU submitted a FOIA request (the "Request") on March 15, 2017, to DOD, its Office of Inspector General, the U.S. Central Command, the Department of State (the "State Department"), the Department of Justice, its Office of Legal Counsel, and the Central Intelligence Agency. *See* Request (attached as Diakun Decl., Ex. 20). The agencies failed to release responsive records, and the ACLU filed suit on May 8, 2017. *See* Complaint, ECF No. 1.

In accordance with a court-ordered processing schedule, the Departments of Defense, State, and Justice searched for records, produced hundreds of pages of heavily redacted material, and withheld hundreds of pages in full. Pursuant to the Court's March 27, 2018 scheduling order, ECF No. 60, the ACLU then provided a preliminary list of fifty-five documents it intended to challenge, pending receipt of Defendants' declarations and *Vaughn* indices.

During the June 8, 2018 pre-motion conference, the Court requested that Plaintiffs provide Defendants with a list of sources containing official acknowledgments so that Defendants could review their withholdings and determine if any additional information could be released prior to briefing. Shortly thereafter, Plaintiffs provided Defendants with a list of nine sources containing official acknowledgments of the Raid. *See* Letter from Anna Diakun, Counsel

---

[38] Chairman of the Joint Chiefs of Staff, No-Strike and the Collateral Damage Estimation Methodology at A-6 (Feb. 13, 2009), *available at* https://www.aclu.org/files/dronefoia/dod/drone_dod_3160_01.pdf (attached as Diakun Decl., Ex. 19).

[39] *Id.*

for Plaintiffs, to Rebecca Tinio, Counsel for Defendants (June 14, 2018) (attached as Diakun Decl., Ex. 21). After receiving these sources, Defendants re-released just five documents, removing redactions of only a few references to the Deputies Committee meetings that Spicer had described and related logistical information.[40] *See* Spicer Feb. 2 Press Briefing, Ex. 4.

Defendants filed their motion for summary judgment on July 20, 2018. *See* ECF No. 74. After reviewing the information Defendants submitted, the ACLU filed its cross-motion for summary judgment on August 21, narrowing its challenge to thirty DOD and State Department documents. *See* ECF Nos. 84–85.

One week later, Defendants sought to stay the briefing schedule to allow the agencies time to re-process some of the challenged documents in response to Plaintiffs' arguments. The Court granted this request. ECF No. 87. Defendants provided Plaintiffs with re-processed versions of some of the challenged documents on September 28, October 4, and October 12.

After reviewing these documents, Plaintiffs informed Defendants that they no longer challenged the withholdings in five DOD documents in light of the additional disclosures. *See* Letter from Anna Diakun, Counsel for Plaintiffs, to Rebecca Tinio, Counsel for Defendants (October 19, 2018) (attached as Diakun Decl., Ex. 28). Plaintiffs maintained the rest of their challenges, pending receipt of the Defendants' declarations and motion for summary judgment.

Meanwhile, unlike the other agencies, Defendant CIA had initially refused to confirm or deny the existence of CIA records related to the Raid. *See, e.g.*, ECF No. 31. The CIA issued this

---

[40] The Department of State re-released four documents, unredacting only the words "DC Readout" from each of the email subject lines and "of the DC" in the body of one of the emails. Compare the December 15, 2017 versions of the following documents with the July 18, 2018 versions: C06432231 (Ex. 22 with Ex. 23); C06432239 (Ex. 24 with Ex. 29); C06432636 (Ex. 25 with Ex. 30); and C06432854 (Ex. 26 with Ex. 31). The Department of Defense re-released just one document, newly revealing only logistical information related to the January 26 Deputies Committee meeting. *See* JS/383-387 (attached as Diakun Decl., Ex. 27).

so-called "*Glomar*" response because it claimed that to acknowledge the existence of records "would reveal information that is protected by FOIA Exemptions 1 and 3." *ACLU v. DOD*, 322 F. Supp. 3d at 472 (citation omitted). This Court disagreed and ordered the CIA to conduct a search for records responsive to one prong of the request, explaining that "the revelation that the CIA contains records responsive to this request has already effectively been made." *Id.* at 481.

The CIA conducted its search, but it did not produce responsive records. Instead, the agency notified Plaintiffs that it was withholding in full all of the responsive records it located, other than those that had already been processed by other agencies. ECF No. 91. Plaintiffs informed the government that they intended to challenge the CIA's blanket withholding of these documents, pending receipt of a more detailed explanation for their withholding filed on the public record. ECF No. 102.

Weeks after the CIA disclosed the results of its search, the government informed Plaintiffs that the CIA had also located documents more appropriately processed by DOD, which DOD had not previously released. ECF No. 96. As a result, the parties agreed to delay briefing again so that they could "consolidate the briefing of all possible issues relating to DOD records." ECF Nos. 96, 97. DOD ultimately withheld all of these documents in full, and Plaintiffs informed the government that they intended to challenge the withholding of six out of the fifteen referred documents. ECF No. 102.

In light of these developments, the parties jointly requested the Court terminate the pending cross-motions for summary judgment so that all of Plaintiffs' challenges could be addressed together in a new round of summary judgment motions. ECF No. 102. The Court granted this request. ECF No. 103.

On April 5, 2019, Defendants Department of State, Department of Defense, and CIA

filed their joint motion for summary judgment. After reviewing the agencies' brief and declarations, Plaintiffs now further narrow their challenges. Plaintiffs continue to challenge the following records: four State Department records (C06432239, C06432636, and C06432854, re-released on July 19, 2018; and C06432231, re-released on September 28, 2018) (attached as Diakun Decl., Exs. 29–32); and nineteen DOD records, some of which were located by the Department of State and referred to DOD for processing (CENTCOM/020-026, 027-030, 045-047, 048-053, 246-268; JS/009-011, 022-023, 048-053, 054-056, 057-058, 188-191, 261-266, 273-278, 280-282, 330-336, 339-345; and STATE/034-035, 036-038, 039-044) (attached as Diakun Decl., Exs. 33–51). Plaintiffs challenge these agencies' Exemption 1 and 5 withholdings, but not their Exemption 6 withholdings.[41]

## ARGUMENT

### I.    Legal Framework

Under FOIA, the government bears the burden of justifying the withholding of responsive records, and courts review the legality of any withholdings *de novo*. *See Bloomberg, L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010). Although FOIA exempts certain types of records, those "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). "These exemptions are explicitly made exclusive, and must be narrowly construed." *ACLU v. DOD*, 322 F. Supp. 3d at 473 (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (citations omitted)). Furthermore, "all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Id.* (quoting *Wilner v. Nat'l Sec. Agency*, 592

---

[41] Plaintiffs no longer wish to challenge the government's withholding of CENTCOM/036-038; CENTCOM/330-334; JS/059-062; any of the documents referred to DOD by the CIA; the documents the CIA withheld in full; or the adequacy of the search for CENTCOM/019.

