UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN CIVIL LIBERTIES UNION and
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,

                    *Plaintiffs*,

      v.

DEPARTMENT OF DEFENSE, CENTRAL
INTELLIGENCE AGENCY, DEPARTMENT
OF JUSTICE, and DEPARTMENT OF
STATE,

                    *Defendants*.

**Oral Argument Requested**

**17 Civ. 3391 (PAE)**

**ECF CASE**

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CROSS-MOTION
FOR SUMMARY JUDGMENT AGAINST DEFENDANTS DEPARTMENT OF
STATE AND DEPARTMENT OF DEFENSE**

Anna Diakun
Brett Max Kaufman
Hina Shamsi
American Civil Liberties Union
   Foundation
125 Broad Street—18th Floor
New York, New York 10004
T: 212.549.2500
F: 212.549.2654
adiakun@aclu.org

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ............................................................................................................................... 1

    I.   The government's overly narrow interpretation of the official acknowledgment
        doctrine does not comply with Second Circuit precedent. ................................................. 1

    II.  The government has improperly withheld information under Exemptions 1 and 5
        from fifteen documents. ................................................................................................... 4

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

## <u>Cases</u>

*ACLU v. CIA*,
   109 F. Supp. 3d 220 (D.D.C. 2015) ............................................................................... 3

*ACLU v. DOD*,
   322 F. Supp. 3d 464 (S.D.N.Y. 2018) ............................................................................ 2

*ACLU v. DOJ*,
   640 F. App'x 9 (D.C. Cir. 2016) .................................................................................... 3

*ACLU v. DOJ*,
   No. 15 Civ. 1954, 2016 WL 889739 (S.D.N.Y. Mar. 4, 2016) .................................... 25

*ACLU v. NSA*,
   925 F.3d 576 (2d Cir. 2019) ......................................................................... 18, 22, 23

*Afshar v. DOS*,
   702 F.2d 1125 (D.C. Cir. 1983) .................................................................................... 3

*Brennan Ctr. for Justice v. DOJ*,
   697 F.3d 184 (2d Cir. 2012) ............................................................................... 5, 21, 22

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) .................................................................................... 21

*Ctr. for Effective Gov't v. DOS*,
   7 F. Supp. 3d 16 (D.D.C. 2013) ......................................................................... 7, 24, 25

*Krikorian v. DOS*,
   984 F.2d 461 (D.C. Cir. 1993) ...................................................................................... 6

*Morley v. CIA*,
   508 F.3d 1108 (D.C. Cir. 2007) .................................................................................... 6

*N.Y. Times Co. v. DOJ* (*N.Y. Times I*),
   756 F.3d 100 (2d Cir. 2014) .......................................................................... 2, 3, 8, 17

*Nat'l Council of La Raza v. DOJ,*
    411 F.3d 350 (2d Cir. 2005) .......................................................................... 21, 22

*NLRB v. Sears, Roebuck & Co.,*
    421 U.S. 132 (1975) ............................................................................................. 22

*Providence Journal Co. v. Dep't of Army,*
    981 F.2d 552 (1st Cir. 1992) ............................................................................... 21

*Pub. Citizen, Inc. v. Office of Mgmt. & Budget,*
    598 F.3d 865 (D.C. Cir. 2010) .............................................................................. 5

*Trea Senior Citizens League v. DOS,*
    994 F. Supp. 2d 23 (D.D.C. 2013) ........................................................................ 6

*Wilson v. CIA,*
    586 F.3d 171 (2d Cir. 2009) .............................................................................. 2, 8

*Wood v. FBI,*
    432 F.3d 78 (2d Cir. 2005) ................................................................................. 23

## Other Authorities

Appendix A to Order, *ACLU v. DOD,*
    No. 15 Civ. 9317 (AKD) (S.D.N.Y. July 31, 2017) ............................................ 25

Cheryl Pellerin, *Pentagon Provides Updates on Support for Operations in Yemen, Somalia,*
    U.S. Dep't of Def., Aug. 4, 2017 ........................................................................ 10

Jamie McIntyre, *US Supporting Yemen Offensive Against al Qaeda,* Wash. Examiner,
    Aug. 4, 2017 ................................................................................................. passim

Joseph Trevithick, *A USAF C-17 Flew a Secretive Mission Into Yemen to Rescue Wounded*
    *Emirati Troops in 2017*, Warzone, Dec. 13, 2018 ................................................ 11

Larry LeGree & Chick Rideout, *BATAAN Amphibious Ready Group 24th Marine*
    *Expeditionary Unit Post-Deployment Brief*, Oct. 18, 2017 ................................. 10

Nat'l Defense Industrial Ass'n, Conference Program, 22nd Annual Expeditionary Warfare
    Conference 95–107 (Oct. 24–26, 2017) ................................................................................ 10

Tara Copp, *US Puts Boots on the Ground in Yemen to Attack AQAP*, Military Times,
    Aug. 4, 2017 ........................................................................................................................ 8

Thomas Gibbons-Neff, *U.S. Troops Are on the Ground in Yemen for Offensive Against al-Qaeda
    Militants*, Wash. Post, Aug. 4, 2017 ....................................................................... 9, 11, 14, 19

## INTRODUCTION

In their opening brief, Plaintiffs explained that Defendants Departments of Defense ("DOD") and State ("DOS") failed to justify keeping secret twenty-three records concerning a deadly military operation in which an American service member and Yemen civilians died—but which the government publicly claimed was an authorized, well-planned success. Plaintiffs have reviewed the agencies' supplemental declarations, and now narrow their challenge to fifteen of those records. The government has invoked Exemptions 1, 5, or both to withhold information from the public, but it has failed to show that those exemptions logically and plausibly apply.

Plaintiffs start by addressing the government's erroneous arguments concerning the official acknowledgment doctrine. Those arguments should be rejected because they advance a narrow reading of the doctrine that is inconsistent with recent Second Circuit law.

Next, Plaintiffs address the government's specific arguments about each document. They show that the government has failed to justify its secrecy claims in light of already public information, and evidence in the government's own filings and produced documents. It is clear that the government has failed to segregate and release all information that can and should be publicly revealed. Should the Court have any doubt, and because only a few records are now at stake, Plaintiffs respectfully renew their request that this Court review each document *in camera*.

