UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
AMERICAN CIVIL LIBERTIES UNION and      :
AMERICAN CIVIL LIBERTIES UNION          :                17 Civ. 3391 (PAE)
FOUNDATION,                             :
                                        :               OPINION & ORDER
                    Plaintiffs,         :
                                        :
          -v-                           :
                                        :
DEPARTMENT OF DEFENSE, CENTRAL          :
INTELLIGENCE AGENCY, DEPARTMENT OF      :
JUSTICE, and DEPARTMENT OF STATE,       :
                                        :
                    Defendants.         :
                                        :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       This lawsuit under the Freedom of Information Act ("FOIA") concerns a request by

plaintiffs American Civil Liberties Union and the American Civil Liberties Union Foundation

(together, the "ACLU") for records held by federal agencies related to an operation carried out

by the United States military on January 29, 2017, in al Ghayil, Yemen ("the Raid").

Specifically, the ACLU brought this action against four federal agencies—the Department of

Defense ("DoD"), the Central Intelligence Agency ("CIA"), the Department of Justice ("DoJ" or

"Justice"), and the Department of State ("DoS" or "State," and collectively with DoD, CIA, and

Justice, "the Government")—seeking disclosure of documents relating to the Raid.

       During this litigation, the parties have substantially narrowed the documents and issues in

dispute.  The ACLU now challenges Government withholdings in only 15 documents:  three

DoS documents and 12 DoD documents (together, the "Challenged Records").

Before the Court are cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the Court grants the Government's motion for summary judgment—and denies the ACLU's cross-motion—as to 13 of the Challenged Records, and directs the Government to provide the remaining two documents for *in camera* review.

## I. Background[1]

### A. The Air Raid in Yemen

On January 29, 2017, the U.S. military conducted an "intelligence-gathering raid" in al Ghayil, Yemen. One service member and an unspecified number of civilians died. According to news reports cited by the ACLU, in anticipation of the Raid, President Trump declared the area around al Ghayil, Yemen, a temporary "area of hostilities." This designation exempted the Raid from existing policy guidance that limited, in the interest of minimizing civilian casualties, the circumstances under which such a raid can lawfully be conducted.

Planning for the Raid began in 2016, during the Obama Administration. The government later revealed that the Raid was part of a larger plan to support a United Arab Emirates ("UAE") military offensive (the "Shabwah Offensive") against al Qaeda in the Arabian Peninsula ("AQAP") in Yemen.

### B. Public Disclosures by White House Press Secretary Sean Spicer

In the days that followed, the White House's then-Press Secretary, Sean Spicer, three times fielded questions at press briefings about the Raid. Because its content is central to this

---

[1] These facts are drawn primarily from the declarations submitted by the parties in support of their motions for summary judgment. Except where otherwise noted, these facts are undisputed, insofar as the decisive facts consist of public statements by officials within the federal government. To the extent that other facts recounted here are drawn from the parties' briefs, which in turn draw upon press accounts, the facts are recounted merely for the purpose of background.

dispute—particularly to the scope of official acknowledgment regarding the Raid—the Court quotes Spicer's second set of remarks in full.

On February 2, 2017, during a daily press briefing, the following exchange occurred:

**Q (Reporter):** On Yemen, it was initially described, the raid over the weekend, as a successful raid by the administration. There are now some questions and comments raised about the possibility of additional civilian casualties. So I've got a couple of questions for you on this one. Would you still stand by your characterization of the raid as "successful"? Was the President given multiple options about this raid, or just one? And were there consultations with the prior administration's national security officials, military officials about the raid moving forward?

**MR. SPICER:** Thank you. Actually, I'd like to just walk through that. I appreciate you bringing this up. There is—let's go through the tick-tock on that raid. On November 7th, CENTCOM submitted the plan to DOD. Clearly, that was under the last administration. Legal teams were involved immediately when it was submitted to DOD. On December 19th, the plan was approved by the Department of Defense and recommended that it be moved ahead. It was sent then to the National Security Council staff here in the White House. Again, this all happened under the previous administration.

On January 6th, there was an interagency deputies meeting. *The deputies recommended at that time that they go ahead*. It was so easily approved it was sent straight up. The conclusion to hold was, at that time, to hold for what they called a "*moonless night*," which, by calendar, wouldn't occur until then-President-elect Trump was President Trump.

On January 24th, shortly after taking office, Secretary of Defense-then Mattis [sic] read the memo, resent it back up to the White House conveying his support. On the 25th of January, the President was briefed by General Flynn on Secretary Mattis's recommendation and the status of the operation, or potential operation.

The President asked to see Secretary Mattis and Joint Chiefs [sic] of Staff Dunford. He then, on that evening, had a dinner meeting, which included the President, the Vice President, Secretary Mattis, Chairman Dunford, Chief of Staff Priebus, Jared Kushner, Chief Strategist Bannon, General Kellogg, General Flynn, and CIA Director Pompeo where the operation was laid out in great extent. The indication at that time was to go ahead on Friday the 26th.

In the morning, the deputies committee met again. It was not a necessary step because they had previously recommended and also reaffirmed their support for that. On January 26th, the President signed the memo authorizing the action. So it was a very—not only was it a very, very though-out [sic] process by this administration, it had started back on November 7th in terms of—clearly well

before that, but it was a move forward by CENTCOM on November 7th. This was a very, very well thought-out and executed effort.

**Q:** Where was the President the night of the raid? How did he learn about Chief Owens's death? And do you still stand by your characterization that it was successful?

**MR. SPICER:** The President was here in the residence. He was kept in touch with his national security staff. Secretary Mattis and others had kept him updated on both the raid and the death of Chief Owens, as well as the four other individuals that were injured. So he was kept apprised of the situation throughout the evening.

And again, I think—I would go back to what I said yesterday: It's hard to ever call something a complete success when you have the loss of life, or people injured. But I think when you look at the totality of what was gained to prevent the future loss of life here in America and against our people and our institutions, and probably throughout the world in terms of what some of these individuals could have done, I think it is a successful operation by all standards.

And again, I want to reiterate, it is tough to ever use the word "success" when you know that somebody has lost their life. But when you go back and look at an individual that dedicated their life to serving this country, and went over and over and over again knowing that this not only the risk that he took but wanted to do it because he knew the threat that these kind of individuals pose to our country and to our people, that's—while not a success that you lost to [sic] him, you know that he died in sacrifice for someone else here in this nation.

Dkt. 119 ("Fourth Daikun Decl."), Ex. 4 at 11–13 (Feb. 2, 2017 press briefing) (emphasis added); *see also* Dkt. 37 ("Daikun Decl."), Ex. 6 at 12 (Jan. 31, 2017 press briefing); *id.*, Ex. 4 at 10–11 (February 7, 2017 press briefing).

### C.    Other Public Statements Regarding the Raid

The ACLU contends that Government officials made several other public statements regarding the Raid. The Court reviews the most relevant ones here.

On August 4, 2017, a Pentagon spokesman, Capt. Jeff Davis, provided a press briefing, which was covered in several outlets. *See* Fourth Daikun Decl., Exs. 11 (*Military Times* article), 14 (article on DoD website); Dkt. 128 ("Fifth Diakun Decl."), Exs. 1 (*Washington Examiner* article), 2 (Washington *Post* article). Davis confirmed that the Raid was among the first U.S.

actions taken in support of the UAE's Shabwah Offensive, targeting AQAP in Yemen, and that

the U.S. military had provided various forms of military and intelligence support to the UAE

Offensive, including conducting more than 80 airstrikes against AQAP in the region and a

limited number of ground operations. Additionally, Davis explained that a small number of U.S.

troops were providing "intelligence sharing" support to the operation, and the military was

providing midair refueling and overhead reconnaissance for forces involved in the operation.

Fifth Diakun Decl., Ex. 2 (Washington *Post* article). According to Davis, all these actions were

"based upon the authorities granted" for the Raid, which permitted, *inter alia*, ground operations

where necessary. Fourth Daikun Decl., Ex. 14 (DoD article); *see id.*, Ex. 11 (*Military Times*

article).[2] In addition, a set of unclassified slides, dated October 18, 2017, and titled "BATAAN

Amphibious Ready Group 24th Marine Expeditionary Unit Post-Deployment Brief," revealed

that that Group had at least some connection to at least one Shabwah Offensive operation,

although details were not provided. *Id.*, Ex. 12 (BATAAN slides), at 5; *see also* Fifth Diakun

Decl., Ex. 2 (noting that the "Bataan Amphibious Ready Group, a collection of U.S. Navy ships

loaded with Marines, is in the region").