F.3d 60, 69 (2d Cir. 2009)).

In general, "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Ctr. for Constitutional Rights v. CIA*, 765 F.3d 161, 166 (2d Cir. 2014) (citation omitted). Courts accord "substantial weight" to government declarations in FOIA cases, but that deference is due only when the government's declarations contain "reasonably detailed explanations" substantiating the exemptions it has invoked, *N.Y. Times Co. v. DOJ* (*N.Y. Times Co. I*), 756 F.3d 100, 112 (2d Cir. 2014) (citation omitted), and when they are not "controverted by contrary evidence in the record or by evidence of bad faith," *Wilner*, 592 F.3d at 68 (alteration and quotation marks omitted). "[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden." *Larson v. DOS*, 565 F.3d 857, 864 (D.C. Cir. 2009). Courts have broad discretion to review *in camera* any agency record that the government seeks to withhold to assess the validity of claimed exemptions. *See* 5 U.S.C. § 552(a)(4)(B).

Even if parts of a responsive record are properly exempt, the agency must "take reasonable steps necessary to segregate and release nonexempt information." *Id.* § 552(a)(8)(A)(ii)(II); *FBI v. Abramson*, 456 U.S. 615, 626 (1982) (agencies and courts must "differentiate among the contents of a document rather than to treat it as an indivisible 'record' for FOIA purposes"). "The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).

## II.   The government has improperly withheld information from the public.

### A.   The government's Exemption 1 withholdings are overbroad.

The government invoked Exemption 1 to withhold in full or in part all twenty-three

challenged documents, asserting that the information is classified and would harm national security if revealed. Defendants' invocation of Exemption 1 is likely improper for two reasons: first, the government cannot rely on Exemption 1 to withhold information that it has officially acknowledged; and second, it cannot rely on Exemption 1 to withhold pure legal analysis.

### 1. Official acknowledgments cast serious doubt on the government's Exemption 1 withholdings.

Under FOIA Exemption 1, agencies are permitted to withhold information that is "properly classified" pursuant to an Executive Order. 5 U.S.C. § 552(b)(1). But if the government has "officially acknowledged" that information—that is, if it has officially and publicly disclosed the information—then the government waives the right to withhold it. *See N.Y. Times I*, 756 F.3d at 119–20. Given the extensive information the government has disclosed about the Raid, it is unlikely that its expansive redaction of the challenged documents is proper. *See ACLU v. DOD*, 322 F. Supp. 3d at 480 ("In the context of 'official acknowledgments,' as in the context of determining the applicability of a FOIA exemption more generally, 'the government retains the burden of persuasion that [the] information [sought] is not subject to disclosure under FOIA.'" (citation omitted)).

Courts apply a three-part test to determine whether the government has officially acknowledged information, determining if: (1) the information is "as specific as the information previously released," (2) it "match[es] the information previously disclosed," and (3) it was "made public through an official and documented disclosure." *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009) (citation omitted). "[T]he 'matching' aspect" of this test does not require "absolute identity" between the withheld and disclosed information because "such a requirement would make little sense." *N.Y. Times I*, 756 F.3d at 120 & n.19. As the Second Circuit has pointed out, "[a] FOIA requester would have little need for undisclosed information if it had to

13

match precisely information previously disclosed."[42] *Id.*; *see also ACLU v. DOD*, 322 F. Supp. 3d at 480 (noting that "[t]he Second Circuit has recently called into question how strictly the *Wilson* test is to be applied in practice"). Additionally, the government's public disclosure of certain information can render its withholding of other, related information no longer "logical" or "plausible." *N.Y. Times Co. I*, 756 F.3d at 120–21 (ordering the release of detailed legal analysis because disclosure "adds nothing to the risk").

The government has publicly disclosed a significant amount of information pertaining to the Raid and the Shabwah Offensive, including, for example, the fact that the United States conducts counterterrorism operations against AQAP in Yemen with "the consent of the Government of Yemen." *See* 2016 White House Report at 18, Ex. 16. Yet despite this fact's critical importance to the legal justification for the Raid and the Shabwah Offensive, it does not appear in the unredacted portion of any record produced to Plaintiffs. To be clear, Plaintiffs do not argue that they are entitled to properly classified information in these documents that has never been publicly acknowledged; instead, they argue that if the government has withheld any officially acknowledged facts on the basis of Exemption 1, those portions must be disclosed.

Moreover, although the agency declarants state as to several documents that they contain no officially acknowledged information, the agencies have themselves shown in this very litigation that these blanket statements are not credible. The agencies filed declarations making similar claims on July 20, 2018, when they filed their initial motion for summary judgment. *See, e.g.*, Declaration of Eric F. Stein ¶ 42, ECF No. 78 ("Original Stein Decl."). They did so even

---

[42] Further, requiring an exact match would undermine the interests FOIA is intended to protect. When Congress enacted FOIA, it was concerned about both government secrecy *and* selective disclosures. *See* Republican Policy Comm. Statement on Freedom of Information Legislation, S.1160, 112 Cong. Rec. 13020 (1966) ("In this period of selective disclosures, managed news, half-truths, and admitted distortions, the need for this legislation is abundantly clear.").

though Plaintiffs had previously provided a list of documents containing acknowledgments, and many of those acknowledgments still appeared nowhere in the unredacted production.

When confronted with Plaintiffs' publicly filed cross-motion for summary judgment, though, Defendants decided to re-process and re-release several documents on the basis of Plaintiffs' arguments, rather than defend them in court. *See* ECF No. 86. Notably, some of the newly released information in these re-processed documents had been officially acknowledged in the same sources Plaintiffs provided in advance of briefing.[43] Because of the government's track record in this case, neither Plaintiffs nor the Court can take Defendants' claims at face value.