## ARGUMENT

**I.     The government's overly narrow interpretation of the official acknowledgment doctrine does not comply with Second Circuit precedent.**

The government has withheld each challenged document in full or in part under Exemption 1. In doing so, it has advanced a narrow interpretation of the official acknowledgment doctrine that the Second Circuit has rejected, and its broad Exemption 1 claims cannot stand.

Second Circuit precedent clearly establishes that if the government officially and publicly discloses information, it then waives the right to keep that information secret under Exemption 1. *N.Y. Times Co. v. DOJ* (*N.Y. Times I*), 756 F.3d 100, 119–20 (2d Cir. 2014); *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009). As with any exemption, the agency's justification for withholding information under Exemption 1 must be "logical" and "plausible." *N.Y. Times I*, 756 F.3d at 119.

To justify its withholdings, the government relies on a rigid application of the three-pronged test for official acknowledgment laid out in *Wilson*. *See* 586 F.3d at 186 (explaining that: (1) the information must be "as specific as the information previously released"; (2) it must "match" the information previously disclosed; and (3) the information must have been "made public through an official and documented disclosure" (citation omitted)). But as this Court noted in this case, "[t]he Second Circuit has recently called into question how strictly the *Wilson* test is to be applied in practice." *ACLU v. DOD*, 322 F. Supp. 3d 464, 480 (S.D.N.Y. 2018).

In *New York Times I*, the Second Circuit described and applied a more functional test for official acknowledgment. It explained that in *Wilson*, the Second Circuit did not actually apply a "matching" requirement, and that any "matching" requirement suggested in earlier cases cited in *Wilson* were "of questionable provenance." *N.Y. Times I*, 756 F.3d at 120 & n.19. According to the Second Circuit, the official acknowledgment doctrine would "make little sense" if it "require[d] absolute identity" between the information the government has disclosed and information the government seeks to keep secret. *Id.* at 120.

The Second Circuit's application of the official acknowledgment test in *New York Times I* makes its instructions even more clear. The court determined that much of a 41-page memorandum (the "OLC–DOD Memorandum") had been officially acknowledged by the government's publication of a 16-page white paper ("White Paper") that included similar, but *not*

2

identical, material. *See N.Y. Times I*, 756 F.3d at 120; *see id.* at 116 (finding that "substantial overlap" of the withheld OLC–DOD Memorandum and the public White Paper "fully establishe[d]" waiver of the government's FOIA privileges over the former); *id.* at 120 (explaining that the government may not continue to justify secrecy of information where differences "add[] nothing to the risk" of potential harm caused by disclosure); *see also Afshar v. DOS*, 702 F.2d 1125, 1132 (D.C. Cir. 1983) (test examines whether the withheld information differs in "some material respect" from information publicly acknowledged by the government).

Nevertheless, the government argues that "an 'official acknowledgment' does not compel the disclosure of other classified information where the prior disclosure is broader and more general than (and therefore not 'as specific as' and not 'matching') the withheld information." Gov't Opp. & Reply 4. In an unremarkable sense, this is true: for example, if the government officially acknowledges that a specific strike took place, this does not mean that it must then reveal every operational detail of that strike, if those details have not been revealed elsewhere. *Cf. ACLU v. CIA*, 109 F. Supp. 3d 220, 240–43 (D.D.C. 2015), *aff'd by ACLU v. DOJ*, 640 F. App'x 9 (D.C. Cir. 2016). However, if a "general" fact *necessarily* encompasses a more "specific" fact, then the government cannot justify the specific fact's withholding. For example, if the government officially acknowledged that it rained every day in March, the government could not then withhold from a record the fact that it rained on March 15—even though that fact is more specific.

Similarly, and as relevant here, the government has acknowledged information about the legal and policy framework that applies to *all* operations against al Qaeda in the Arabian Peninsula ("AQAP") in Yemen. *See, e.g.*, 2016 White House Report, ECF No. 119-16; 2018 White House Report, ECF No. 119-15. The al Ghayil Raid was one such operation against

AQAP in Yemen. Thus, the information that the government acknowledges applies to all operations in Yemen is therefore necessarily acknowledged for the al Ghayil Raid. The withholding of that information would not logically and plausibly serve the purposes of Exemption 1. *See* Pls.' Br. 13–16.

## II.   The government has improperly withheld information under Exemptions 1 and 5 from fifteen documents.

After previous briefing resulted in additional government disclosures, Plaintiffs narrowed their challenge to the government's full or partial withholding of twenty-three documents. Now, in light of the additional information provided by the agency declarants, Plaintiffs further narrow their challenge to fifteen documents.[1] The government invokes Exemption 1 to withhold information from all of these documents; the deliberative process privilege to withhold ten documents; and the presidential communications privilege to withhold eight documents. As described below, the government has failed to meet its burden to establish that these exemptions apply, and the Court should accordingly order disclosure of any non-exempt information.

**C06432239, C06432636, and C06432854**. These records, filed as ECF Nos. 119-29, 119-30, and 119-31 respectively, are "identical copies of a three-page intra-agency email . . . providing a readout of deliberations from an interagency meeting of the Deputies Committee held on January 6, 2017." Declaration of Eric F. Stein ¶ 37, ECF No. 114. To justify their withholding, the agency invokes Exemption 1, the deliberative process privilege, and the presidential communications privilege. *Id.* ¶¶ 38–41.

Exemption 1. In their opening brief, Plaintiffs pointed to officially acknowledged information that is likely to be present in this email. *See* Pls.' Br. 21. In response, the State

---

[1] Plaintiffs no longer challenge CENTCOM/246-268; COM/045-047; JS/009-011; JS/054-056; JS/280-282; STATE/034-035; STATE/036-038; and C06432231.

Department's declarant asserts summarily that "the Department has not previously authorized or officially acknowledged public release of the information withheld under Exemption 1." Second Declaration of Eric F. Stein ¶ 4, ECF No. 126. However, the government's narrow interpretation of the official acknowledgment doctrine does not comport with Second Circuit precedent, and it has made disclosures about the January 6 Deputies Committee meeting, which likely encompass some of the information at issue here. *See* Pls.' Br. 20–22. As a result, this email likely contains officially acknowledged information that can be reasonably segregated and disclosed.