     The Government has also made official acknowledgments of broadly applicable legal and

policy standards, which the ACLU argues necessarily apply to operations like the Raid. In

particular, the White House released reports on the legal framework for the use of force abroad

in 2016 and 2018. The 2018 report stated that, in 2017, the Government continued to "conduct[]"

---

[2] A similar article quoted an unidentified public affairs official discussing operations in Yemen. *See* Fourth Diakun Decl., Ex. 10. Because the ACLU concedes that the content of those statements was separately revealed in the statements of named officials, such as Spicer and Davis, the Court need not reach the issue of whether an unnamed source in an article could supply an official acknowledgement. Dkt. 134 ("OA Tr.") at 20–21.

direct action against AQAP in Yemen as described in" the 2016 report. *Id.*, Ex. 15 ("2018 White House Report"). The 2016 report on the use of force abroad, in turn, stated:

> The United States has been working closely with the Government of Yemen to dismantle operationally and ultimately eliminate the terrorist threat posed by AQAP. As part of this effort, the United States has taken direct action, including airstrikes, against a limited number of AQAP operatives and senior leaders in Yemen who posed a threat to the United States. The United States has also deployed small numbers of U.S. military personnel to Yemen to support operations against AQAP, including support for operations to capture AQAP leaders and key personnel.

*Id.*, Ex. 16 ("2016 White House Report") at 18.

The 2016 report further disclosed that, "[a]s a matter of international law, the United States has conducted counterterrorism operations against AQAP in Yemen with the consent of the Government of Yemen in the context of the armed conflict against AQAP and in furtherance of U.S. national self-defense." *Id.* According to the report, as a matter of domestic law, "the 2001 AUMF confers authority to use force against AQAP" because AQAP is an "associated force" of al Qaeda, in that it is both "an organized, armed group that has entered the fight alongside al-Qa'ida or the Taliban" and "a co-belligerent with al-Qa'ida or the Taliban in hostilities against the United States or its coalition partners." *Id.* at 4, 18. In addition, the 2016 White House Report stated that, "under the law of armed conflict, States may target specific, identified individual members of an enemy force as well as individuals directly participating in hostilities." *Id.* at 19; *see also id.*, Ex. 19 (Chairman of the Joint Chiefs of Staff, No-Strike and the Collateral Damage Estimation Methodology (Feb. 13, 2009)) at A-6 (stating there must be a "reasonable certainty that a functionally and geospatially defined object of attack is a legitimate military target in accordance with the Law of War and applicable ROE [rules of engagement]").

The ACLU argues that because these broader statements apply to all operations like the Raid in Yemen, they constitute official acknowledgments about the law and policy applicable to the Raid itself.

### D.     Procedural History

On March 15, 2017, following Spicer's statements, the ACLU submitted a FOIA request about the Raid in Yemen to the DoD and other federal agencies.  In its request, the ACLU sought the release of any and all records that pertain to:

> (1) The legal and policy bases in domestic, foreign, and international law upon which the government evaluated or justified the al Ghayil Raid, including but not limited to records related to the designation of parts of Yemen as "areas of active hostilities," and the legal and factual basis that the government uses in designating such areas;
>
> (2) The process by which the government approved the al Ghayil Raid, including which individuals possessed decision-making authority and the evidentiary standard by which the factual evidence was evaluated to support the determination;
>
> (3) The process by which the decision was made to designate three parts of Yemen as "areas of active hostilities;"
>
> (4) Before-the-fact assessments of civilian or bystander casualties of the raid and the "after-action" investigation into the raid; and
>
> (5) The number and identities of individuals killed or injured in the al Ghayil Raid, including but not limited to the legal status of those killed or injured, with these separated out by individuals intentionally targeted and collateral casualties or injuries.

Diakun Decl., Ex. 1 at 2, 5.

On May 8, 2017, after no agency had released any responsive records, the ACLU filed this lawsuit to obtain compliance with its FOIA requests.  *See* Dkt. 1 ("Complaint").

On July 31, 2017, the CIA sent the ACLU its *Glomar* response, in the form of a letter, which stated that "the CIA cannot confirm or deny the existence or nonexistence of the requested records because to do so would reveal information that is protected by FOIA Exemptions."  *See*

Diakun Decl., Ex. 2 at 2.  On October 11, 2017, the ACLU moved for summary judgment with respect to the CIA's *Glomar* response, seeking a declaration that the CIA's response had been unlawful, such that the CIA was obliged to produce a *Vaughn* index and to either produce responsive records or invoke an applicable FOIA exemption for such records.  *See* Dkts. 35, 36. On November 9, 2017, the CIA opposed the ACLU's motion and cross-moved for summary judgment.  Dkts. 42–44.  On November 28, 2017, the ACLU filed a brief in opposition to the CIA's motion and in further support of its own.  Dkt. 47.  On December 13, 2017, the CIA filed a reply.  Dkt. 52.

On June 27, 2018, the Court issued an opinion and order resolving that motion.  Dkt. 67 ("*Glomar* Op.").  The limited legal issue before the Court in the motion was whether the official acknowledgment doctrine applied so as to bar the CIA from relying on its *Glomar* response (*i.e.*, its refusal to confirm or deny the existence of responsive records) that it issued to the ACLU's FOIA request regarding the Raid.  The Court held, with the ACLU, that the statements by then-Press Secretary Spicer at the press briefings reviewed above represented an "official acknowledgment" of the CIA's intelligence interest in the Raid, precluding a *Glomar* response. Accordingly, the Court denied in full the CIA's motion, granted the ACLU's motion with regard to FOIA request 2, and ordered the CIA to submit a more targeted *Glomar* response to the ACLU—or to produce responsive records and/or a *Vaughn* index—with regard to the remaining FOIA requests.  *Glomar* Op. at 12–23; *see Am. Civil Liberties Union v. Dep't of Defense*, 322 F. Supp. 3d 464, 475 (S.D.N.Y. 2018).

On July 18, 2018, the CIA notified the ACLU that it was conducting searches for records responsive to FOIA request 2 and that it would conduct searches for responsive records consistent with the acknowledgments made by Spicer.  *See* Dkt. 80 (CIA status report).  The

ACLU, in turn, notified the CIA that, in light of the CIA's searches for such responsive records, the ACLU did not intend to challenge further the CIA's *Glomar* response. *Id.*

While the CIA litigated its *Glomar* response, the other agencies searched for and provided responsive records to the ACLU. Three components within DoD searched for, located, and processed responsive records: the Joint Staff, the DoD Office of the General Counsel ("DoD OGC"), and the United States Central Command ("CENTCOM"). *See* Dkt. 113 ("DoD Decl.") ¶ 4. The Joint Staff processed 442 pages of records, DoD OGC processed 38 pages, and CENTCOM processed 343 pages. *Id.* In addition, DoS referred a set of responsive records to DoD for processing and release. *Id.* DoD made several releases of documents to the ACLU between November 2017 and July 2018. *Id.* DoS, in turn, processed 489 pages of responsive records and made three releases to the ACLU between November 2017 and July 2018. Dkt. 114 ("DoS Decl.") ¶¶ 10–12, 17.

On July 20, 2018, DoD, DoS, and DoJ moved for summary judgment. Dkts. 74–79. At the time, the ACLU challenged the Government's withholdings in 45 DoD records, 9 DoS records, and one DoJ Office of Legal Counsel ("OLC") record, *see* Dkt. 64 (enumerating the ACLU's challenges), as well as two searches conducted by DoD's CENTCOM. *See generally* Dkt. 75 at 3. On August 21, 2018, the ACLU opposed the motion and cross-moved for summary judgment against DoS and partial summary judgment against DoD. Dkts. 83–85. In its memorandum of law, the ACLU narrowed its challenge to 26 DoD records, 4 DoS records, and one CENTCOM search. *See* Dkt. 84 at 5.

On August 29, 2018, DoS and DoD notified the Court that, in connection with the summary judgment briefing, they had undertaken additional review of the documents at issue and had concluded that they could likely release to the ACLU further parts of the documents.

Dkt. 86.  In September and October 2018, after further voluntary re-review of the remaining challenged documents, DoD made three supplemental releases of information from 12 of the challenged DoD records, DoD Decl. ¶ 5, and DoS made a supplemental release of information that had been previously withheld from one challenged DoS record, DoS Decl. ¶ 13.  Following these supplemental releases, the ACLU notified the Government that it no longer challenged five of the DoD records.  Fourth Diakun Decl., Ex. 28 (October 19, 2018 letter from ACLU's counsel to Government counsel).

On December 20, 2018, the Court granted a joint request by the parties to deny, without prejudice, the pending motions for summary judgment and to allow for a single round of new motion practice in light of the Government's re-review and re-processing of responsive documents, including documents located by the CIA.  *See* Dkts. 102, 103.[3]

On April 5, 2019, the CIA, DoD and DoS again moved for summary judgment.  Dkt. 111.  In support, the agencies jointly filed a memorandum of law, Dkt. 112 ("Gov't Mem."); DoD filed the declaration of Major General Jim Hecker, DoD Decl.; DoS filed the declaration of Eric F. Stein, DoS Decl.; and the CIA filed the declaration of Antoinette B. Shiner, Dkt. 115, and a classified declaration, *see* Dkt. 116.  At the time, the Government understood the ACLU to challenge withholdings in 21 DoD records, 4 DoS records, 6 records referred by the CIA to DoD, the entire category of withheld CIA records that contained intelligence reporting, and one CENTCOM search for one record.  *See* Gov't Mem. at 6.

---

[3] The ACLU did not, at this point, challenge any DoJ withholdings, so the new round of briefing involved only DoD, DoS, and the CIA as defendants.  *See* Dkt. 84 at 5 (withdrawing challenge to DoJ withholdings).