### 2. Pure legal analysis cannot be withheld under Exemption 1.

Under Exemption 1, the government cannot withhold "pure" legal analysis, meaning constitutional and statutory interpretation, discussion of precedent, and legal conclusions that can be segregated from properly classified or otherwise exempt facts. However, the absence of *any* legal analysis in the government's production suggests that it may have done just that.

The Second Circuit has recognized that "in some circumstances legal analysis could be so intertwined with facts entitled to protection that disclosure of the analysis would disclose such facts." *N.Y. Times I*, 756 F.3d at 119. Executive Order 13,526 sets out categories of facts entitled

---

[43] For example, Plaintiffs provided Defendants a PDF of a February 1, 2017 CENTCOM statement on civilian casualties via email on June 14, 2018. *See* Feb. 1 Press Release, Ex. 1. Defendants did not re-release any documents in response to the ACLU calling this specific official statement to their attention. In their subsequent cross-motion for summary judgment, Plaintiffs pointed out in particular that the public statement summarizing the conclusions of a "task force commander" was published *the same day* as the redacted document CENTCOM/330-334, a February 1, 2017 memorandum from the "Task Force 111 Commander." *See* ECF Nos. 84 at 23 (August 21, 2018 ACLU Motion for Summary Judgment); 85-1 (Feb. 1 Press Release); 85-22 (Apr. 19, 2018 version of CENTCOM/330-334). After Defendants asked to stay briefing to re-process certain documents, they re-released CENTCOM/330-334, removing the redactions from a significant portion of the document, much of which mirrored the information in the public statement. *Compare* Feb. 1 Press Release, Ex. 1 *with* Ex. 6 (September 28, 2018 version of CENTCOM/330-334).

to protection and the basis for making withholding determinations. Exec. Order 13,526 §§ 1.4, 1.1 (original classification authority must determine that disclosure of facts in enumerated categories "reasonably could be expected to result in damage to the national security" and "is able to identify or describe the damage"). But if the challenged documents contain legal analysis whose disclosure would not reveal a properly classified fact—because the analysis can be segregated from facts or because the specific facts have been officially acknowledged—then disclosure of the legal analysis cannot reasonably harm national security, and it must be disclosed unless properly protected by another privilege. *N.Y. Times I*, 756 F.3d at 119–20. While harm could result "in some circumstances, [when] the very fact that legal analysis was given concerning a planned operation would risk disclosure of the likelihood of that operation," *id.* at 119, that is not an issue here. The government has acknowledged both that the Raid occurred and that the government contemplated subsequent operations. *See, e.g.*, Ex. 2 at JS/039. And if any legal analysis does contain properly protected facts—for example, details regarding specific raids that have not been officially acknowledged—those specific facts should simply be redacted from the disclosed analysis. *See N.Y. Times I*, 756 F.3d at 119.

**B.    The government has not established that Exemption 5 applies.**

The government improperly relies on Exemption 5 to withhold in full or in part eighteen challenged documents. Under this exemption, the government may withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The government relies on two Exemption 5 privileges: deliberative process and presidential communications.[44] Plaintiffs address each in turn, before explaining how these privileges can be overcome.

---

[44] Although Defendants had previously withheld some of the challenged documents in full or in part based on the attorney-client privilege, they no longer invoke this privilege.

16

### 1.    Deliberative Process Privilege

The government improperly withheld all or part of eighteen challenged documents under the deliberative process privilege. To establish that the privilege applies, an agency must show that the document is both "'predecisional,' *i.e.*, 'prepared in order to assist an agency decisionmaker in arriving at [their] decision,'" and "'deliberative,' *i.e.*, 'actually . . . related to the process by which policies are formulated.'" *Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184, 194 (2d Cir. 2012) (citation omitted). Documents fall within this privilege if they "would inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a *personal* position." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (emphasis added). Critically, "even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, *formally or informally*, as the agency position on an issue or is used by the agency in its dealings with the public." *Id.* (emphasis added).

To meet its burden, the agency should, at a minimum, describe: (1) the roles of the author and recipient of each document; (2) the document's function and significance in a decision-making process; and (3) the document's subject matter and the nature of the deliberative opinion. *See Senate of P.R. v. DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987); *Coastal States*, 617 F.2d at 868; *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 743 (S.D.N.Y. 2011). As detailed below, *infra* Argument § II.C, for some documents, Defendants have wrongly invoked this privilege to shield post-decisional records; for others, they have not adequately described why the privilege applies.

### 2.    Presidential Communications Privilege

The government withheld fifteen challenged documents in full or in part under the

presidential communications privilege. This privilege is narrowly circumscribed to serve specific purposes: "the promotion of candor and effective presidential decision-making." *Ctr. for Effective Gov't v. DOS*, 7 F. Supp. 3d 16, 26 (D.D.C. 2013). It therefore only applies to "communications authored or solicited and received by" the president, the president's immediate White House advisers, and "members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate." *In re Sealed Case*, 121 F.3d 729, 751–52 (D.C. Cir. 1997). "White House advisers" are those in the Office of the President, "comprised of such immediate advisers as the Chief of Staff and the White House Counsel." *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1109 & n.1, 1112 (D.C. Cir. 2004).

Although the government argues that this privilege should extend to anyone "who had a need to know the information in order to perform their job duties," including "DOD or DOS personnel connected to the Raid," Br. for Defs. at 17, this is not the law. The D.C. Circuit has made clear that "the privilege should not extend to staff outside the White House in executive branch agencies." *Judicial Watch*, 365 F.3d at 1116, 1123 (citation omitted). "[I]nternal agency documents that are not 'solicited and received' by the President or his Office are instead protected against disclosure, if at all, by the deliberative process privilege." *Id.* at 1112.