   <u>Deliberative Process Privilege</u>. Plaintiffs contend that this email is not entirely covered by the deliberative process privilege because "it appears to be *post*-decisional, at least in part." Pls.' Br. 21. In its brief, the government misapprehends Plaintiffs' deliberative process privilege arguments, stating that Plaintiffs argue that this email constitutes agency working law. *See* Gov't Opp. & Reply 17. This is not the case.

   Instead, Plaintiffs argue that to the extent this email reflects final decisions made in the Deputies Committee meetings, that portion of the document does not fall within the ambit of the deliberative process privilege because it is not "predecisional" and "deliberative," as required to invoke the privilege. *See Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184, 194 (2d Cir. 2012). Courts have repeatedly recognized that just because a record contains *some* predecisional and deliberative material, this does not necessarily mean that the *entire record* is covered by the privilege. *See e.g.*, *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 876 (D.C. Cir. 2010) (An agency may not "avail itself of Exemption 5 to shield existing policy from disclosure simply by describing the policy in a document that as a whole is predecisional, such as a memo written in contemplation of a change in that very policy. Only those portions of a predecisional document that reflect the give and take of the deliberative process may be withheld."); *Morley v.*

*CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) ("Factual material that does not reveal the deliberative process is not protected by this exemption." (citation omitted)); *Trea Senior Citizens League v. DOS*, 994 F. Supp. 2d 23, 36–37 (D.D.C. 2013). Thus, even if the government may withhold some predecisional and deliberative material from the email, it has an obligation to segregate and disclose any portions that do not fall within the privilege. *See, e.g.*, *Krikorian v. DOS*, 984 F.2d 461, 466 (D.C. Cir. 1993) ("It has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions . . . . We have made clear that [t]he 'segregability' requirement applies to *all documents* and *all exemptions in the FOIA*." (citation omitted) (emphases added)).

Here, the relevant decisions are the ones that the Deputies Committee made that day—and that the White House Press Secretary publicly announced. This means that if the government is withholding material reflecting the decision to "go ahead" with the Raid or to wait for a "moonless night," *see* ECF No. 119-4, that information is not shielded by the privilege. To be clear, Plaintiffs do not argue that the Court should order disclosure of *other* details about the deliberations; they only argue that to the extent the Deputies Committee's *decisions* are memorialized in this email, references to those decisions must be disclosed.

Moreover, even if the Court concludes that the final Deputies Committee decisions described by Mr. Spicer were nonetheless "predecisional" with respect to the ultimate Raid, the deliberative process privilege would still not protect them because the government waived the privilege by specifically discussing the deliberation. In publicly describing the deliberation, Mr. Spicer waived any application of the privilege to the fact that the decisions were made, when they were made, and by whom. Contrary to the government's assertion, Gov't Opp. & Reply 18, it is of no moment that Mr. Spicer did not reference this particular email in discussing the

decision. Mr. Spicer was describing the January 6 Deputies Committee meeting, and this email is *a readout of that meeting*. Disclosure of the fact that this email memorializes Deputies Committee decisions would reveal nothing more than what Mr. Spicer himself chose to reveal when he gave the public an official narrative of the Raid's approval process.

Presidential Communications Privilege. As Plaintiffs pointed out in their opening brief, Pls.' Br. 22–23, the State Department failed to establish that it had maintained the privilege after this email was distributed to at least nine people who do not appear to serve in the close advisory role that the privilege requires. The State Department has not attempted to rebut these arguments, instead simply stating that "the limited distribution of these documents to certain groups of government officials and personnel who had a need to know the information did not disturb the privilege." Gov't Opp. & Reply 23. But this is not enough under the law. "[F]or the privilege to apply, the *reason* a given recipient 'needs to know' must implicate the purposes that animate the privilege: the promotion of candor and effective presidential decision-making." *Ctr. for Effective Gov't v. DOS*, 7 F. Supp. 3d 16, 26 (D.D.C. 2013). The government has failed to show that those purposes are served here.

**CENTCOM/020-026, JS/188-191.** CENTCOM/020-026, filed as ECF No. 119-33, contains emails "discussing military options post-al Ghayil Raid." *See* Revised *Vaughn* at 1, ECF No. 113-2. The record JS/188-191, filed as ECF No. 119-43, contains duplicates of emails found on CENTCOM/022-025. DOD invokes Exemption 1 to withhold information in these emails. *See* Revised *Vaughn* at 1, 2, ECF No. 113-2.

Exemption 1. Plaintiffs' brief pointed to specific officially acknowledged information that the government may be improperly withholding from these emails. *See* Pls.' Br. 4–5, 25–26. In response, the government states that the withheld information "is more specific than (and not

matched by) information previously officially acknowledged and made public in the documents identified by Plaintiffs." Declaration of Mark H. Herrington ("Herrington Decl.") ¶ 5, ECF No. 125. The government also claims that legal analysis contained in CENTCOM/023 and JS/189 "is not reasonably segregable from information that has been withheld pursuant to Exemption 1." *Id.*

In support of this argument, the government falsely states that "[m]ost of the information to which Plaintiffs point in their Statement of Facts . . . does not appear to be drawn from any official government disclosure," highlighting the sources listed in footnotes 23, 24, and 26 of Plaintiffs' brief. Gov't Opp. & Reply 7. In fact, the government concedes that one of the four sources in those footnotes contains official acknowledgments, but wrongly asserts that those acknowledgments are too general in nature to be relevant. *See id.* at 8 (describing an article from a DOD website filed as ECF No. 119-14). As to the other three sources, the government appears to suggest (without support) that they cannot contain official acknowledgments because they are not government publications. *Id.* at 7–8. That is wrong: the Second Circuit has previously considered and applied official acknowledgments by named officials when they are cited in the press. *See, e.g.*, *N.Y. Times I*, 756 F.3d at 118 (describing a *Wall Street Journal* article that reported statements by then–CIA Director Leon Panetta).

The four sources cited in those footnotes all contain official disclosures and are potentially relevant to the withholdings in these documents.