On May 10, 2019, the ACLU opposed the Government's motion and cross-moved for summary judgment. Dkt. 117. The ACLU also filed a memorandum in opposition to the agencies' motion and in support of its own, Dkt. 118 ("ACLU Mem."), and the fourth declaration of Anna Diakun, Fourth Diakun Decl.[4] In its memorandum of law, the ACLU narrowed its challenge to 19 DoD records and 4 DoS records—thus withdrawing, *inter alia*, its challenges to any and all documents withheld by the CIA. ACLU Mem. at 10–11 & n.41. On June 28, 2019, DoD and DoS filed a brief in opposition to the ACLU's motion and in further support of their own. Dkt. 124 ("Gov't Reply"). The same day, DoD filed the declaration of Mark H. Herrington, Dkt. 125 ("DoD Reply Decl."), and DoS filed the declaration of Eric F. Stein, Dkt. 126 ("DoS Reply Decl."). On July 19, 2019, the ACLU filed its reply in support of its motion, Dkt. 127 ("ACLU Reply"), and the fifth declaration of Anna Diakun, Fifth Diakun Decl. In its reply, the ACLU withdrew its challenge to withholdings in eight records, leaving in dispute only the 15 Challenged Records at issue here. ACLU Reply at 4 & n.1.

On October 8, 2019, the Court held argument on the pending motions.[5]

## II. Applicable Legal Standards

### A. Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the

---

[4] The second and third Diakun declarations, which are not relevant here, were filed in support of the previous motions for summary judgment. *See* Dkts. 48, 85.

[5] On October 4, 2019, DoD and DoS filed a letter regarding the September 27, 2019 decision in *N.Y. Times v. Dep't of Justice*, 939 F.3d 479 (2d Cir. Sept 27, 2019) ("*N.Y. Times III*"), Dkt. 132, and, on October 7, 2019, the ACLU replied, Dkt. 133.

light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 US. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## B.     Summary Judgment Motions Under FOIA

FOIA governs public access to information held by the federal government. "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). However, "Congress realized that legitimate governmental and private interests could be harmed by release of certain types of information, and therefore provided the specific exemptions under which disclosure could be refused." *Id.* (citation omitted). "Recognizing past abuses, Congress sought to reach a workable balance between the right of the public to know and the need of the

Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *Id.* (citation omitted).

"FOIA thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). "These exemptions are explicitly made exclusive, and must be narrowly construed." *Id.* (citations omitted). "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009). Courts review the adequacy of the agency's justifications *de novo*. *Id.* Even if portions of a responsive record are properly exempt, the agency must "take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii)(II); *see FBI v. Abramson*, 456 U.S. 615, 626 (1982).

Summary judgment is the usual means by which a court resolves a challenge to a government agency's FOIA response. *See, e.g.*, *Johnson v. CIA*, No. 17 Civ. 1928 (CM), 2018 WL 833940, at *2 (S.D.N.Y. Jan. 30, 2018); *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wilner*, 592 F.3d at 73 (citation omitted). An agency's affidavits in support of its nondisclosure are "accorded a presumption of good faith." *Carney*, 19 F.3d at 812 (internal quotation marks and citation omitted). However, "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009). "Ultimately, an agency's justification for invoking a

FOIA exemption is sufficient if it appears logical or plausible." *Wilner*, 592 F.3d at 73 (citation omitted).

Moreover, courts consistently adopt a "deferential posture in FOIA cases regarding the uniquely executive purview of national security" and accord "substantial weight" to agencies' declarations predicting harm to national security. *Id.* at 73, 76; *see also Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980) (where agency affidavits appear sufficient, "the court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency").

Here, the Government invokes FOIA Exemptions One and Five to justify its withholdings in the remaining Challenged Records. The Court accordingly reviews the standards applicable to those exemptions—and the exceptions that defeat their invocation.

### C.     FOIA Exemption One – Properly Classified Information

Exemption One "exempts from disclosure records that are 'specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy,' and 'are in fact properly classified pursuant to such Executive order.'" *Ctr. for Constitutional Rights v. CIA*, 765 F.3d 161, 164 (2d Cir. 2014) (quoting 5 U.S.C. § 552(b)(1)). The current standard for classification is set forth in Executive Order 13,526, 75 Fed. Reg. 707, 707 (Dec. 29, 2009) ("E.O. 13,526").

Section 1.1(a) of E.O. 13,526 requires that national security information "may be originally classified under the terms of this order only if all of the following conditions are met":

(1) an original classification authority is classifying the information;

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

E.O. 13,526 § 1.1(a)(1)–(4).

Five protected categories of information listed in section 1.4 of the Executive Order are relevant here: "(a) military plans, weapons systems, or operations; (b) foreign government information; (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; (d) foreign relations or foreign activities of the United States, including confidential sources;" and "(g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security." E.O. 13,526 § 1.4(a)–(d), (g).

Courts are to give deference "to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Am. Civil Liberties Union v. Dep't of Justice*, 681 F.3d 61, 70 (2d Cir. 2012) ("*Dep't of Justice*") (citation omitted); *see id.* at 70–71 ("Recognizing the relative competencies of the executive and judiciary, . . . it is bad law and bad policy to second-guess the predictive judgments made by the government's intelligence agencies regarding whether disclosure of the [withheld information] would pose a threat to national security." (internal quotation marks omitted) (quoting *Wilner*, 592 F.3d at 76)).

### 1.    Official Acknowledgments

"Voluntary disclosures of all or part of a document may waive an otherwise valid FOIA exemption." *New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 114 (2d Cir. 2014) ("*New York Times I*") (quoting *Dow Jones & Co. v. U.S. Dep't of Justice*, 880 F. Supp. 145, 150–51 (S.D.N.Y. 1995)), *opinion amended on other grounds on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented on other grounds*, 762 F.3d 233 (2d Cir. 2014). However, the

Second Circuit has made clear that "the application of Exemption 1 is generally unaffected by whether the information has entered the realm of public knowledge[,] . . . [and a] limited exception is permitted only where the government has officially disclosed the specific information the requester seeks." *Halpern v. FBI*, 181 F.3d 279, 294 (2d Cir. 1999) (citing *Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*, 891 F.2d 414, 421 (2d Cir. 1989)).

"A plaintiff mounting an official acknowledgment argument must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Am. Civil Liberties Union v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013) ("*ACLU v. CIA*") (internal quotation marks and citation omitted). However, in the context of "official acknowledgments," as in the context of determining the applicability of a FOIA exemption more generally, "the government retains the burden of persuasion that [the] information [sought] is not subject to disclosure under FOIA." *Inner City Press/Cmty. on the Move v. Bd. of Governors of Fed. Reserve Sys.*, 463 F.3d 239, 245 (2d Cir. 2006).

In *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009), the Second Circuit articulated a test with respect to the tailoring required between a FOIA request for classified information and prior official disclosures of that information. Specifically, "[c]lassified information that a party seeks to obtain or publish is deemed to have been officially disclosed only if it (1) [is] *as specific as* the information previously released," (2) "*match[es]* the information previously disclosed," and (3) was "made public through an official and documented disclosure." *Id.* (emphasis added). Prior "[d]isclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Osen LLC v. U.S. Cent. Command*, 375 F. Supp. 3d 409, 421 (S.D.N.Y. 2019) ("*Osen II*") (quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007)).

The Second Circuit has clarified that "the 'matching' aspect" of the *Wilson* test does not require "absolute identity" between the withheld and previously disclosed information. *N.Y. Times I*, 756 F.3d at 120; *see id.* at n.19 (reaffirming that *Wilson* is the law of the Circuit but noting that a "rigid application" of *Wilson* may not always be warranted). *New York Times I* involved a FOIA request for the OLC's opinions or memoranda concerning its legal basis for the targeted killings of U.S. citizens through drone strikes. *See id.* at 104. The Second Circuit concluded that the government had officially acknowledged certain aspects of its purported legal basis by releasing a "white paper" that "virtually parallel[ed]" the legal analysis in the OLC memorandum, even though the memorandum discussed some secondary issues not addressed in the white paper. *Id.* at 116. Accordingly, in light of the "substantial overlap" in the legal analyses in the white paper and the OLC memorandum, *id.*, release of the OLC memorandum "add[ed] nothing to the risk" of damage to national security, *id.* at 120.

However, even where withheld information appears to "match" official acknowledgments, courts "take[] care to consider the context of any withheld information, as context itself may convey information that has not been disclosed." *N.Y. Times Co. v. FBI*, 297 F. Supp. 3d 435, 450 (S.D.N.Y. 2017); *see also, e.g.*, *New York Times Co. v. U.S. Dep't of Justice*, 806 F.3d 682, 686–87 (2d Cir. 2015) ("*New York Times II*") (explaining that "differences in context" between previously disclosed records and requested records are relevant in determining whether the government has waived exemption under FOIA). And an official acknowledgement does not compel the disclosure of other classified information where the prior disclosure is only similar to, or partially overlaps with, the withheld information. *See, e.g.*, *Osen LLC v. U.S. Dep't of State*, 360 F. Supp. 3d 258, 265 (S.D.N.Y. 2019) ("*Osen I*") ("While the Second Circuit has clarified that the matching requirement does not require absolute identity, . . .

this does not imply that any overlap in information satisfies the matching requirement or that courts should not consider the specific nuances and contexts of the documents being compared. Here, the disclosed documents, while they may overlap to some degree with the subjects of conversation in the [withheld] cables, do not relate the same discussions and, accordingly, by no means match or are as specific as the information redacted from the cables, as required by *Wilson*." (internal quotation marks and citations omitted)).