Defendants also argue that "the privilege extends to both presidential communications and to records memorializing or reflecting such communications," citing only a four-page district court opinion. *See* Br. for Defs. At 16 (citing *CREW v. DHS*, No. 06-0173, 2008 WL 2872183, at *3 (D.D.C. July 22, 2008)). Even if the privilege indeed protected a memo to file or "notes taken at meetings . . . at which [the] advisers were present," *In re Sealed Case*, 121 F.3d at 758, this does not mean that those memorializations can then be distributed widely throughout the

Executive Branch without waiving the privilege. Quite the contrary: "[T]he transmittal of a document to persons who are unlikely to be in a position to give advice to the President waives the privilege . . . ." *ACLU v. DOJ*, No. 15 Civ. 1954, 2016 WL 889739, at *4 (S.D.N.Y. Mar. 4, 2016); *see also id.* at *5 ("[W]idespread dissemination of documents, to persons well beyond the circle of close presidential advisors, will eviscerate" the privilege.). This is so because "documents distributed from the Office of the President for non-advisory purposes do not implicate the goals of candor, opinion-gathering, and effective decision-making that confidentiality under the privilege is meant to protect"—*even* if the document is distributed on a "need to know" basis. *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26–27. To meet its burden, the government must show that communications (or records summarizing them) are kept confidential "for the purpose of the presidential communications privilege." *Id.* at 27.

As explained below, *infra* § II.C, Defendants have failed to establish that the documents they seek to withhold were in fact intended to be and actually kept confidential. It is clear some documents were widely distributed to individuals outside the White House in non-advisory roles. For other documents, Defendants have failed to establish that the privilege applies because they do not state to whom the documents were distributed and why.

### 3.    Waiver

Just as official acknowledgment defeats Exemption 1, "[v]oluntary disclosures of all or part of a document may waive" Exemption 5 privileges. *N.Y. Times I*, 756 F.3d at 114 (quoting *Dow Jones & Co. v. DOJ*, 880 F. Supp. 145, 150–51 (S.D.N.Y. 1995)); *see In re Sealed Case*, 121 F.3d at 742 (waiver by official acknowledgment of presidential communications privilege). That is sensible, as Exemption 5 privileges are designed to ensure the integrity of government decision-making. *See Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 773 (D.C. Cir.

1998) (en banc). But when the government itself has revealed confidential information, the rationale underpinning Exemption 5 evaporates, and the government may no longer rely on the secrecy of that information to justify its withholding. *See, e.g.*, *N.Y. Times I*, 756 F.3d at 116.

### 4. Working Law

Even if a document is protected by the deliberative process privilege, it may nonetheless require disclosure if it is "working law." Under this doctrine, agencies cannot rely on Exemption 5 to withhold the rules, interpretations, and opinions that embody their formal or informal law or policy. *Brennan Ctr.*, 697 F.3d at 195–96, 199–202, 208; *Tax Analysts v. IRS*, 117 F.3d 607, 619 (D.C. Cir. 1997). The Supreme Court explained the doctrine's rationale in *NLRB v. Sears*: "the public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted"—and these reasons "constitute the 'working law' of the agency." 421 U.S. 132, 152–53 (1975). An agency's reliance on legal analysis as a basis for its policy or operational decisions transforms that analysis into working law. "[T]he question is not about a given document's label, but whether its reasoning or conclusions have become the agency's operative view of its legal duties." *ACLU v. DOJ*, 90 F. Supp. 3d 201, 218 (S.D.N.Y. 2015) .

As explained below, *infra* § II.C, some of the challenged documents may qualify as agency working law, and if so, must be disclosed.

### C. Defendants improperly withheld in full or in part each challenged document.

### 1. The State Department failed to justify withholding information from four challenged documents.

**C06432239, C06432636, and C06432854.** These documents, attached as Exhibits 29, 30, and 31 respectively, are "identical copies of a three-page intra-agency email . . . providing a readout of deliberations from an interagency meeting of the Deputies Committee held on January 6, 2017." Declaration of Eric F. Stein ("Stein Decl.") ¶ 37, ECF No. 114. To justify their

withholding, the agency invokes Exemption 1, the deliberative process privilege, and the presidential communications privilege. *Id.* ¶¶ 38–41.

Exemption 1. If this email contains any officially acknowledged information, *see supra* Statement of Facts, the government may not withhold it on the basis of Exemption 1. For example, the Stein Declaration notes that the document includes information about "conditions under which to conduct certain activities." *Id.* ¶ 38. If this includes the decision to hold the Raid for a "moonless night," this cannot be withheld. *See* Spicer Feb. 2 Press Briefing, Ex. 4.

Deliberative Process Privilege. The State Department invokes the deliberative process privilege, saying that "[t]hese discussions were predecisional because they predated both the President's decision whether to approve the operation that is the subject of this litigation and the Deputies Committee's recommendation to the President." Stein Decl. ¶ 40. But the agency has not shown that the document is entirely "predecisional." *Brennan Ctr.*, 697 F.3d at 194.

In fact, it appears to be *post*-decisional, at least in part. Mr. Spicer explained that the Deputies Committee made at least two decisions on January 6: to "recommend[] at that time that they go ahead" with the Raid, and "to hold [the operation] for what they called a 'moonless night.'" Spicer Feb. 2 Press Briefing, Ex. 4. It follows that a subsequent "readout" of the meeting would reflect those decisions and the rationales for them. Because Mr. Spicer publicly relied on those decisions, the agency may not now hide this information from the public. *See Coastal States*, 617 F.2d at 866 (document can "lose" its predecisional status if it "is used by the agency in its dealings with the public"). Even if part of this document includes deliberative and predecisional discussion, any portion conveying post-decisional or public information cannot be withheld under the deliberative process privilege.