- Tara Copp, *US Puts Boots on the Ground in Yemen to Attack AQAP*, Military Times, Aug. 4, 2017, ECF No. 119-11

This article describes statements made by Pentagon spokesman Capt. Jeff Davis at a press briefing. To qualify as an official acknowledgment, a statement must have been "made public through an official and documented disclosure." *N.Y. Times I*, 756 F.3d at 120 (quoting *Wilson*, 586 F.3d at 186). Statements made by a Pentagon spokesperson when briefing the press on the

record are quintessential official government disclosures.[2] *See also* Jamie McIntyre, *US Supporting Yemen Offensive Against al Qaeda*, Wash. Examiner, Aug. 4, 2017, https://www.washingtonexaminer.com/us-supporting-yemen-offensive-against-al-qaeda (attached as Fifth Diakun Decl., Ex. 1) (describing Capt. Davis's statements during the same press briefing); Thomas Gibbons-Neff, *U.S. Troops Are on the Ground in Yemen for Offensive Against al-Qaeda Militants*, Wash. Post, Aug. 4, 2017, https://www.washingtonpost.com/news/ checkpoint/wp/2017/08/04/u-s-troops-are-on-the-ground-in-yemen-for-offensive-against-al-qaeda-militants (attached as Fifth Diakun Decl., Ex. 2) (same).

The government also attempts to discount the acknowledgments documented in this article by stating that "much of it relates to other military operations post-dating these email chains." Gov't Opp. & Reply 7. This misses the point. Capt. Davis explicitly referred to these military operations as part of the "Shabwah offensive," McIntyre, Ex. 1, which the President initially approved in January 2017, *see, e.g.*, JS/242, ECF No. 119-3. If that weren't enough, during that press briefing, Capt. Davis also stated that these later military operations were "'based upon the authorities granted in the operation that began' with the January raid." ECF No. 119-14. In the *Military Times* article, Capt. Davis explained that "the U.S. role in the operation includes surveillance, aerial refueling, close air support, and a 'small number of forces on the ground.'" ECF No. 119-11. Because the agency has officially acknowledged that the military is conducting exactly these activities in support of the Shabwah Offensive, the government cannot keep secret any portions of CENTCOM/020-026 or JS/188-191 stating generally that the U.S. military engaged in such activities.

---

[2] If the DOD believed either that the author of the article mischaracterized Capt. Davis's statements or that Capt. Davis was not authorized to make those statements, it could have said so in its declaration. It did not.

- Larry LeGree & Chick Rideout, *BATAAN Amphibious Ready Group 24th Marine Expeditionary Unit Post-Deployment Brief*, Oct. 18, 2017, ECF No. 119-12

Another source the government calls into question is a set of unclassified slides comprising the "BATAAN Amphibious Ready Group 24th Marine Expeditionary Unit Post-Deployment Brief." *See* ECF No. 119-12. The fifth slide reveals that the Group was deployed in support of the Shabwah Offensive. *See id.* at 5. The redaction of any information in CENTCOM/020-026 to conceal the fact of this support would be improper.

It is unclear from the government's brief why it believes these slides do not comprise official government disclosures. The same slides are also found on a government website, showing beyond doubt that these disclosures are official government acknowledgments. *See* Nat'l Defense Industrial Ass'n, Conference Program, 22nd Annual Expeditionary Warfare Conference 95–107 (Oct. 24–26, 2017), *available at* https://apps.dtic.mil/dtic/tr/fulltext/u2/1042380.pdf.

- Cheryl Pellerin, *Pentagon Provides Updates on Support for Operations in Yemen, Somalia*, U.S. Dep't of Def., Aug. 4, 2017, ECF No. 119-14

As mentioned above, the government concedes that this article "contain[s] official statements by a DOD representative." Gov't Opp. & Reply 8. Even so, the government argues that the acknowledgments therein are "very general" and that "the information withheld from JS/188-191 and CENTCOM/020-026 . . . is more specific than (and is not matched by) the information previously officially acknowledged . . . ." *Id.*

Even without knowing precisely what information the government is withholding, the government's unduly narrow application of the official acknowledgment doctrine calls its claim into question. *See supra* Part I. In the DOD article, Capt. Davis officially acknowledges that the authorities the President granted in January 2017 are the same authorities that permitted the

10

military to "conduct[] more than 80 strikes against [AQAP] militants, infrastructure, fighting

positions and equipment . . . ." ECF No. 119-14. In the DOD article and other reports, Capt.

Davis confirms that those authorities permit: "ground operations where necessary;" U.S. troops

to "serv[e] as advisers;" and "surveillance, aerial refueling, close air support, and a 'small

number of forces on the ground.'" *See* McIntyre, Ex. 1; Copp, ECF No. 119-11; *see also*

Gibbons-Neff, Ex. 2. The government may not withhold information in CENTCOM/020-026 and

JS/188-191 that shows the military engaged in such activities in support of the Shabwah

Offensive.

- Joseph Trevithick, *A USAF C-17 Flew a Secretive Mission Into Yemen to Rescue Wounded Emirati Troops in 2017*, Warzone, Dec. 13, 2018, ECF No. 119-10

Plaintiffs also cited an article by Joseph Trevithick, which quotes a CENTCOM public

affairs official as saying that U.S. forces have "provided the Emiratis with intelligence support;

airborne [intelligence, surveillance, and reconnaissance]; advice and assistance with operational

planning; maritime interdiction and security operations; medical support; and aerial refueling."

*See* Pls.' Br. 4–5 (quoting ECF No. 119-10). The government argues that because the

CENTCOM public affairs officer is unnamed, this does not constitute an "official"

acknowledgment. Gov't Opp. & Reply 8. But the individual is identified by their title and

directly quoted, and the article gives no indication that the official was not speaking on behalf of

the government.

But even ignoring the Trevithick article, the result is the same: the bulk of this

information has been officially acknowledged by named officials or government documents in

other sources. *See* Gibbons-Neff, Ex. 2 ("intelligence sharing"); Copp, ECF No. 119-11

("surveillance, aerial refueling, close air support"); McIntyre, Ex. 1 ("U.S. troops are serving as

11

advisers"); LeGree & Rideout, ECF No. 119-12 (maritime support from the BATAAN Amphibious Ready Group).

In sum, contrary to the government's assertions, each of these sources (and others) contains potentially relevant official acknowledgments, and to the extent that public information is currently redacted in CENTCOM/020-026 or JS/188-191, it must be disclosed.