## 2. Pure Legal Analysis

Pure legal analysis—which the ACLU here describes as "constitutional and statutory interpretation, discussion of precedent, and legal conclusions that can be segregated from properly classified or otherwise exempt facts," ACLU Mem. at 15—is not a protected category of information pursuant to E.O. 13,526, and therefore would generally not be properly classified for purposes of FOIA Exemption One.

However, legal analysis is exempt from disclosure where it is "so intertwined with facts entitled to protection that disclosure of the analysis would disclose such facts." *Am. Civil Liberties Union v. NSA*, 925 F.3d 576, 601 (2d Cir. 2019) ("*ACLU v. NSA*") (quoting *N.Y. Times I*, 756 F.3d at 119). Thus, agencies may withhold legal analysis under Exemption One when its disclosure would tend to reveal the underlying classified information. *See, e.g.*, *N.Y. Times II*, 806 F.3d at 687 (holding that documents remained entitled to protection where "[i]t would be difficult to redact any arguably disclosable lines of legal analysis from these documents without disclosing the contents of that other document"); *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 229 F. Supp. 3d 259, 267 (S.D.N.Y. 2017) ("[I]t is unlikely that each and every word in the Memorandum is classified. But case citations and quotations standing in a vacuum would be meaningless. If sufficient context was disclosed to make the non-exempt material meaningful,

the circumstances warranting the classification of the Memorandum would be revealed.  FOIA does not require redactions and disclosure to this extent.").[6]

### D.      FOIA Exemption Five – Litigation Privileges

Exemption Five protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  This exemption incorporates "all the normal civil discovery privileges," *Hopkins v. U.S. Dep't of Hous. and Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991), as well as the deliberative process privilege, *see, e.g.*, *New York Times I*, 756 F.3d at 104.

 The Government here relies on two Exemption Five privileges: the deliberative process privilege and the presidential communications privilege.

### 1.      Deliberative Process Privilege and "Working Law" Doctrine

#### a.      The Privilege

The deliberative process privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001).  "[I]ts object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government."  *Id.* at 9 (internal quotation marks and citation omitted).

To establish that the privilege applies, an agency must show that the document is both "(1) 'predecisional,' *i.e.*, 'prepared in order to assist an agency decisionmaker in arriving at [their] decision' and (2) 'deliberative,' *i.e.*, 'actually . . . related to the process by which policies

---

[6] Legal analysis may also be exempt from disclosure where "the very fact that legal analysis was given concerning a planned operation would risk disclosure of the likelihood of that operation," *N.Y. Times I*, 756 F.3d at 119.  That principle is not relevant here.

are formulated.'" *Brennan Ctr. for Justice v. Dep't of Justice*, 697 F.3d 184, 194 (2d Cir. 2012) (quoting *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005)).

<em>b.      "Working Law" Doctrine</em>

"Just because a document satisfies [the above] requirements, however, does not mean that the deliberative process privilege bars its disclosure." *La Raza*, 411 F.3d at 356. Rather, "Exemption 5, properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (internal quotation marks omitted). Documents representing an agency's "working law," therefore, cannot be withheld pursuant to FOIA Exemption Five.

A document "embodies an agency's 'working law' when the document binds agency officials or members of public." *ACLU v. NSA*, 925 F.3d at 594. Such a document "announces what an agency's law *is*, not what the law *might be* . . . [and] has operative effect—*i.e.*, binding rather than persuasive power." *Id.* Agencies cannot withhold a document that represents "working law" because "an agency ought not be permitted 'to promulgate[] a body of secret law which it is actually applying in its dealings with the public but which it is attempting to protect behind a label.'" *N.Y. Times III*, 939 F.3d at 493 (quoting *Brennan Ctr.*, 697 F.3d at 200).

"Even when a document is, in fact, pre-decisional and non-binding at the time of its creation, it may over time come to constitute the agency's 'working law' if the agency 'expressly adopts' the document's reasoning as the agency's official position, or if the agency 'incorporates by reference' the document into a final decision." *Id.* at 490; *see ACLU v. NSA*, 925 F.3d at 593 (clarifying that "'working law' describes a category of post-decisional material, and 'express adoption' and 'incorporation by reference' describe two methods by which pre-decisional

material can become post-decisional"). For the advice or analysis contained within a document

to become "working law," an agency generally must expressly adopt or explicitly rely upon both

the conclusion *and* the reasoning of that document. *See Renegotiation Bd. v. Grumman Aircraft

Eng'g Corp.*, 421 U.S. 168, 185–86 (1975); *La Raza*, 411 F.3d at 358 ("Mere reliance on a

document's conclusions does not necessarily involve reliance on a document's analysis; both

will ordinarily be needed before a court may properly find adoption or incorporation by

reference.").

Express adoption of a pre-decisional document into working law means that "a document

first drafted as legal or policy advice has *become* an agency's 'effective law and policy.'" *ACLU

v. NSA*, 925 F.3d at 595. In clarifying the bounds of the doctrine, the Second Circuit recently

offered the following explanatory example:

> For instance, an agency's director might receive a memorandum from counsel
> advising him or her how to conduct a program in accordance with law. The director
> might then distribute that document to subordinates with instructions to obey the
> advice rendered therein. After such distribution, the document is no longer
> privileged. The reason is straightforward: while the initial communication was
> deliberative and pre-decisional, the subsequent communication was a promulgation
> of "working law," and therefore post-decisional and no longer privileged.

*Id.* Because the "adoption process is usually internal and hidden from public view," courts in

this Circuit "look[] for external evidence that such adoption has occurred," such as, *inter alia*,

"whether the document is applied in the agency's dealings with the public." *Id.*

Express adoption is not itself an "exception" to Exemption Five; rather "an 'express

adoption' inquiry is only relevant insofar as the previously-privileged intra-agency document has

become binding 'working law.'" *N.Y. Times III*, 939 F.3d at 492; *see id.* (rejecting argument that

"a privileged document could lose Exemption 5 protection if the agency adopted or incorporated

it into *any* non-privileged document, even if that document were not 'working law'").

The doctrine of "incorporation by reference" is a "close cousin" to the doctrine of "express adoption," representing another method through which a previously advisory document may be transformed into binding "working law." *ACLU v. NSA*, 925 F.3d at 597. Whereas in "express adoption" cases courts look for external evidence that an agency relates to the document as binding, "in cases of 'incorporation by reference,' [courts] identify the agency's *enactment* of that document as its law or policy through explicit textual reference in a final decision." *Id.* As the Second Circuit recently explained:

> [I]ncorporation occurs only when the incorporating "opinion" is itself a document with functionally binding effect. This limitation is significant; a decisionmaker's mere statements expressing his or her reliance on the reasoning of a separate memorandum do not amount to "incorporation" of that memorandum. . . . Appropriately, such statements *cannot* "incorporate by reference" external memoranda because such statements do not themselves have binding effect, either within the agency or on the public.

*Id.* at 598. Thus, "a previously privileged document is subject to disclosure under the doctrine of 'incorporation by reference' only when an agency's formal opinion or determination of law or policy expressly references and relies on that document and its reasoning as the basis for a decision." *Id.*

Although defendants bear the burden of proving the applicability of a FOIA exemption, *see Carney*, 19 F.3d at 812, once an agency has established that an Exemption Five privilege applies to the withheld information, the FOIA requester must present "evidence that an agency has *actually* adopted or incorporated by reference the document at issue; mere speculation will not suffice." *La Raza*, 411 F.3d at 359; *see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*, 584 F. Supp. 2d 65, 78 (D.D.C. 2008) ("[T]he government does not carry the burden of proving that documents were not adopted." (citation omitted)).

## 2.  Presidential Communications Privilege

The presidential communications privilege protects "communications in performance of a President's responsibilities, . . . and made in the process of shaping policies and making decisions." *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 522 (S.D.N.Y. 2010) (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977)).

The presidential communications privilege protects communications involving the President, the President's immediate White House advisers, and "members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate." *In re Sealed Case*, 121 F.3d 729, 751–52 (D.C. Cir. 1997).  These protected communications include "'both . . . communications which these advisers solicited and received from others as well as those they authored themselves,' in order to ensure that such advisers investigate issues and provide appropriate advice to the President." *Amnesty Int'l*, 728 F. Supp. 2d at 522 (quoting *In re Sealed Case*, 121 F.3d at 752).  The privilege applies to documents in their entirety and "covers final and post-decisional materials as well as pre-deliberative ones." *Id.* (quoting *In re Sealed Case*, 121 F.3d at 745).