Whether the Deputies Committee recommended that the military "go ahead" with the

Raid is of particular importance because it goes to the heart of a dispute about the narrative of the Raid. Mr. Spicer emphasized that the Deputies Committee had made that recommendation during the Obama administration and used it to characterize the Raid's approval process as a "very, very well thought-out and executed effort." Spicer Feb. 2 Press Briefing, Ex. 4. But a former Obama administration official disagreed with this narrative. *See* Interview with Andrew Exum and Colin Kahl, *On Yemen Raid Planning, Where Did the Obama Administration Leave Off for Trump to Pick Up?*, PBS News Hour, Mar. 1, 2017, https://www.pbs.org/newshour/show/yemen-raid-planning-obama-administration-leave-off-trump-pick. According to the former official, the Obama administration didn't consider "a particular raid," and instead only considered "a proposal from the Pentagon to expand the authorities and resources to allow special operations forces to more actively engage in direct raids to go after compounds." *Id.* The official also stated that "when the deputies convened . . . in early January, they recommended that this decision get deferred to the Trump administration." *Id.*

Presidential Communications Privilege. The State Department's invocation of the presidential communications privilege over the email produced in these documents fails for three reasons. First, this email does not appear to be "authored or solicited and received by" any of President Trump's immediate White House advisers. *See Judicial Watch*, 365 F.3d at 1116. Instead, it appears to be purely internal to the Department, and was *created for* "staff outside the White House in executive branch agencies" to whom the privilege typically does not apply. *In re Sealed Case*, 121 F.3d at 752. Second, even if the substance of the communication had been privileged, the privilege was waived through the "transmittal . . . to persons who are unlikely to be in a position to give advice to the President." *ACLU v. DOJ*, No. 15 Civ. 1954 (CM), 2016 WL 889739, at *4 (S.D.N.Y. Mar. 4, 2016). The email was sent to at least nine individuals

outside the White House, including foreign service officers, *see* Exs. 29–31, and then forwarded

at least twice. *See* C06395335 (forwarding email to additional recipients) (attached as Diakun

Decl., Ex. 52). The agency has not argued that these individuals serve in the close advisory role

the privilege requires, but only that "[t]his information has been closely held within the

Executive Branch." *See* Stein Decl. ¶ 41. Third, Mr. Spicer's official disclosures about the

decisions to proceed with the Raid and to wait for a moonless night have at the very least waived

Exemption 5 privileges over that information, to the extent that those decisions are memorialized

within the email. *See, e.g.*, *In re Sealed Case*, 121 F.3d at 741–42.

**C06432231.** Document C06432231, attached as Exhibit 32, is a "two-page intra-agency

email . . . providing a readout of deliberations from an interagency meeting of the Deputies

Committee held on January 26, 2017." Stein Decl. ¶ 30. The State Department withheld

information under Exemption 1, the deliberative process privilege, and the presidential

communications privilege. *Id.* ¶¶ 30–34.

Exemption 1. If this email contains any officially acknowledged information, *see supra*

Statement of Facts, the government may not withhold it on the basis of Exemption 1. For

example, the Stein Declaration states that the document "contains foreign government

information, including the views of a senior foreign official about U.S. activities that were

conveyed on a confidential basis." *Id.* ¶ 31. If this document conveys that the United States

planned to act with the consent of the government of Yemen, this information cannot be

withheld. *See* 2016 White House Report at 18, Ex. 16. Likewise, if this document conveys that

the planned raid was a bilateral U.S.–UAE raid, or that "the UAE-led coalition [was]

orchestrating" this operation, this information has also been officially acknowledged and cannot

be redacted. *See* JS/241, Ex. 3; JS/039, Ex. 2.

Deliberative Process Privilege. The State Department asserts it is withholding this email in part under the deliberative process privilege because it "summarizes interagency deliberations about a specific proposal." Stein Decl. ¶ 33. But based on Mr. Spicer's official narrative, much of this email should reflect post-decisional discussions, which cannot be withheld under the privilege. President Trump approved the proposal for the Raid at the dinner meeting on January 25. *See* Spicer Feb. 2 Press Briefing, Ex. 4; JS/242, Ex. 3. When the Deputies Committee met the following morning, "[i]t was not a necessary step because they had previously recommended and also reaffirmed their support." Spicer Feb. 2 Press Briefing, Ex. 4. The purpose of the privilege—to protect government deliberations before a decision is made—is not served by protecting *post*-decisional communications. If this "readout" reflects decisions made and the rationales for them, it cannot be withheld under the deliberative process privilege. *See Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982) ("'Communications made after the decision and designed to explain it' are not" privileged.) (quoting *Sears*, 421 U.S. at 151–52).

Presidential Communications Privilege. The agency's invocation of the presidential communications privilege over the email fails for two reasons. First, this communication was not "authored or solicited and received by" any of President Trump's immediate White House advisers. *See Judicial Watch*, 365 F.3d at 1112 ("[I]nternal agency documents that are not 'solicited and received' by the President or his Office are instead protected against disclosure, if at all, by the deliberative process privilege."). Instead, this communication—while summarizing *external* information—appears to be purely *internal* to the agency. Second, even if the communication had been privileged, the privilege was waived through "transmittal . . . to persons who are unlikely to be in a position to give advice to the President." *ACLU*, 2016 WL 889739, at *4. This email was distributed to at least seventeen individuals and an unknown number of others

on two email lists. *See* Ex. 32. Surely country desk officers and individuals on the

"CT_StaffAssistants" email list do not serve in the close presidential "advisory role" required for

the privilege. *Id.*; *see ACLU*, 2016 WL 889739, at *5. Given this widespread dissemination, the

agency has waived the privilege, assuming it applied in the first place.

### 2.    DOD failed to justify withholding information from nineteen challenged documents.

**CENTCOM/020-026 and JS/188-191.** CENTCOM/020-026, attached as Exhibit 33, is

an "[e]mail thread discussing military options post-al Ghayil Raid," dating from January 30,

2017, to February 1. *See* Revised *Vaughn* at 1, ECF No. 113-2. JS/188-191, attached as Exhibit

43 and described in the *Vaughn* as "[e]mail discussing al Ghayil Raid," Revised *Vaughn* at 2,

contains duplicates of emails produced on CENTCOM/022-025. DOD invokes Exemption 1 to

withhold these documents.[45] *Id.*

Exemption 1. If these emails contain any officially acknowledged information, *see supra*

Statement of Facts, the government may not withhold that information on the basis of Exemption

1. In particular, DOD has redacted a paragraph from the Office of General Counsel that "set[s]

forth legal analysis regarding an aspect of planned military operations after the al Ghayil Raid."