**JS/022-023**. This document is a memorandum from the then–National Security Advisor to the then–Secretary of Defense memorializing "Presidential Authorization on Department of Defense Proposals Related to Yemen" (the "Authorization Memo"). *See* JS/022, ECF No. 119-39. DOD invokes Exemption 1 to withhold information from this record. Declaration of Major General Jim Hecker ("Hecker Decl.") ¶ 35, ECF No. 113.

Exemption 1. Plaintiffs argued that "[i]f this document contains any officially acknowledged information, such as the different types of support the President authorized DOD to provide, . . . the government may not withhold it on the basis of Exemption 1." Pls.' Br. 30. In response, the government asserts that "[t]he information still withheld from this document . . . is more specific than (and not matched by) information previously officially acknowledged and made public in the documents identified by Plaintiffs." Herrington Decl. ¶ 9.

Evidence in the government's own productions in this case and its acknowledgments elsewhere, however, make clear that the government's assertion is questionable. It seems likely that the redacted portions of the Authorization Memo contain references to at least three pieces of officially acknowledged information that the government cannot withhold under Exemption 1: (1) references to the al Ghayil Raid or to ground raids generally; (2) references to an intelligence-sharing agreement; and (3) information relating to the general types of activities the military was

authorized to carry out as part of the Shabwah Offensive. If so, each of these pieces of information has been withheld impermissibly.

First, while the agency explains that the Authorization Memo "reflect[s] the President's approval of the al Ghayil Raid," Herrington Decl. ¶ 9, there is no mention of the al Ghayil Raid—nor of ground raids generally—in the unredacted portion of the memo. *See* ECF No. 119-39. This discrepancy is especially noteworthy because Pentagon spokesman Navy Capt. Jeff Davis disclosed that the military had "the authority to do ground operations where necessary" in support of the Shabwah Offensive. McIntyre, Ex. 1. Although Capt. Davis disclosed this information in August 2017 when discussing a number of U.S. military actions in support of the Shabwah Offensive, he made clear that these actions were "'based upon the authorities granted in the operation that began' with the January raid"—that is, the authorities that were granted in this Authorization Memo. *See* ECF No. 119-14. And yet, there is no unredacted mention of ground raids or operations in the memorandum at all.

Second, although the government has officially acknowledged that it engaged in intelligence sharing in support of the Shabwah Offensive, the unredacted portions of the Authorization Memo make no reference to that fact. This is striking because the government's own production reveals that the Authorization Memo was circulated with the file name "POTUS Approval – *UAE Shabwah and Intel Sharing* (27JAN2017).pdf." *See* Revised *Vaughn* at 1, ECF No. 113-2 (emphasis added in file name) (stating that the Authorization Memo "is the attachment to JS/161-164"); JS/161 (attachment to JS/161-164 bears the file name noted above) (attached as Fifth Diakun Decl., Ex. 3). In addition, when the Chairman of the Joint Chiefs of Staff communicated the President's operational approval following the January 25 dinner meeting at the White House, he sent an email titled "SHABWAH AND BAM INTELL SHARING" and

wrote in the body that "POTUS approved both requests." *See* JS/238-239 (attached as Fifth

Diakun Decl., Ex. 4); *see also* JS/240, ECF No. 119-3 (attaching a document titled "CENTCOM

BAM FCO - UAE Intel Sharing 15 Nov 16 (v3).pptx"). Finally, the *Washington Post* reported

that during the August 4, 2017 Shabwah Offensive press briefing described above, Capt. Davis

said that U.S. troops were in Yemen assisting with "intelligence sharing." Gibbons-Neff, Ex. 2

("A small number of troops are [in Yemen] to help with 'intelligence sharing,' Pentagon

spokesman Capt. Jeff Davis said."). Given these disclosures, this aspect of the operation should

not be blacked out in the Authorization Memo, yet it is nowhere to be found.

Third, the government has officially acknowledged that the military was authorized to

engage in different types of activities in support of the Shabwah Offensive, most of which are

not mentioned in the unredacted portions of the Authorization Memo. As recounted by a variety

of news sources, Capt. Davis said at the August 2017 Shabwah Offensive briefing that "U.S.

troops are serving as advisers," McIntyre, Ex. 1; that "the United States is providing midair

refueling and overhead reconnaissance for forces involved in the operation," Gibbons-Neff, Ex.

2; and that "the U.S. role in the operation includes surveillance, aerial refueling, [and] close air

support," ECF No. 119-11. If the Authorization Memo conveys authorization to carry out any of

these activities, there is no basis upon which to withhold that information.

**CENTCOM/027-030, JS/057-058**. These documents (or "Military Orders"), filed as

ECF Nos. 119-34 and 119-42, are "military orders from the Joint Staff to CENTCOM to conduct

operations supporting the Shabwah offensive approved by the President." Hecker Decl. ¶ 36.

DOD withheld them on the basis of Exemption 1.

Exemption 1. Plaintiffs' opening brief cited several government documents laying out the

legal and policy standards to which the government asserts it adheres in its military operations in

Yemen; Plaintiffs argued that if any of this information was redacted from the Military Orders, it must now be disclosed. Pls.' Br. 5–8, 26–27. The government states, however, that "[t]he potentially relevant information in these documents is not as specific as, and does not match, the information withheld from CENTCOM/027-030 and JS/057-058." Gov't Opp. & Reply 9. The government's argument seems to be that because its legal and policy documents, including the 2016 and 2018 White House reports, don't *specifically* mention the Raid, the information in those documents is not as "specific" enough for the purposes of official acknowledgment. *See id.* at 9–10.

The government is incorrect. As discussed in Part I, if the more general acknowledgment *necessarily encompasses* the more specific acknowledgment, then, as a matter of logic, the general admission waives protection over the specific. For example, the 2016 White House Report asserts that "[a]s a matter of international law, the United States has conducted counterterrorism operations against AQAP in Yemen with the consent of the Government of Yemen in the context of the armed conflict against AQAP and in furtherance of U.S. national self-defense." ECF No. 119-16 at 18. The 2018 White House Report affirmed that this was still the case for strikes that took place in 2017. *See* ECF No. 119-15 at 6 (in 2017, the government continued to "conduct[] direct action against AQAP in Yemen as described in" the December 2016 White House Report). Although this disclosure does not specifically mention the al Ghayil Raid, it applies to *all* counterterrorism operations against AQAP in Yemen—which of course would include the January 29, 2017 al Ghayil Raid. The same is true for what the government asserts is its general requirement that the U.S. military comply with the "fundamental principles of necessity, humanity, distinction, and proportionality," ECF No. 119-15 at 7, and the requirement that the military have a "reasonable certainty that a functionally and geospatially

defined object of attack is a legitimate military target in accordance with the Law of War and applicable [rules of engagement]," ECF No. 119-19 at A-6.