"The circle within which the presidential communications privilege extends has a narrow diameter," and "the transmittal of a document to persons who are unlikely to be in a position to give advice to the President waives the privilege." *Am. Civil Liberties Union v. Dep't of Justice*, No. 15 Civ. 1954 (CM), 2016 WL 889739, at *4 (S.D.N.Y. Mar. 4, 2016); *see id.* at *5 ("The widespread dissemination of documents, to persons well beyond the circle of close presidential advisors, will eviscerate the presidential communications privilege." (citing *Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 27–29 (D.D.C. 2013))).

### 3. **Waiver by Disclosure**

As with Exemption One, "[v]oluntary disclosures of all or part of a document may waive" Exemption Five privileges. *N.Y. Times I*, 756 F.3d at 114 (internal quotation marks and citation omitted); *see, e.g.*, *Brennan Ctr.*, 697 F.3d at 208 (deliberative process privilege may be lost by disclosure); *In re Sealed Case*, 121 F.3d at 742 (waiver of presidential communications privilege by disclosure). "Verbal description of the contents of a document, if sufficiently specific, is as inconsistent with the maintenance of secrecy of that document as would be disclosure of the document itself." *N.Y. Times III*, 939 F.3d at 495.

However, "disclosure of similar *information* to that contained in documents protected by [Exemption 5] privileges does not waive the privilege," as "[t]hese privileges protect a communication, not information." *ACLU v. NSA*, 925 F.3d at 599.

### E. *In Camera* Review

District courts may review documents containing challenged withholdings *in camera*. 5 U.S.C. § 552(a)(4)(B); *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 82 (2d Cir. 2002). Where agency affidavits are "not sufficiently detailed to permit meaningful assessment of the exemption claims," *in camera* review "may be appropriate when the number of records involved is relatively small and when the dispute turns on the contents of the documents, and not the parties' interpretations of the documents." *Am. Civil Liberties Union v. Dep't of Justice*, No. 12 Civ. 7412 (WHP), 2014 WL 956303, at *3 (S.D.N.Y. Mar. 11, 2014) (internal quotation marks and citations omitted)). "Affidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Carney*, 19 F.3d at 812. Declarations from government agencies are "accorded a presumption of good faith." *Id.* (internal quotation marks and citation omitted). However, such declarations

must be "relatively detailed and nonconclusory." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 488–89 (2d Cir. 1999) (internal quotation marks omitted).

"*In camera* review is considered the exception, not the rule, and the propriety of such review is a matter entrusted to the district court's discretion." *Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988). "[I]f an agency's statements supporting exemption contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption and evidence in the record does not suggest otherwise . . . the court should not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions." *Wilner*, 592 F.3d at 76 (quoting *Larson*, 565 F.3d at 865).

## III.     Discussion

The 15 remaining Challenged Records fall into 6 clusters. The Court addresses the propriety of the Government's withholdings in each set of documents, concluding that the Government adequately justified its withholdings from 5 clusters but that *in camera* review of the sixth cluster is necessary before granting or denying summary judgment as to those documents.

### A.     Email Summarizing January 6, 2017 Deputies Committee Meeting

The ACLU claims that DoS improperly withheld at least part of the three remaining Challenged Records processed by DoS: C06432239, C06432636, and C06432854. *See* Fourth Diakun Decl., Exs. 29–31. These documents are "identical copies of a three-page intra-agency email sent on a classified system providing a readout of deliberations from an interagency meeting of the Deputies Committee held on January 6, 2017." DoS Decl. ¶ 37. The content of the email was originally and is currently classified Secret. *Id.* DoS invokes Exemption One, the deliberative process privilege, and the presidential communications privilege to justify its

redaction of virtually the entire body of this email. *Id.* ¶¶ 38–41. The ACLU, in turn, argues that Exemption One was partially waived by official acknowledgements, that parts of the email are not pre-decisional, and that the email was too widely distributed to be covered by the presidential communications privilege.

DoS attests that the email contains information properly classified pursuant to E.O. 13,526 § 1.4(a)–(d), and thus validly withheld pursuant to FOIA Exemption One. In particular, the email contains "military plans and operations, including detailed discussion of the modalities of potential U.S. military activities"; "foreign government information, including the views of foreign officials about military activities and their plans from them provided in confidence"; "intelligence activities, including possible assessments from members of the intelligence community"; and "information about foreign relations and foreign activities of the United States, including details of potential U.S. engagements with regional partners and possible reactions by regional adversaries." DoS Decl. ¶ 38.

DoS predicts that release of this information "reasonably could be expected to cause serious damage to the national security" in several ways, most notably by: providing adversaries "with detailed knowledge of U.S. [military] capabilities, force levels and intentions," which would "jeopardiz[e] U.S. military operations"; "reducing the likelihood that foreign officials will be willing to convey sensitive national security information in confidence to the U.S. government for fear that expectation of confidentiality will be breached"; and "revealing diplomatic strategies and tactics that depend on discretion, including conditions under which to conduct certain activities and factors considered in deciding whether to encourage or support particular foreign governments' initiatives." *Id.*; *see also* DoD Decl. ¶ 46 ("When foreign governments cooperate with the U.S. Government, many do so with the understanding that the

fact of their cooperation will be kept in the strictest confidence.  Any violation of this confidence

could weaken, or even sever, the relationship between the United States and its foreign partners,

thus degrading the Government's ability to combat hostile threats abroad.").

The ACLU does not dispute that the withheld information is properly classified, instead

positing that the "email likely contains officially acknowledged information that can be

reasonably segregated and disclosed."  ACLU Reply at 5.  Specifically, then-Press Secretary

Spicer publicly revealed that, at the January 6 Deputies Committee meeting, "[t]he deputies

recommended at that time that they go ahead [with plans for the Raid]. . . .  The conclusion [was]

to hold for what they called a 'moonless night,' which, by calendar, wouldn't occur until then-

President-elect Trump was President Trump."  Fourth Diakun Decl., Ex. 4 at 11–12 (Feb. 2,

2017 Spicer press briefing).

The ACLU argues that, if the email, which summarizes the January 6 meeting, contains

segregable information about the recommendations to "go ahead" with the Raid or to wait for a

"moonless night," the Government must disclose such information.  The ACLU notes that the

Government must release such portions of the email even if there is not "absolute identity"

between the withheld and previously disclosed information.  *See* OA Tr. at 14 (counsel for

ACLU stating: "I think a good example of [information that is not identical to 'moonless night'

but close enough to be considered officially acknowledged] would be 'and the moonless nights

are January 29th [and] February 18th'").  However, the ACLU concedes that the Government

would be entitled to withhold information relating to the Spicer acknowledgments if release of

that information would be "revelatory of new information that has not been officially

acknowledged."  OA Tr. at 14; *see id.* at 13–14 (conceding that Exemption One would protect

information that "goes beyond the bounds" of Spicer's official acknowledgements—*e.g.*, discussion of the impact of the moon on the planning or potential success of the operation).

The DoS declarant, in turn, explains that the information withheld under Exemption One "includes a great degree of detail about particular plans, possible contingencies, and potential consequences relating to the operation that have not been officially acknowledged" and does not include officially acknowledged information. DoS Decl. ¶ 39. Further, following the ACLU's identification of specific acknowledgments, including those made by Spicer, in its opening brief, the DoS declarant "reviewed the documents provided by [the ACLU] in support of this argument" and re-reviewed the email readout of the January 6, 2017 meeting." DoS Reply Decl. ¶ 5. Having done so, the DoS declarant confirmed that "[t]he information previously officially acknowledged and made public in the documents proffered by [the ACLU] is neither as specific as, nor matched by, the information withheld under Exemption 1." *Id.*

Here, although the ACLU met its initial burden of identifying official acknowledgments, *see Inner City Press*, 463 F.3d at 245, the Government has met its ultimate burden of showing that its justification for non-disclosure is "logical or plausible," *Wilner*, 592 F.3d at 73 (citation omitted). The DoS declarations explained the types of information withheld and the harm to national security that would likely result from disclosure, and they represented that line-by-line review of the documents in conjunction with the official acknowledgments provided by the ACLU revealed no additional information subject to disclosure.

The Court finds it logical and plausible that references to the Deputies Committee's recommendation to "go ahead" and to wait for a "moonless night," if any, in this classified and narrowly distributed email are so intertwined with other, non-acknowledged information that disclosure would reveal new information that undisputedly would be more specific than, and not

merely match, Spicer's limited revelations. *See Osen I*, 360 F. Supp. 3d at 265 (overlap in information between public disclosure and withheld document insufficient to prevent application of Exemption One, especially where the context of the disclosure differed from that of the withheld record).

Particularly in light of the "presumption of good faith" accorded to agency affidavits, *Carney*, 19 F.3d at 812 (citation omitted), and the deference the Second Circuit gives "to executive affidavits predicting harm to the national security," *Wilner*, 592 F.3d at 76, the DoS declarations provide sufficient grounds to justify the invocation of Exemption One. And in the absence of evidence of agency bad faith or other evidence contradicting agency affidavits, the Court will not question DoS's veracity as to its factual representations and predictions of harm to national security. *See Dep't of Justice*, 681 F.3d at 70–71 ("[I]t is bad law and bad policy to second-guess the predictive judgments . . . regarding whether disclosure of the [withheld information] would pose a threat to national security." (citation omitted)).[7]

B.      **Email Threads Discussing Military Options After the Raid**

The ACLU also challenges redactions to two documents, JS/188-191 and CENTCOM/020-026, which are partially overlapping classified email chains among DoD personnel discussing military activities following the Raid.[8] DoD Decl. ¶ 42; *see* Fourth Diakun Decl., Exs. 33, 43. The emails in these threads "discuss details regarding the execution and

---

[7] DoS invoked Exemption Five to withhold the same portions of the email withheld pursuant to Exemption One. Having concluded that DoS properly invoked Exemption One for those entire sections, the Court need not address the parties' arguments relating to Exemption Five.