Declaration of Major General Jim Hecker ("Hecker Decl.") ¶ 42, ECF No. 113. According to the

declaration, "this paragraph is withheld pursuant to exemption 1 because it sets forth operational

detail and strategy that is not meaningfully segregable." *Id.* However, as described in the

Statement of Facts, the government has disclosed significant information about the types of

action the President authorized to support the Shabwah Offensive. This email chain states that

---

[45] DOD no longer invokes the attorney-client privilege to withhold these documents, or the deliberative process privilege to withhold JS/188-191. *Compare* Revised *Vaughn* at 1, 2, ECF No. 113-1, *with* ECF No. 77-3 at 1, 4.

the military planned to undertake "kinetic fires" following the Raid. *See* JS/190, Ex. 43.[46] The

military has also acknowledged that it provided support to the Emiratis including assistance with

operational planning, intelligence support, close air support, and troops on the ground. *See supra*

Statement of Facts. The military has further stated that it conducted strikes against what it

identified as AQAP militants, infrastructure, fighting positions, and equipment. *Id.* If any of this

information appears in that paragraph or elsewhere in the documents, it cannot be withheld or

serve as a basis for withholding information that may be intertwined with it.

**CENTCOM/027-030 and JS/057-058.** These documents, attached as Exhibits 34 and 42

respectively, are "military orders from the Joint Staff to CENTCOM to conduct operations

supporting the Shabwah offensive approved by the President." Hecker Decl. ¶ 36. DOD withheld

them on the basis of Exemption 1. *Id.*

Exemption 1. If the documents contain any officially acknowledged information, *see*

*supra* Statement of Facts, the government may not withhold it on the basis of Exemption 1. In

particular, to the extent the government is redacting legal or policy standards that apply to "areas

of active hostilities" on CENTCOM/029 and JS/058, this is inappropriate because the

government has asserted publicly that it adhered to the law of armed conflict in this instance and

has elsewhere publicly explained what it deems those legal obligations to be—such as the

requirement that there be a "reasonable certainty" that an "object of attack is a legitimate military

target." *See supra* Statement of Facts. In addition, if the notation "Ref A" on CENTCOM/028

and JS/057 refers to the document that grants "area of active hostility" ("AAH") authority, that

information cannot be withheld because the existence of that document and the AAH designation

---

[46] Although CENTCOM/020-026 and JS/188-191 contain some of the same emails, more
information is unredacted on JS/190 than CENTCOM/024. This email concerns the "kinetic fires
associated with the Shabwah operation." *See* JS/190, Ex. 43.

have already been officially disclosed. *See* JS/400-404 (attached as Diakun Decl., Ex. 53) (circulating an attachment titled "AAH Support to Shabwah Authorities Request").

**CENTCOM/045-047, JS/009-011, JS/054-056, JS/280-282, STATE/034-035, and STATE/036-038.** Four of these documents are identical "signed, final versions of [a] memorandum" from the Secretary of Defense to the National Security Advisor conveying a "DoD operational proposal." Hecker Decl. ¶ 31; *see* CENTCOM/045-047, Ex. 35; JS/054-056, Ex. 41; JS/280-282, Ex. 46; STATE/036-038, Ex. 50. JS/009-011, attached as Exhibit 38, is an "undated draft of this memorandum." Hecker Decl. ¶ 31. While these documents relate to the initial proposal, STATE/034-035, attached as Exhibit 49, is a similar memorandum seeking "an extension of a prior approval of military operations." Hecker Decl. ¶ 37. DOD withholds these documents under Exemption 1, the deliberative process privilege, and the presidential communication privilege. Hecker Decl. ¶ 33, 37.

Exemption 1. If these documents contain any officially acknowledged information, *see supra* Statement of Facts, the government may not withhold it on the basis of Exemption 1. In particular, redacted from most of these documents are the "[k]ey elements of DoD's recommended support to the UAE." *See* CENTCOM/045, Ex. 35. DOD has acknowledged that this support includes advice and assistance to UAE operational planning, intelligence support, aerial refueling, and more. *See supra* Statement of Facts.

An additional acknowledgment may be relevant for STATE/034-035. The extension request was approved on May 16, 2017. *See* Hecker Decl. ¶ 37. Shortly thereafter, CENTCOM carried out another raid in Yemen that was "conducted under the same U.S. authorities as those granted in advance of the earlier, Jan. 28 raid, which included authorities for airstrikes and follow-on action." Terri Moon Cronk, *Pentagon Spokesman Describes U.S. Raid in Yemen*, U.S.

27

Cent. Command, May 23, 2017, http://www.centcom.mil/MEDIA/NEWS-ARTICLES/News-Article-View/Article/1191797/pentagon-spokesman-describes-us-raid-in-yemen (attached as Diakun Decl., Ex. 54). DOD publicly described that follow-up raid and the other types of support provided to the UAE Shabwah Offensive in detail, *see id.*; *supra* Statement of Facts, and if any of that information is present in that document, it cannot be withheld.

Deliberative Process Privilege. The agency has failed to meet its burden of demonstrating that the deliberative process privilege applies because it has not provided sufficient information about who received the memoranda, for what purpose, and when. *See Senate of P.R.*, 823 F.2d at 585. This is critical because even if the documents were initially deliberative and predecisional, if the agency circulated and relied upon them as the final plan after the approval date, the documents could lose their predecisional character, thus stripping them of the privilege. *See Coastal States*, 617 F.2d at 866. Indeed, it appears as if that is precisely what happened: at least one of these documents was distributed widely among agency employees after President Trump approved the proposal, indicating that the document was relied upon as final. *See* Revised *Vaughn* at 1 (noting JS/009-011 was attached to the email at JS/400-401, which was sent after the Raid); JS/400-401, Ex. 53 (showing circulation to three separate email lists).

Presidential Communications Privilege. DOD has failed to establish that the presidential communications privilege applies because it has not demonstrated that the documents were kept confidential for the purposes of the privilege. *See ACLU*, 2016 WL 889739, at *5. As noted above, at least one version of this document, JS/009-011, was distributed widely: it was attached to JS/400-401 and distributed to three email lists of an undisclosed number of people. *See* Revised *Vaughn* at 1; JS/400-401, Ex. 53. This makes it highly likely that it was transmitted "to staffers who serve in non-advisory roles to the President," thus "los[ing] any claim to the

presidential communications privilege." *ACLU*, 2016 WL 889739, at *5. Because these documents are either duplicates or substantially similar, if the privilege has been waived as to one version of this document, it has been waived as to all.