**JS/330-336, JS/339-345**. These documents, filed as ECF Nos. 119-47 and 119-48, are "substantially similar, detailed operational proposals regarding support to the Shabwah offensive, including the al Ghayil Raid," dated January 3, 2017, and November 10, 2016, respectively. Hecker Decl. ¶ 22. DOD withholds these versions of this "Joint Proposal" in full based on Exemption 1 and the deliberative process privilege. *See id.* ¶ 23; Revised *Vaughn* at 2.

Exemption 1. In their opening brief, Plaintiffs explained that it appears that the title of the Joint Proposal has been openly referenced and therefore officially acknowledged in another email. *See* Pls.' Br. 33. If so, the title of the Joint Proposal cannot be withheld. *Id.* In particular, Plaintiffs argued that this is the "Joint Proposal" that corresponds with the "Joint Proposal PPG Variance Request for Direct Action in Yemen" referenced in JS/324-329, an email chain spanning from November 22, 2016 to January 6, 2017. *See id.*; ECF No. 119-55. The government does not dispute that the Joint Proposal reflected in JS/330-336 and JS/339-345 is referenced in the email chain on JS/324-329, instead stating that "the DOD's declarant confirms that JS/330-336 and JS/339-345 were not located as *attachments* to JS/324-329 . . . ." Gov't Opp. & Reply 11 (emphasis added). That does not respond to Plaintiffs' point, which is that if this Joint Proposal is the one *referenced* in that email chain, then the disclosure of that email chain has officially acknowledged the title and/or topic of the Joint Proposal. In any event, it appears that a copy of that proposal *is* attached to JS/337, an email that circulates a document with the file name "Joint Proposal PPG Variance Request in Yemen (22NOV16).docx." JS/337 (attached as Fifth Diakun Decl., Ex. 5). Having already revealed the topic of the proposal, the government cannot withhold the title from these documents.

Changing tacks, the government states that "the information withheld from the two DOD proposal documents is more specific than, and is not matched by, information previously official[ly] acknowledged and made public in JS/324-329 (or in any other documents proffered by Plaintiffs)." Gov't Opp. & Reply 11. The government appears to be withholding the title of the proposal because the title is not *precisely* "Joint Proposal PPG Variance Request for Direct Action in Yemen," so in its view the disclosure does not meet the specificity or matching requirements under its rigid application of the *Wilson* test.

But if Plaintiffs have correctly identified these withheld documents as the Joint Proposals discussed in the above-referenced email chains, then the government's argument is flawed. The agency has officially acknowledged that it discussed approval of a "Joint Proposal PPG Variance Request for Direct Action in Yemen," and that it circulated for discussion a Word document with the file name "Joint Proposal PPG Variance Request in Yemen (22NOV16).docx." *See* JS/324-329, ECF No. 119-55; JS/337, Ex. 5. Official acknowledgment does not require that the actual title or subject line within the redacted proposals match this phrasing word-for-word. As clarified in *N.Y. Times I*, the Second Circuit "do[es] not understand the 'matching' aspect of the *Wilson* test to require absolute identity. Indeed, such a requirement would make little sense. A FOIA requester would have little need for undisclosed information if it had to match precisely information previously disclosed." 756 F.3d at 120 & n.19. It is difficult to understand how a title conveying the same substance that has already been officially disclosed can possibly harm national security—how, in other words, a few extra words could "add[ any]thing to the risk," *N.Y. Times I*, 756 F.3d at 120. So long as the title would not reveal additional material information, the government cannot logically and plausibly rely on Exemption 1 to withhold it. *See id.* at 119.

17

<u>Deliberative Process Privilege</u>. The government argues that "even if DOD had disclosed similar information to that withheld in these documents pursuant to the deliberative process privilege, that would not waive the privilege, as it protects a communication, not particular information contained therein." Gov't Opp. & Reply 22 (citing *ACLU v. NSA*, 925 F.3d 576, 599 (2d Cir. 2019)). However, if Plaintiffs have correctly identified these documents as the ones attached to JS/337 and discussed in JS/324-329, then the confidentiality of this information— meaning the title and/or the general topic of the proposal—has been waived *as to this specific communication*.

**CENTCOM/048-053, JS/048-053, JS/261-266, JS/273-278, STATE/039-044**. These five records, filed at ECF Nos. 119-36, 119-40, 119-44, 119-45, and 119-51 respectively, are "identical copies of [a] detailed DoD operational proposal document regarding support to the Shabwah offensive, including the anticipated al Ghayil Raid" ("Operational Proposal"). Hecker Decl. ¶ 22. At least one version of the Operational Proposal, CENTCOM/048-053, was attached to the "Memorandum from [the] Secretary of Defense to [the] National Security Advisor seeking approval for [a] detailed operational proposal relating [the] to al Ghayil Raid." Revised *Vaughn* at 1. DOD withholds all five records under Exemption 1, the deliberative process privilege, and the presidential communications privilege. *See* Hecker Decl. ¶¶ 23–24.

<u>Exemption 1</u>. Despite the wealth of information that the government has acknowledged about the al Ghayil Raid and the Shabwah Offensive, it has withheld the Operational Proposal in full under Exemption 1, stating that "[t]he information withheld from the proposal document is more specific than (and not matched by) information previously officially acknowledged and made public in the documents identified by Plaintiffs." Herrington Decl. ¶ 10. Although it is possible that some information may be properly withheld, it is implausible that there is no

reasonably segregable officially acknowledged or unclassified information in the Operational

Proposal—especially considering the information disclosed in the Defense Secretary's

Memorandum conveying the Operational Proposal for approval, and the Authorization Memo

approving it. *See* CENTCOM/045-047, ECF No. 119-35; JS/022, ECF No. 119-39; *see generally*

Statement of Facts, Pls.' Br. 1–8; McIntyre, Ex. 1; Gibbons-Neff, Ex. 2.