[8] The Court notes that marginally more information is unredacted from the version of an email sent by General Joseph Votel on January 30, 2017 that appears at JS/190-191 than from the same email that appears at CENTCOM/023-025. The Court does not understand the ACLU to be seeking disclosure of that inconsistently redacted portion of CENTCOM/020-026 or the DoD to be claiming that such information properly could be withheld, and therefore does not address the issue here.

scope of the [later] operations, as well as tactics and strategy." DoD Decl. ¶ 42. Each document also contains the same "paragraph setting forth legal analysis regarding an aspect of planned military operations after the al Ghayil Raid." *Id.* The Government invokes Exemption One to justify both its withholding of classified information regarding military activities following the Raid and its withholding of the paragraph of legal analysis, which two separate DoD declarants affirmed contained operational detail and strategy that is not meaningfully segregable from the legal analysis. *Id.*; DoD Reply Decl. ¶ 5. The DoD's primary declarant, Vice Director of Operations for the Joint Staff at the Pentagon, Major General Jim Hecker, further attested that "[r]evealing details of military operations [such as those discussed in these email threads], even after the passage of time, could provide great insight to adversaries regarding DoD's capabilities, priorities, vulnerabilities, and limitations," which would threaten national security by helping adversaries "to better plan attacks or evade justice." DoD Decl. ¶ 47.

The ACLU argues that at least some information in the email threads likely has been officially acknowledged by one of several sources. Most notably, the ACLU points to several articles quoting an August 4, 2017 press briefing provided by a Pentagon spokesman, Captain Jeff Davis. *See supra* Part I.C; ACLU Mem. at 25–26; ACLU Reply at 7–12. As reviewed above, Captain Davis revealed, at a very general level, that U.S. forces were providing support to the Shabwah Offensive against AQAP in Yemen in the form of intelligence sharing, air support, and a limited number of troops on the ground. The ACLU argues that "[i]f any of this information appears in th[e] paragraph [of legal analysis] or elsewhere in the documents, it cannot be withheld or serve as a basis for withholding information that may be intertwined with it." ACLU Mem. at 26.

The Government concedes that Davis's statements are official acknowledgments, OA Tr. at 21, and its declarants reviewed the Challenged Records accordingly, *see, e.g.*, DoD Reply Decl. ¶¶ 4–5. However, the Government contends, based on DoD declarants' affidavits, that the official acknowledgements, including Captain Davis's, are far broader, and do not match, the information withheld in these email chains.

As reviewed above, an official acknowledgment that is similar to, or even partially overlaps with, information withheld by an agency does not necessarily require disclosure of the withheld information. *See, e.g.*, *Wolf*, 473 F.3d at 378. In *Osen II*, a law firm brought a FOIA action against CENTCOM, seeking documents regarding improvised explosive device ("IED") attacks on American servicemembers in Iraq. *Osen II*, 375 F. Supp. 3d at 409. The Government had previously made FOIA disclosures regarding the particular type of IED at issue, including press briefings broadly discussing the danger presented by such IEDs and photographs of some previous attacks demonstrating the ability of such IEDs to penetrate the armor of certain U.S. military vehicles. *Id.* at 420. The Court held that, although "CENTCOM has certainly revealed the general risks of [these IEDs], this general disclosure does not overcome [the Government's] argument [that] the [additional] photographs' level of detail and specificity would reveal new and unexpected weaknesses to adversaries." *Id.* at 420–21. In particular, the prior official disclosures and the plaintiff's speculation as to the similarity of the withheld information could not overcome CENTCOM's declarant's declaration that disclosure of specific photos and related details would reveal new information that could cause harm to national security. *Id.* at 421.[9]

---

[9] The court in *Osen II* did require disclosure of certain photographs on the separate ground, not relevant here, that a separate division of DoD had released detailed photographs and associated information from specific attacks, which CENTCOM did not dispute were as specific as, and matched, the withheld information. *Osen II*, 375 F. Supp. 3d at 422–23.

Here, DoD's declarants have, in sworn affidavits, explained that information withheld from the email chains in JS/188-191 and CENTCOM/020-026 involves discussion of military tactics and strategy that would be far more revealing than prior acknowledgments of the general fact that the U.S. military has engaged in certain categories of support for the Shabwah Offensive.  This explanation, to which the courts are instructed to defer, appears logical and plausible.  The official disclosures at issue here revealed basic information to a public that had limited prior knowledge about the military's operations in support of the campaign against AQAP in Yemen.  By contrast, the DoD personnel discussing post-Raid plans and options presumably had significant knowledge of the details of the relevant military activities that would likely obviate the need to include basic information, along the lines of that revealed by Captain Davis, in their emails.  Davis's comments generally discuss categories of military action without providing details as to the time, place, or manner of specific instances of such action; the exigencies of military planning make it unlikely that the DoD email threads are similarly bereft of such details.  Indeed, the record provides no reason to think that these post-Raid email threads would include any discussion that came close to matching or being as non-specific as Captain Davis's.  The Court accordingly defers to the DoD's declarations attesting to the contrary.  *See Wilner*, 592 F.3d at 73.

Even the paragraph containing legal analysis regarding an aspect of post-Raid military operations is not, under the circumstances present here, required to be disclosed.  As reviewed above, legal analysis may be properly classified where it is "so intertwined with facts entitled to protection that disclosure of the analysis would disclose such facts."  *ACLU v. NSA*, 925 F.3d at 601 (quoting *N.Y. Times I*, 756 F.3d at 119); *see generally supra* Part II.C.2.  Here, the DoD's declarants have confirmed that the specific paragraph at issue "sets forth operational detail and

strategy [from which the legal analysis] is not meaningfully segregable." DoD Decl. ¶ 42; DoD Reply Decl. ¶ 5. This justification for withholding, too, is logical and plausible. Unlike in *New York Times I*, the key case cited by the ACLU—in which the key document sought was an OLC legal memorandum consisting primarily of legal analysis and meant to be widely applicable to many operations—the legal analysis here is contained in a single paragraph in email threads otherwise devoted to planning a single set of military operations abroad. In this context, it makes eminent sense that the legal analysis is so intertwined with properly classified factual information as to justify withholding the entire paragraph. *See, e.g.*, *ACLU v. DOJ*, 229 F. Supp. 3d at 267 (agency could withhold memorandum, despite court's doubts that "each and every word" is classified); *cf. N.Y. Times I*, 756 F.3d at 113 (holding that even though legal analysis in OLC memorandum must be disclosed, factual sections containing details of specific operations remained classified and exempt in their entirety).

Giving proper deference to the DoD's judgments regarding the classified status of the redacted sections of JS/188-191 and CENTCOM/020-026, the Court therefore concludes that DoD's justifications for its redactions are entirely logical and plausible.[10]

### C.     Presidential Authorization Memorandum

The ACLU challenges DoD's redactions to JS/022-023, a one-page memorandum dated January 27, 2017 from then-National Security Advisor Michael Flynn to then-Secretary of Defense James Mattis relaying President Trump's approval of "Department of Defense Proposals

---

[10] This conclusion is reinforced by DoD's voluntary re-review of CENTCOM/020-026 and determination that it could release additional information contained in that record to the ACLU, which it did on September 28, 2018. *Cf. Conti v. Dep't of Homeland Sec.*, No. 12 Civ. 5827 (AT), 2014 WL 1274517, at *15 (S.D.N.Y. Mar. 24, 2014) ("agency's additional releases of documents accomplished as a result of working with the [FOIA] requester," demonstrates good faith by the agency, rather than the opposite).

Related to Yemen," including the Raid.  *See* DoD Decl. ¶ 34; Fourth Diakun Decl., Ex. 39

("Presidential Authorization Memo" or "Authorization Memo").

The Authorization Memo "details the specific operational scope of the President's

approval, including information regarding the number of personnel, the assets to be utilized, the

parameters of the mission, and the time span of approval."  DoD Decl. ¶ 35.  DoD invokes

Exemption One to justify all of its withholdings in the Authorization Memo, explaining that the

redacted portions of the document "detail foreign activities of the United States and military

operations" and thus are properly classified pursuant to E.O. 13,526 § 1.4(a), (d).  DoD Decl.