**CENTCOM/246-268.** This fully withheld document, attached to a February 9, 2017 email, concerns the "[r]ules of engagement" and contains "briefing slides regarding support to the Shabwah Offensive." Hecker Decl. ¶ 26; Revised *Vaughn* at 1. DOD withholds this document under Exemption 1 and the deliberative process privilege. *Id.*

Exemption 1. If this email contains any officially acknowledged information, such as that the government of Yemen consented to the Raid, the UAE was responsible for detaining captured individuals other than "high value targets," and the general ways in which the U.S. military would provide support to the Shabwah Offensive, *see supra* Statement of Facts, the government may not withhold it on the basis of Exemption 1. To be clear, though, Plaintiffs do not seek properly classified information, such as "photographs, maps, diagrams," and other information that has not been publicly disclosed. *See* Hecker Decl. ¶ 27.

Deliberative Process Privilege. The agency has failed to establish that the privilege applies. The slides, some of which are dated January 26, 2017, were circulated on February 9, 2017, after the Raid was carried out. Hecker Decl. ¶ 26. According to the agency, the slides "appear[] to have been attached to the email as a point of factual reference to be used in the planning of future, follow-on operations in the same vicinity." *Id*.

First, even if the slides were previously covered by the privilege, if the agency circulated and treated them as final (as it appears to have done on February 9), they would no longer be subject to the privilege. *See Coastal States*, 617 F.2d at 866 (document can lose predecisional status "if it is adopted, formally or informally, as the agency position on an issue"). This is

especially so if they contain the Raid's legal basis and the agency's working law. *See ACLU v. DOJ*, 90 F. Supp. 3d at 218 ("[T]he question is not about a given document's label, but whether its reasoning or conclusions have become the agency's operative view of its legal duties.").

Second, it seems likely that that this document, as a "point of factual reference" to guide future operational plans, *id.*, explains "a decision already reached or a policy already adopted." 421 U.S. at 152 n.19. The Supreme Court in *Sears* rejected the argument that the government could use the deliberative process privilege to withhold a final, post-decisional document that might "provid[e] guides for decisions of similar or analogous cases arising in the future." *Id.* Thus, even if the document could in one sense be considered predecisional with respect to future decisions, it nonetheless cannot be withheld under the deliberative process privilege.

**JS/022-023.** This document, attached as Exhibit 39, is a "memorandum from the National Security Advisor to the Secretary of Defense dated January 27, 2017" relaying the President's approval. Hecker Decl. ¶ 34. DOD invokes Exemption 1 to withhold information.[47] *Id.* ¶ 35.

<u>Exemption 1</u>. If this document contains any officially acknowledged information, such as the different types of support the President authorized DOD to provide, *see supra* Statement of Facts, the government may not withhold it on the basis of Exemption 1. Similarly, if this document contains the Raid's legal basis, and that analysis is not inextricably intertwined with properly classified facts, the government must disclose it. *See N.Y. Times I*, 756 F.3d at 119.

**CENTCOM/048-053, JS/048-053, JS/261-266, JS/273-278, STATE/039-044.** These records, attached as Exhibits 36, 40, 44, 45, and 51 respectively, are "identical copies of [a] detailed DoD operational proposal document regarding support to the Shabwah offensive, including the anticipated al Ghayil Raid." Hecker Decl. ¶ 22. DOD invokes Exemption 1, the

---

[47] DOD no longer invokes the presidential communications privilege to withhold this record. *Compare* Revised *Vaughn*, ECF No. 113-2 at 1, *with* ECF No. 77-3 at 3.

deliberative process privilege, and the presidential communications privilege. *See id.* ¶ 23–24.

Exemption 1. If this operational proposal contains any officially acknowledged information, including general information about the types of actions DOD planned to take in support of the Shabwah Offensive, *see supra* Statement of Facts, the government may not withhold it on the basis of Exemption 1. Similarly, if this proposal contains legal analysis concerning the Raid's legal basis, and that analysis is not inextricably intertwined with properly classified facts, the government must disclose it. *See N.Y. Times I*, 756 F.3d at 119.

Deliberative Process Privilege. The agency argues it can withhold this proposal under the deliberative process privilege because it "predat[es] proposed military operations" and is deliberative. Hecker Decl. ¶ 23. However, at least one copy of the proposal, JS/048-053, was circulated among agency employees *after* President Trump approved the broader plan to support the UAE Shabwah Offensive and the Raid that was a part of it—that is, after the operative decision had been made. *See* Revised *Vaughn* at 1 (JS/048-053 was attached to JS/240-242); JS/242, Ex. 3 (attachment was circulated by email on January 27, 2017). That suggests the proposal was no longer deliberative or predecisional, but rather represented the final plan adopted by the government. *See Coastal States*, 617 F.2d at 866. If so, it would no longer serve the purposes of the privilege to withhold the proposal. *See id.*

Moreover, if the proposal reflects the legal basis for the Raid or the plan to support the Shabwah Offensive, and these "reasoning or conclusions have become the agency's operative view of its legal duties," *ACLU v. DOJ*, 90 F. Supp. 3d at 218, this legal basis must be disclosed as working law. *Cf.* PPG, Ex. 17 at 3 (requiring "operational plan[s] for taking direct action against terrorist targets" to include "[t]he international legal basis for taking action").

Presidential Communications Privilege. DOD argues that the proposal is also exempt

31

from disclosure under the presidential communications privilege because it "provide[d] complete operational detail for the President's consideration." Hecker Decl. ¶ 24. It asserts that it was "closely held in that it was sent initially only to the President's National Security Advisor as an attachment . . . and circulated later only to relevant advisors, including . . . a limited group of personnel within DoD involved with the planning and execution of the Raid." *Id.*

Although the proposal may have once been shielded by the presidential communications privilege, the information provided is insufficient to establish that the privilege still applies. DOD stated that "relevant advisors" and "a limited group of personnel within DoD" received the proposal, but it has not established that each of those individuals falls within "the circle of close presidential advisors" that warrants the privilege. *See ACLU*, 2016 WL 889739, at *5. Rather, it appears that DOD waived the privilege through "transmittal . . . to persons who are unlikely to be in a position to give advice to the President." *Id.* at *4.