      <u>Deliberative Process Privilege</u>. In their brief, Plaintiffs argued that the Operational

Proposal "was no longer deliberative or predecisional, but rather represented the final plan

adopted by the government." Pls.' Br. 31. The government responds that "there is no evidence

that [the President] (or anyone else with authority to do so) 'adopted' any of these

recommendation memoranda or operational proposals in whole or in part." Gov't Opp. & Reply

19. The government is wrong: there are three distinct pieces of evidence showing the Operational

Proposal was approved in full.

      First, there is direct evidence that the President approved the Operational Proposal

through the Military Order. *See* JS/057–058, ECF No. 119-42. In approving DOD support to the

UAE Shabwah Offensive, the Military Order explicitly references the Operational Proposal,

states that the President "approved" it, and authorizes CENTCOM "to support the UAE Shabwah

Offensive *as described*" in the Operational Proposal. *Id.* (emphasis added).[3] These references to

---

[3] In this litigation, the government disclosed that the Secretary of Defense submitted the
Operational Proposal to the National Security Advisor as an attachment to the Secretary's
memorandum "requesting Presidential approval of the proposed Raid." Hecker Decl. ¶ 22. This
copy of the Operational Proposal is at CENTCOM/048-053, *id.*, and it is referred to as "REF B"
in the Military Order; the Secretary of Defense memorandum is located at CENTCOM/045-047,
*id.*, and it is referred to as "REF C" in the Military Order. *See* JS/057, ECF No. 119-42 ("REF C
is the SecDef memorandum endorsing REF B and submitting it for Presidential approval.").

The "Execution" section of the Military Order states that "[p]er REF B"—the Operational
Proposal—"[the Commander of Central Command] requested authorization to support the UAE
Offensive against AQAP in Shabwah Governorate, Yemen." JS/057, ECF No. 119-42. The
Military Order then states that "the POTUS has approved REF B," and that "[the Commander of

explicit presidential approval of the Operational Proposal, and to the President's endorsement of the operation as laid out within it, conclusively establish adoption.

Second, contrary to the government's assertion, the Authorization Memo *does* reference the Operational Proposal—further evidence that the proposal lost its predecisional character and was accepted as final. *Cf.* Gov't Opp. & Reply 19 ("These presidential authorization memoranda did not cite or reference any of the predecisional recommendation memoranda or operational proposals[.]"). In fact, the very subject line of the Authorization Memo references it: "Presidential Authorization on *Department of Defense Proposals Related to Yemen*." JS/022, ECF No. 119-39 (emphasis added). Given that the government has disclosed that the Operational Proposal submitted for presidential authorization was the copy on CENTCOM/048-053, *see* Hecker Decl. ¶ 22, this is a clear reference to the Operational Proposal.

Third, one copy of the Operational Proposal was circulated among agency employees shortly *after* President Trump approved the plan to support the UAE Shabwah Offensive, which is evidence that this is the final plan to be implemented by subordinates. *See* Revised *Vaughn* at 1 (JS/048-053 was attached to JS/240-242); JS/242, ECF No. 119-3 (circulating Operational Proposal on January 27, 2017). Similarly, another copy was circulated as "an attachment to the memorandum from the National Security Advisor conveying the President's May 2017 authorization of an extension of prior approval for military operations." Herrington Decl. ¶ 10.

There should be no question that the Operational Proposal was approved in full by the President. Therefore, the government cannot withhold the Operational Proposal under the deliberative process privilege for two reasons: first, because the Operational Proposal is neither

---

Central Command] is authorized to support the UAE Shabwah Offensive *as described in REF B*." JS/058, ECF No. 119-42 (emphasis added).

predecisional nor deliberative; and second, because the Operational Proposal has been expressly adopted as or incorporated by reference into final agency policy.

First, although the Operational Proposal may have been "predecisional" when it was written, it is no longer "predecisional" or "deliberative," and thus does not fall within the ambit of the deliberative process privilege. *See Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2005); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) ("[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public."). The President not only subsequently approved the proposal, but instructed CENTCOM to act in accordance with its terms. *See* JS/057–058 (ECF No. 119-42) (CENTCOM is authorized "to support the UAE Shabwah Offensive *as described* in REF B"— the Operational Proposal). The Operational Proposal was circulated to DOD personnel as the point of reference "regarding the details and execution of the operation." Hecker Decl. ¶ 22. It is therefore clear that this document is the final plan expressly approved by the President and relied upon by CENTCOM in its execution of the Shabwah Offensive, and is not "predecisional" for the purposes of the deliberative process privilege.

Additionally, the Operational Proposal is no longer "deliberative." For a predecisional document to also qualify as "deliberative," it must "reflect[] the personal opinions of the writer rather than the policy of the agency, and . . . if released, would inaccurately reflect or prematurely disclose the views of the agency." *Brennan Ctr.*, 697 F.3d at 202 (alterations in original) (quoting *Providence Journal Co. v. Dep't of Army*, 981 F.2d 552, 559 (1st Cir. 1992)). Because the Operational Proposal was approved, it reflects the *policy of the agency*—authorized by the President—rather than the author of the proposal.

Moreover, withholding the Operational Proposal would not serve the purposes of the deliberative process privilege. The privilege "is designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials." *La Raza*, 411 F.3d at 356. But "[t]he probability that an agency employee will be inhibited from freely advising a decisionmaker for fear that his advice *if adopted*, will become public is slight." *Id.* at 359–60 (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975)). That is true for three reasons: (1) "when adopted, the reasoning becomes that of the agency and becomes its responsibility to defend"; (2) "agency employees will generally be encouraged rather than discouraged by public knowledge that their policy suggestions have been adopted by the agency"; and (3) "the public interest in knowing the reasons for a policy actually adopted by an agency supports [disclosure]." *Id.* Here, the President and the agency have accepted responsibility for defending the operation's approval, and there can be no chill of agency deliberations by requiring disclosure of the proposal that the President himself has approved.

Second, and for similar reasons, the Operational Proposal was a once-privileged document that has been adopted as the agency's foreign policy, and "the Government may not expressly *adopt* a privileged communication *as its effective law or policy* while maintaining the privilege." *ACLU v. NSA*, 925 F.3d at 591; *see La Raza*, 411 F.3d at 359–60 (holding that "use of the OLC Memorandum by Department personnel [was] powerful evidence that the Department explicitly adopted the OLC Memorandum as part of its policy" and ordering disclosure).