¶ 35.  According to Major General Hecker, disclosure of this information could reasonably be

expected to damage national security by negatively impacting "counterterrorism operations, . . .

caus[ing] countries to rethink their acquiescence to U.S. counterterrorism missions within their

borders, . . . [and] provid[ing] great insight to adversaries regarding DoD's capabilities,

priorities, vulnerabilities, and limitations."  *Id.* ¶¶ 46–47.  Although the Authorization Memo was

originally withheld in full, DoD voluntarily re-reviewed the document in response to ACLU

filings in this case and determined that it could release additional information contained therein,

which it did in September and October 2018.  *Id.* ¶ 35; *see* DoD Reply Decl. ¶ 9.  As discussed

further below, significant portions of the one-page memorandum are now unredacted.  *See*

Authorization Memo.

The ACLU argues that "three pieces" of officially acknowledged information are "likely"

present in the still-redacted portions of the presidential authorization memorandum: "(1)

references to the al Ghayil Raid or to ground raids generally; (2) references to an intelligence-

sharing agreement; and (3) information relating to the general types of activities the military was

authorized to carry out as part of the Shabwah Offensive."  ACLU Reply at 12–13.  However, DoD's

declarants attest that the "information still withheld from this document, after DoD voluntarily re-

processed it to release additional detail, is more specific than (and not matched by) information previously officially acknowledged and made public in the documents identified by [the ACLU]." DoD Reply Decl. ¶ 9. The Authorization Memo also "does not contain any legal analysis." *Id.*

The Court finds DoD's justifications for its redactions, as well as the absence of the information cited by the ACLU in the disclosed portion of the Authorization Memo, to be logical and plausible. Indeed, Major General Hecker's description of the withheld information—"the specific operational scope of the President's approval, including information regarding the number of personnel, the assets to be utilized, the parameters of the mission, and the time span of approval," DoD Decl. ¶ 35—provides precisely the type of "reasonably specific detail" that warrants summary judgment "on the basis of agency affidavits." *Wilner*, 592 F.3d at 73.

Further, the significant information already released from this document bolsters the justification for the Government's remaining withholdings. The disclosed portion of the memorandum's body reveals that DoD sought authorization to "provide U.S. military support to the United Arab Emirates (UAE) for [redacted] to a UAE-led operation by Yemeni forces against al-Qaida in the Arabian Peninsula (AQAP) in Shabwah, Yemen" and to "conduct airstrikes against AQAP target and designate [redacted] an 'area of active hostilities,' with zero expected civilian noncombatant deaths for each such strike." Authorization Memo at JS/022 (redactions in original). With regard to the first request, the DoD releases further reveal: "On Thursday, January 26, 2017, the President of the United States authorized the Department of Defense to provide U.S. military support to the UAE for [redacted] to a UAE-led operation by Yemeni forces against al-Qaida in the Arabian Peninsula (AQAP) in Shabwah, Yemen. The President authorized the following [number redacted] aspects of this plan: [redacted]." *Id.* (redactions in original).

These disclosed portions, released after voluntary re-review by DoD, track the official acknowledgments of Spicer and Davis, providing substantially similar information. Indeed, demonstrating DoD's compliance with *New York Times I*'s interpretation of the *Wilson* test, the released information does not have "absolute identity" with the prior acknowledgments produced by the ACLU in this case. *See N.Y. Times I*, 756 F.3d at 120; Fourth Diakun Decl., Exs. 4, 11, 14, and 18. For example, while DoD testimony to Congress had previously disclosed that "the requirement for a 'near certainty' . . . that no civilians would be injured or killed" had applied to the Raid, the ACLU has not pointed to any evidence that suggests that the fact that DoD had specifically sought presidential authorization to conduct airstrikes "with zero expected civilian noncombatant deaths for each such strike" had previously been made public. *Compare* Fourth Diakun Decl., Ex. 18 at 33 (DoD congressional testimony) *with* Authorization Memo at JS/022.

Moreover, DoD's disclosures from the Authorization Memo shed light on the information likely contained in the still-redacted parts of the document. For example, DoD released a section containing a high-level description of the President's approval of U.S. military support— matching those given by Spicer and Davis—before redacting what, based on context, appears to be a description of the specific operational details authorized by the President. *See* Authorization Memo. DoD's declarants confirm that the remaining redactions appear to be specific descriptions of operational details that go far beyond the limited official acknowledgments that have been made in this case, *see* DoD Decl. ¶ 35, and they predict harm to national security from additional disclosures from this document, *id.* ¶¶ 46–47. And, while the ACLU has pointed to three pieces of officially acknowledged information that one might expect to find in the Authorization Memo, it is hardly illogical or implausible that any references to such categories of information would be so specific and/or intertwined with properly classified information as to

justify non-disclosure.  The Court accordingly finds there is no basis to second-guess DoD's judgments or question their affiants' good faith under these circumstances.

### D.     Military Orders from the Joint Staff to Conduct Operations

The ACLU further challenges DoD's redactions to CENTCOM/027-030 and JS/057-058, which are "military orders from the Joint Staff to CENTCOM to conduct operations supporting the Shabwah offensive approved by the President."[11]  DoD Decl. ¶ 36; *see* Fourth Diakun Decl., Exs. 34, 42 (the "Military Order").  DoD withheld portions of the Military Order on the basis of Exemption One, explaining that the order contains "details regarding the parameters of the mission, the time span of the approval, and other operational information" that would reveal classified information about the "foreign activities [ ], intelligence methods, and military operations" of the United States.  DoD Decl. ¶ 36.  DoD predicts reasonably likely harm to U.S. national security from the disclosure of each of these categories of classified information. *Id.* ¶¶ 45–47.[12]

The ACLU points to several official acknowledgments of the legal and policy standards to which the Government has previously asserted it adheres in all of its military operations in Yemen.  The ACLU argues that, because the government has officially acknowledged the application of these standards to *all* operations in Yemen, it has necessarily acknowledged that such standards apply to the specific operations at issue here.  *See* ACLU Mem. at 26–27; ACLU Reply at 14–16.  For example, as reviewed above, the 2016 White House Report asserts that "[a]s a matter of international law, the United States has conducted counterterrorism operations against AQAP in Yemen with the consent of the Government of Yemen in the context of the

---

[11] JS/057/058 is a corrected copy of CENTCOM/027-030.  *See* OA Tr. at 55.

[12] The orders were originally withheld in full, but DoD released approximately half of the text of each record in September and October 2018 following voluntary re-review of the document.

armed conflict against AQAP and in furtherance of U.S. national self-defense." 2016 White House Report at 18; *see* 2018 White House Report at 6 (affirming that this was still the case for strikes that took place in 2017). Although this disclosure does not specifically mention the January 29, 2017 Raid, it applies to *all* counterterrorism operations against AQAP in Yemen— which would include the Raid. So does the general requirement that the U.S. military have a "reasonable certainty that a functionally and geospatially defined object of attack is a legitimate military target in accordance with the Law of War and applicable [rules of engagement]." Fourth Diakun Decl., Ex. 19 at A-6.

Unlike in the context of the email threads discussed above—for which, the Court held, a general factual acknowledgment by Captain Davis did not require the release of similar (but more specific) factual information regarding particular operations—the prior disclosures that the ACLU points to here are legal standards that the Government has officially acknowledged apply to all military operations in Yemen. Put differently, the prior disclosures here do not merely "overlap" with the withheld information. Rather, they necessarily encompass a category of information that the ACLU provides evidence to suggest may be present in the withheld record. For example, because the Government has officially acknowledged that all operations against AQAP in the relevant area during the relevant period were carried out with the consent of the Government of Yemen, the Government would not be justified in withholding a mention of Yemeni consent to the Raid in the Military Order here. DoD does not meet this argument head on. Instead it asserts that "[t]he information that continues to be withheld from these records . . . is more specific than (and not matched by) information previously officially acknowledged and made public in the documents identified by [the ACLU]." DoD Reply Decl. ¶ 6; *see* DoD Reply at 9 ("[T]he documents and statements that Plaintiffs cite . . . do not refer to the Raid at all, but

rather set forth (at most) very generalized statements regarding the United States' military activities in Yemen."); OA Tr. at 37 (characterizing the official acknowledgments cited by the ACLU as containing "nothing about this particular Raid").

Under these circumstances, the Court cannot conclude that DoD's affidavits alone contain sufficient "specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption." *Wilner*, 592 F.3d at 76 (citation omitted). The Government's failure to address directly the ACLU's argument here precludes the Court from making a "meaningful assessment," *Am. Civil Liberties Union v. Dep't of Justice*, 2014 WL 956303, at *3, of the Government's declaration claim that the withheld information is more specific than that made public in the 2016 and 2018 White House Reports. The Court accordingly will exercise its discretion to review *in camera* CENTCOM/027-030 and JS/057-058. *See* 5 U.S.C. § 552(a)(4)(B); *Tigue*, 312 F.3d at 82.

### E.    DoD Operational Proposal

The ACLU also challenges the withholding of five records—CENTCOM/048-053, JS/048-053, JS/261-266, JS/273-278, and STATE/039-044—which are "identical copies of [a] detailed DoD operational proposal document regarding support to the Shabwah offensive, including the anticipated al Ghayil Raid." DoD Decl. ¶ 22; *see* Fourth Diakun Decl., Exs. 36, 40, 44, 45, and 51 (the "Operational Proposal" or "DoD Operational Proposal"). DoD invokes the deliberative process privilege, the presidential communications privilege, and Exemption One as alternative bases for withholding the entire document. The Court focuses first on the deliberative process privilege.