In addition, at least one court in this District has held that the privilege does not apply to documents that "are themselves authorizations for action." *See* Appendix A of Order at 8, *ACLU v. DOD*, No. 15 Civ. 9317 (AKH), (S.D.N.Y. July 31, 2017), ECF No. 76. One version of the proposal "was attached to a Presidential authorization memorandum sent by the National Security Advisor to a small group of cabinet and similarly high-level government officials conveying Presidential approval of a later military operation." Hecker Decl. ¶ 24. Because the proposal appears to have been an integral part of the authorization memorandum, it should not be withheld under the presidential communications privilege.

**JS/330-336, JS/339-345.** These documents, attached as Exhibits 47 and 48, are "substantially similar, detailed operational proposals regarding support to the Shabwah offensive, including the al Ghayil Raid," dated January 3, 2017, and November 10, 2016, respectively.

Hecker Decl. ¶ 22. DOD withholds these documents in full based on Exemption 1 and the deliberative process privilege. *Id.* ¶ 23.

Exemption 1. If these documents contain any officially acknowledged information, *see supra* Statement of Facts, the government may not withhold it on the basis of Exemption 1. It appears that these documents are copies of the "Joint Proposal PPG Variance Request for Direct Action in Yemen" referenced in JS/324-329 (attached as Diakun Decl., Ex. 55). If this is in fact the title of the documents, the government has no justification for redacting it. In addition, if these documents contain any public information relating to the factors the government considers when determining if an area is an "area of active hostilities," *see supra* Statement of Facts*,* that information is not properly classified and cannot be withheld on the basis of Exemption 1.

Exemption 5. To the extent that the government has officially acknowledged information specific to these documents, such as the title, that disclosure overcomes the deliberative process privilege. *See N.Y. Times I*, 756 F.3d at 114.

**III.    The government has failed to segregate and release all non-exempt information.**

Even if parts of the challenged records are properly withheld, the agency must "take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii)(II). Both agencies have submitted declarations stating that they have released reasonably segregable information. *See* Stein Decl. ¶ 43; Hecker Decl. ¶ 49.

Usually it is exceedingly difficult, if not impossible, for plaintiffs to know whether agencies have satisfied this requirement. Here, however, it is clear that at least DOD did not.

DOD's failure to satisfy its statutory obligations is evident from its re-processing and re-release of CENTCOM/036-038. As originally produced, the contents of the two emails within the document were entirely redacted. *See* ECF No. 85-16. In response to Plaintiffs' cross-motion

for summary judgment, DOD re-processed this document and re-released it on September 28, 2018, unredacting a handful of sentences on CENTCOM/036. *See* CENTCOM/036-038 (attached as Diakun Decl., Ex. 56).

DOD continued to withhold the rest of the information on CENTCOM/036 as classified, and the information on CENTCOM/037 as classified and deliberative. Hecker Decl. ¶ 39. DOD's declarant stated that "DoD has conducted a page-by-page and line-by-line review of the documents at issue in this declaration. Indeed, . . . in September and October 2018, DoD re-reviewed each DoD document then being challenged and made three re-releases of records from which DoD determined it could release additional information." *Id.* ¶ 49. The agency "confirm[ed] that there is no further reasonably segregable information, factual or otherwise, contained in any of the records." *Id.*

Upon review of the re-released document, Plaintiffs realized that these same emails had been produced as part of a different email chain by the Joint Staff more than a year ago on December 29, 2017.[48] Notably, despite DOD's declaration that there is "no further reasonably segregable information" in CENTCOM/036-038, Hecker Decl. ¶ 49, the version of these emails produced on JS/222-224 discloses several sentences that inexplicably remain hidden in CENTCOM/036-038, *even after* DOD had the opportunity to re-process that document. *Compare* CENTCOM/036-038, Ex. 56, *with* JS/222-224, Ex. 7. In light of DOD's failure to reasonably segregate unprivileged information in these emails, DOD's blanket affirmation regarding segregability is simply not credible as to the remainder. The Court should evaluate its claims that no other information can be produced with skepticism. *See Wilner*, 592 F.3d at 68

---

[48] Because of the extent of the redactions in CENTCOM/036-038, Plaintiffs did not initially know that those emails were elsewhere produced. In light of the additional information available in JS/222-224, Plaintiffs no longer challenge CENTCOM/036-038.

("[A] court must accord 'substantial weight' to the agency's affidavits, 'provided [that] the justifications for nondisclosure are not controverted by contrary evidence . . . .").

## IV.    This Court should review the withheld documents *in camera.*

For the reasons explained above, Plaintiffs respectfully request that the Court hold that the government has failed to establish that the challenged documents are properly withheld under FOIA, and order it to release any information not properly subject to the claimed exemptions.

Should the Court have any doubt about the propriety of ordering the release of any record, Plaintiffs ask it to review the withheld document *in camera* to ensure the government's claimed exemptions apply. *See, e.g.*, *PHE, Inc. v. DOJ*, 983 F.2d 248, 252 (D.C. Cir. 1993) ("[I]n camera review is appropriate when agency affidavits are not sufficiently detailed to permit meaningful assessment of the exemption claims."). Under FOIA, judges have broad discretion to "examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions." 5 U.S.C. § 552(a)(4)(B). Courts "often . . . examine the document *in camera*" "in an effort to compensate" for the information imbalance between FOIA requestors and the government in FOIA litigation. *Vaughn v. Rosen*, 484 F.2d 820, 825 (D.C. Cir. 1973). Finally, *in camera* review is appropriate where "the number of records is relatively small." *ACLU v. DOJ*, No. 12-cv-7412 (WHP), 2014 WL 956303, at *3 (S.D.N.Y. Mar. 11, 2014). Out of hundreds of documents, the ACLU has narrowed its challenge to just twenty-three, many of which are duplicative and just a few pages in length.

## CONCLUSION

Plaintiffs respectfully ask the Court to reject the government's withholding of information from the challenged documents and order the immediate release of information not properly subject to FOIA exemptions.

35

Dated: May 10, 2019                    Respectfully submitted,

                                       */s/ Anna Diakun*
                                       Anna Diakun
                                       Brett Max Kaufman
                                       Hina Shamsi
                                       American Civil Liberties Union Foundation
                                       125 Broad Street—18th Floor
                                       New York, New York 10004
                                       T: 212.549.2500
                                       F: 212.549.2654
                                       adiakun@aclu.org

                                       *Counsel for Plaintiffs*