The government argues that the Operational Proposal does not "constitute[] agency 'working law'" because "[t]he document is not 'law' at all." Gov't Opp. & Reply 20. But "working law" encompasses the agency's effective law *and* policy. *See La Raza*, 411 F.3d at 359–61 (ordering disclosure of adopted policy); *Brennan Center*, 697 F.3d at 196 ("The reasons

for a decision made by an agency, or a policy actually adopted, however, 'constitute the 'working law' of the agency.'" (citation omitted)); *ACLU v. NSA*, 925 F.3d at 591. The Operational Proposal embodies the agency's policy: it lays out the parameters—legal and operational—of the government's policy of providing large-scale support to the UAE Shabwah Offensive. The President's instruction, conveyed in the Military Order, constrained CENTCOM's support to the Shabwah Offensive to the parameters laid out in the Operational Proposal. The President's endorsement was not of an operation in the abstract, but of the operation precisely as described in the Operational Proposal. *Cf. Wood v. FBI*, 432 F.3d 78, 84 (2d Cir. 2005) (requiring reliance on both the conclusion and reasoning before finding adoption).

In addition, the Operational Proposal does contain agency "law": the government has conceded that the Operational Proposal contains legal analysis, *see* Gov't Opp. & Reply 11; Herrington Decl. ¶ 10, which the President endorsed when he approved the proposal in full.

More importantly, though, even if this Court were to determine that the Operational Proposal does *not* constitute agency "law" or "policy," that does not mean that the government can withhold the document. As the Second Circuit has recently clarified, the "adoption" and "working law" doctrines "are not 'exceptions' to Exemption 5," but are "tell-tale indicators that, notwithstanding its appearance, a document simply is not protected by the deliberative process and attorney-client privileges." *ACLU v. NSA*, 925 F.3d at 593 n.77. The Operational Proposal has the same "tell-tale indicators" described in *ACLU v. NSA*, including "explicit textual reference in a final decision" (the Military Order), and evidence that the "agency circulated and consulted" the Operational Proposal "as a source of binding authority." *Id.* at 594, 597.

<u>Presidential Communications Privilege</u>. Although Plaintiffs emphasized in their opening brief that the government has not established that it maintained the confidentiality required for

the presidential communications privilege, Pls.' Br. 31–32, DOD has not provided any additional information to support its privilege assertion. The Defense Department's original declaration acknowledged that "shortly after the President's approval," the document was circulated "to a limited group of personnel within DoD involved with the planning and execution of the Raid." Hecker Decl. ¶ 24. Another copy of the document was later sent "to a small group of cabinet and similarly high-level government officials conveying Presidential approval of a later military operation." *Id.* The DOD's *Vaughn* index reveals that a copy of the document was transmitted to at least one email listserv with an unknown number of recipients. *See* Revised *Vaughn* at 1 (JS/048-053 was attached to JS/240-242); JS/240, ECF No. 119-3 (attachment was circulated by email to Darse Crandall, the "JS Pentagon DoM List LC Bridge" listserv, and another individual). Whether that was the only listserv to which this document was disseminated, who is on that listserv, and what role those individuals played in the presidential decision-making process are still unanswered questions.

Additional evidence suggests that even if the government had answered those questions, it could not sustain its burden. According to the Defense Department, a copy of the document was attached "to an email thread among DoD personnel discussing the just-approved al Ghayil operation, to provide factual context regarding the details and execution of the operation." Hecker Decl. ¶ 22. Because this dissemination was not in service of *making* a decision, but rather to widely communicate a decision already made, the Operational Proposal cannot be withheld under the privilege. *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26–27 ("[D]ocuments distributed from the Office of the President for non-advisory purposes do not implicate the goals of candor, opinion-gathering, and effective decision-making that confidentiality under the privilege is meant to protect."); *see also ACLU v. DOJ*, No. 15 Civ. 1954, 2016 WL 889739, at *4–5

(S.D.N.Y. Mar. 4, 2016) (waiver of privilege where document is "transmit[ed] . . . to persons who are unlikely to be in a position to give advice to the President").

Without any further elaboration, the government simply asserts that "the limited distribution of these documents to certain groups of government officials and personnel who had a need to know the information did not disturb the privilege." Gov't Opp. & Reply 23. But the government has cited to no authority to support this assertion. And in fact, case law shows the opposite: simply asserting that the personnel had a "need to know" is not enough. "[F]or the privilege to apply, the *reason* a given recipient 'needs to know' must implicate the purposes that animate the privilege: the promotion of candor and effective presidential decision-making." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26. Those purposes would not be served here.

Finally, the Operational Proposal does not fall within the ambit of the presidential communications privilege for the additional reason that "the privilege does not apply to documents that 'are themselves authorizations for action.'" Pls.' Br. 32 (quoting Appendix A to Order at 8, *ACLU v. DOD*, No. 15 Civ. 9317 (AKD) (S.D.N.Y. July 31, 2017), ECF No. 76). The Operational Proposal was both attached to and referenced in the subject line of the Authorization Memo, showing that it was an integral part of that memo. Hecker Decl. ¶ 24; JS/022, ECF No. 119-39. Moreover, it was incorporated by reference into the Military Order authorizing action— removing it from the privilege's protection. *See* JS/057-058, ECF No. 119-42; *supra* Note 3.

## CONCLUSION

Plaintiffs respectfully ask the Court to reject the government's withholding of information from the challenged documents and order the immediate release of information not properly subject to FOIA exemptions. Should the Court have any doubt about the propriety of ordering the release of any record, Plaintiffs request that the Court review it *in camera*.

Dated: July 19, 2019                                   Respectfully submitted,

                                         /s/ *Anna Diakun*
                                        Anna Diakun
                                        Brett Max Kaufman
                                        Hina Shamsi
                                        American Civil Liberties Union Foundation
                                        125 Broad Street—18th Floor
                                        New York, New York 10004
                                        T: 212.549.2500
                                        F: 212.549.2654
                                        adiakun@aclu.org

                                        *Counsel for Plaintiffs*