As reviewed above, to establish that the deliberative process privilege applies, an agency must show that a document is both "predecisional," meaning "prepared in order to assist an agency decisionmaker in arriving at [their] decision," and "deliberative," meaning "actually . . .

39

related to the process by which policies are formulated." *Brennan Ctr.*, 697 F.3d at 194 (citation omitted). Once an agency has established that withheld information meets these requirements, a FOIA plaintiff must present "evidence that an agency has *actually* adopted or incorporated by reference the document at issue; mere speculation will not suffice." *La Raza*, 411 F.3d at 359.[13]

The ACLU does not dispute that the DoD Operational Proposal was predecisional and deliberative at the time of its creation, but instead argues that the document became non-privileged "working law," either through express adoption or incorporation by reference. *See* ACLU Mem. at 31; ACLU Reply at 19–23.

The ACLU raises three separate such "working law" arguments.

First, the ACLU claims that the Operational Proposal was also adopted or incorporated by the Authorization Memo discussed above. According to the ACLU, the subject line of the Authorization Memo, "Presidential Authorization on Department of Defense Proposals Related to Yemen," constituted an incorporation by reference of the Operational Proposal.

This argument is easily dispatched. As a factual matter, the Government affirmed that the Authorization Memo "does not cite, reference, or attach any other documents," including the Operational Proposal. DoD Reply Decl. ¶¶ 9–10. And, even if the "Department of Defense Proposals" mentioned in the title could be construed as a reference to the Operational Proposal, much more would be required to transform the challenged record into "working law." *See N.Y. Times III*, 939 F.3d at 496 ("[A] limited citation to and quotation of a privileged report does not waive Exemption 5 protection over the rest of the document." (citing *Tigue*, 312 F.3d at 81)); *Wood v. FBI*, 432 F.3d 78, 84 (2d Cir. 2005) (collecting cases for proposition that a decisional

---

[13] The ultimate burden of proving the applicability of a FOIA exemption, of course, lies with the Government. *See Carney*, 19 F.3d at 812.

document's mere reference to or endorsement of a predecisional document's conclusion does not amount to adoption or incorporation by reference).

Second, the ACLU claims that the Operational Proposal was adopted or incorporated by the Military Order discussed above. One copy of the proposal, "CENTCOM/048-053," was located as an attachment to a "January 24, 2017 memorandum sent by the Secretary of Defense to the National Security Advisor, requesting Presidential approval of the proposed Raid and attaching the operational proposal in order to provide full detail about the proposed military operation." DoD Decl. ¶ 22. The Military Order cites as "REF B" a document it defines as "CONOPS/DOD/24JAN2017//."[14] In its reply brief, the ACLU argued for the first time in a footnote that REF B likely is the Operational Proposal, based on the January 24, 2017 date and a reference to its having been attached to a memorandum from the Secretary of Defense. *See* ACLU Reply at 19 n.3.[15] The "Execution" section of the Military Order states that "[p]er REF B, [the Commander of CENTCOM] requested authorization to support the UAE offensive against AQAP in Shabwah Governorate, Yemen." Military Order at JS/057. The Military Order further states that "the P[resident of the United States] has approved REF B" and that CENTCOM "is authorized to support the UAE Shabwah Offensive as described in REF B." *Id.* at JS/058. The ACLU argues that "[t]hese references to explicit presidential approval of the Operational Proposal, and to the President's endorsement of the operation as laid out within it, conclusively establish adoption." ACLU Reply at 19–20.

---

[14] Only the corrected copy of the Military Order contains this date for Ref B. *Compare* Fourth Diakun Decl., Ex. 34 (original Military Order), *with id.*, Ex. 42 (corrected copy). For the purposes of this discussion, the Court refers to the corrected copy only.

[15] The Government lightly disputed this conclusion at argument, OA Tr. at 58, but did not seek to file a sur-reply or otherwise to supplement the record.

Assuming that REF B is, in fact, the Operational Proposal—an assumption that the Government has failed to rebut adequately—this argument presents a somewhat closer question. An agency generally must expressly adopt or explicitly rely upon both the conclusion and the reasoning of a document for a court properly to find adoption or incorporation by reference. *La Raza*, 411 F.3d at 358. The ACLU correctly points out that the Military Order's statements that the President "approved REF B" and that CENTCOM may support the Shabwah Offensive "as described in REF B" appear to approve both the conclusion and reasoning of the Operational Proposal. However, "mere agreement with a document's reasoning and conclusion is insufficient to transform advice into law." *ACLU v. NSA*, 925 F.3d at 598. Rather, "the document must be *treated* as binding by the agency (*i.e.* '[express] adoption') or explicitly relied upon in a formal decision (*i.e.* 'incorporation by reference')." *Id.*

The Second Circuit's recent decision in *New York Times III* is instructive here. In that case, the Circuit held that prosecutorial determinations as to whether to prosecute specific instances of alleged CIA wrongdoing did not constitute working law because they were discretionary and non-precedential. *See N.Y. Times III*, 939 F.3d at 492. The Circuit explained that, for documents reflecting such determinations to become "working law," they must represent "not only *final* decisions on legal issues, but also decisions that were *binding* on the public." *Id.* at 491; *see id.* at 491 n.8 ("[T]he distinguishing feature of an agency communication that has lost Exemption 5 protection [by becoming 'working law'] is that it is binding on the agency and the public."). Here, the Operational Proposal is "simply a plan for a particular one-off operation." OA Tr. at 58; *see* DoD Decl. ¶ 24 (the Operational Proposal was included with a request for Presidential authorization to "provide complete operational detail for the President's consideration"). It did not provide a precedent or "bind" the public, and the President retained

discretion to adjust course at any time. Indeed, it was "not 'law' at all," much less the effective law and policy of the government on an ongoing basis. DoD Reply at 20. Even more so than the prosecutorial recommendations and determinations in *New York Times III*, the Operational Proposal is simply a mismatch with the concept of "working law." The ACLU's second argument thus also fails.

Third, the ACLU claims that the circulation of the Operational Proposal as an attachment to two emails—neither of which were themselves "predecisional"—transformed the Operational Proposal into post-decisional "working law." Each of these emails were sent to a limited number of DoD personnel or high-level government officials after the President approved the Raid, for discussion purposes. DoD Decl. ¶ 22; DoD Reply Decl. ¶ 10.

The circulation of a document from a superior to subordinates with instructions to obey the advice rendered therein may sometimes be an indication that a document has been expressly adopted. *ACLU v. NSA*, 925 F.3d at 595. But, the limited circulation here of the Operational Proposal to high-level officials—"to provide factual context regarding the details and execution of the operation," DoD Decl. ¶ 22—is insufficient evidence of express adoption.[16]

Thus, none of the ACLU's arguments regarding the Operational Proposal move beyond "mere speculation" into "evidence that an agency has *actually* adopted or incorporated by reference the document at issue." *La Raza*, 411 F.3d at 359. The Government's justification for

---

[16] The ACLU here conflates the type of circulation that would waive the Presidential Communications Privilege—*i.e.*, "the transmittal of a document to persons who are unlikely to be in a position to give advice to the President," *ACLU v. DOJ*, 2016 WL 889739, at *4—with the type of circulation that might constitute evidence that a document had become working law.

withholding the Operational Proposal in its entirety pursuant to the deliberative process privilege remains logical and plausible.[17]

### F.        Top Secret Operational Proposals for Military Support to Shabwah Offensive

JS/330-336 and JS/339-345 are "detailed operational proposals regarding support to the Shabwah offensive, including the al Ghayil Raid," dated January 3, 2017, and November 10, 2016, respectively.  DoD Decl. ¶ 22.  DoD invokes both Exemption One and the deliberative process privilege, pursuant to Exemption Five, to justify its withholding of the entirety of these documents, which are currently and properly classified as Top Secret.  *See* DoD Decl., Ex. B ("*Vaughn* Index") at 2.

The ACLU seeks only the title of these documents, which it speculates was revealed (and thus officially acknowledged) in another email released by the Government in this case.  *See* ACLU Mem. at 33; ACLU Reply at 16–17.  At argument, Government counsel represented that, having reviewed the document, the title of these records had not been revealed, is materially different than what the ACLU thought it might be, and remains classified.  OA Tr. at 43; *see* DoD Reply Decl. ¶ 11 (confirming same).  Counsel for the ACLU, in turn, conceded that "it would be appropriate for [the Court] to accept that representation" in granting summary judgment as to this record.  OA Tr. at 45.  The Court accordingly accepts DoD's representation and the ACLU's concession, holding that JS/330-336 and JS/339-345 were properly withheld.

### CONCLUSION

For the foregoing reasons, the ACLU's motion for summary judgment is denied except as to CENTCOM/027-030 and JS/057-058, and the Government's motion for summary judgment is

---

[17] The Court accordingly does not reach the issue of whether either Exemption One or the Presidential Communications Privilege applies.

granted except as to CENTCOM/027-030 and JS/057-058. The Government is directed to provide those two records for secure *in camera* review by February 13, 2020.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 111 and 117.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 27, 2020
      New York, New York